# 14-2027-cv

*To Be Argued By*:
DANIEL S. RUZUMNA

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

IN RE: 650 FIFTH AVENUE COMPANY AND RELATED PROPERTIES

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR CLAIMANTS-APPELLANTS
## ALAVI FOUNDATION AND 650 FIFTH AVENUE COMPANY
## [REDACTED]

DANIEL S. RUZUMNA
KRISTA D. ADLER
ADAM BLUMENKRANTZ
MELISSA R. GINSBERG
PATTERSON BELKNAP WEBB
    & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Claimants-Appellants
Alavi Foundation and 650 Fifth
Avenue Company*

## CORPORATE DISCLOSURE STATEMENT

The Alavi Foundation is a not-for-profit corporation organized under the laws of New York. The Alavi Foundation has no parent corporation, and no publicly-held corporation owns 10% or more of its stock.

The 650 Fifth Avenue Company is a partnership organized under the laws of New York. The 650 Fifth Avenue Company has no parent corporation, and no publicly-held corporation owns 10% or more of its stock.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................... i

TABLE OF AUTHORITIES .................................................. x

PRELIMINARY STATEMENT ........................................... 1

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION ............................................4

STATEMENT OF THE ISSUES PRESENTED ...................4

STATEMENT OF THE CASE ............................................5

    A.    Procedural History Of This Civil
          Forfeiture Action ...................................................6

        1.    The Forfeiture Complaint And The
             Amended Complaint ........................................6

        2.    Claimants' Inability To Obtain
             Meaningful Discovery.....................................8

        3.    The Suppression And Summary
             Judgment Motions...........................................10

    B.    Relevant Facts For Appellate Review...............13

        1.    The Alavi Foundation Is And Has
             Been A New York Not-For-Profit
             Corporation For Over Forty Years.................13

        2.    The Foundation's Charitable Mission:
             Donating Money And The Use Of Its
             Real Property To U.S.-Based Charities
             And Educational Institutions..........................14

        3.    The Foundation Is Controlled By Its
             Board And President Without Influence
             By The Iranian Government............................15

4. The 650 Fifth Avenue Company Is A Partnership Between Alavi And Assa Corporation That Was Created For Lawful Tax-Savings Purposes ........................16

5. Assa Corporation And Its Changing Ownership Structure Over The Years .............19

6. The Iranian Sanctions: Issuance Of Executive Orders In 1995 And The Promulgation Of The Iranian Transaction Regulations....................................................23

7. ████████████████████
   ████████████████████
   ████████████████████..................................25

8. For Nearly Twenty Years, Iran Has Had No Influence Over Alavi's Operations ...........25

9. Alavi's Other Properties...................................27

SUMMARY OF THE ARGUMENT...................................28

I. The District Court Disregarded Disputed Issues Of Material Fact In Ordering The Forfeiture Of The Defendant Properties ................. 29

II. The District Court Erred In Not Suppressing Evidence Seized In Violation Of Claimants' Fourth Amendment Rights And By Relying On That Evidence In Granting Summary Judgment ................................................................ 34

III. The District Court Erred By *Sua Sponte* Granting Summary Judgment Against Claimants' Statute Of Limitations Defense ............................... 37

IV. The District Court Erred By Ordering The Forfeiture Of Property In Amounts Grossly Disproportional To The Gravity Of The

iii

Alleged Offenses And Constitutionally
Excessive Under The Eighth Amendment .............. 39

ARGUMENT ...................................................................... 41

I.     The District Court Erred In Granting Summary
       Judgment Because There Are Genuine Issues
       Of Material Fact ...................................................... 41

       A.     Applicable Legal Principles For Summary
              Judgment .......................................................... 42

       B.     Material Issues Of Fact Exist As To
              Whether Claimants Knowingly Provided
              Services To Iran In Violation Of
              The IEEPA ........................................................ 43

              1.     The Record Before The District Court
                     Presented A Genuine Issue Of Material
                     Fact As To Bank Melli's Alleged
                     Ownership And Control Of Assa ................... 44

              2.     The District Court Refused To Credit
                     Evidence Demonstrating That Claimants
                     Were Unaware Of Bank Melli's Purported
                     Ownership And Control Of Assa
                     After 1995 ...................................................... 53

              3.     The District Court Failed To Consider
                     Whether Alavi's Alleged Services
                     Were Specifically Intended For Iran .............. 61

       C.     Issues Of Material Fact Exist Concerning
              Whether, And To What Extent, The
              Defendant Properties Constitute Proceeds
              Of Unlawful Activity ......................................... 64

              1.     Legal Standard For The Forfeiture Of
                     Proceeds Of Specified Unlawful
                     Activity .......................................................... 65

iv

2. The District Court Erred In Finding The Foundation's Partnership Interest In The Fifth Avenue Company And The Building To Be Unlawful Proceeds ...............................68

3. The District Court Erred In Holding That The Foundation's Seven Real Properties And Bank Accounts Were Subject To Forfeiture As Proceeds Of The IEEPA Violations ..............................71

D. Issues Of Material Fact Exist Concerning What Defendant Properties, If Any, Were Involved In A Money Laundering Transaction ................................................................77

1. Legal Standard For The Forfeiture Of Property Involved In A Money Laundering Transaction ..................................78

2. The District Court Erred In Finding No Genuine Issue Of Material Fact As To Whether The Defendant Properties Were Involved In A Money Laundering Transaction .....................................................80

E. The District Court Erred By Relying On Inadmissible And Unauthenticated Evidence In Granting Summary Judgment ............................................................83

II. The District Court's Summary Judgment Decisions Must Be Reversed Because The Court Relied On Evidence Seized In Violation Of The Fourth Amendment ......................................86

A. Facts And Circumstances Of The December 2008 Search And Seizure ..................................87

v

1.  The Filing Of The Complaint Against
    Assa's And Assa Ltd.'s Assets; The
    Post-Complaint Protective Order; And
    The Service Of The Grand Jury
    Subpoena On Alavi ........................................87

2.  The Application For And Issuance Of A
    Warrant Permitting A Nearly Limitless
    Search And Seizure Based On A Single
    19-Year Old Transaction.................................88

3.  Execution Of The Unlawful Warrant And
    Seizure Of Virtually All Of Claimants'
    Hard Copy And Electronic Records...............93

4.  Use Of Unlawfully-Seized Evidence In
    Drafting The Amended Complaint And
    Formulating Civil Discovery Requests...........94

5.  The Motion To Suppress And The District
    Court's Order Denying Suppression
    Without A Hearing Or Any Fourth
    Amendment Analysis ......................................96

B.  The December 19, 2008 Search And
    Seizure Violated Claimants' Fourth
    Amendment Rights ............................................97

1.  The Search Warrant Application And
    Attached Affidavit Failed To Establish
    Probable Cause For The Issuance Of
    The Warrant ....................................................99

2.  The Search Warrant Violated The
    Fourth Amendment Because It Lacked
    Particularity And Improperly Authorized
    An Overbroad Seizure Of Documents
    And Electronic Media ...................................102

vi

3. The Government's Execution Of The Search And Seizure Was Unreasonable And Violated The Fourth Amendment .........105

C. The District Court Committed Legal Error In Denying Claimants' Suppression Motion ...............................................................105

1. Claimants' Alleged Preservation, Inspection, And Production Obligations Did Not Obviate The Need For A Fourth Amendment Analysis ....................................106

2. Claimants Did Not "Waive" Their Fourth Amendment Protections By Not Objecting To The Protective Order Or Discovery ........................................................110

3. The District Court's Ruling That The Search Evidence Would Have Been "Inevitably Discovered" Is Legally And Factually Unsupportable ..............................115

D. The Summary Judgment Orders Must Be Reversed Because The District Court Relied On Illegally-Seized Evidence ............................120

III. The District Court Committed Reversible Error By Granting, *Sua Sponte*, Summary Judgment On Claimants' Statute Of Limitations Defense Based On Its Erroneous Ruling That The Statute Had Not Run As A Matter of Law ........................................................................ 121

A. Applicable Law On Statute Of Limitations In Civil Forfeiture Actions ..............................122

B. The Limited Materials Obtained In Discovery Reveal That The Government Knew Of The Alleged Forfeitable Offenses More Than Five Years Before Filing Suit

vii

Against Alavi And The Fifth Avenue
Company ....................................................127

C.    The District Court Erred In Finding As
A Matter Of Law That Discrete IEEPA
Violations Supporting Forfeiture Occurred
After November 12, 2004 ...............................129

    1.    The Foundation Managed The Building
As Part Of Its Continuing Course Of
Conduct ........................................................131

    2.    Managing The Partnership And
Conspiring To Conceal Assa's Identity
Were Not A Series Of Multiple Distinct
Events ..........................................................133

IV.    The Forfeiture Of Claimants' Interests In
The Defendant Properties Was Grossly
Disproportional To The Gravity Of Their
Alleged Conduct And Constitutionally
Excessive............................................................ 139

A.    Proportionality Under The Eighth
Amendment's Excessive Fine Clause
And § 983(g) ...................................................140

B.    The Forfeiture Of The Defendant
Properties Is Punitive And Therefore
Implicates The Eighth Amendment ................141

C.    Forfeiture Of Claimants' Interests In The
Defendant Properties Is Grossly
Disproportional To The Alleged Conduct
And Constitutes An Excessive Fine Under
The Eighth Amendment ..................................144

    1.    Forfeiture Of Claimants' Interests In The
Defendant Properties Was Grossly
Disproportional To The Gravity Of The
Alleged Offenses...........................................144

2.  The Defendant Properties' Nexus To
    The Alleged Offenses Was Largely
    Incidental .......................................................147

3.  Claimants' Culpability Does Not Justify
    Forfeiture Of Their Entire Property
    Interests In The Defendant Properties ...........148

CONCLUSION ...........................................................150

CERTIFICATE OF COMPLIANCE WITH
    RULE 32(a) ....................................................151

ix

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).............................................48

*Auer v. Robbins*,
519 U.S. 452 (1997).............................................51

*Austin v. United States*,
509 U.S. 602 (1993).........................................140

*Bivens v. Six Unknown Named Agents of Fed.*
*Bureau of Narcotics*,
403 U.S. 388 (1971).........................................105

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988).............................................51

*Brink v. Union Carbide*,
210 F.3d 354, 2000 U.S. App. LEXIS 7150
(2d. Cir. Apr. 18, 2000)......................................84

*Chambers v. TRM Copy Ctrs. Corp.*,
43 F.3d 29 (2d Cir. 1994)...................................63

*Chevron, U.S.A., Inc. v. NRDC*,
467 U.S. 837 (1984).............................................51

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012)............................133

*Consarc Corp. v. Iraqi Ministry*,
27 F.3d 695 (D.C. Cir. 1994) ................ 50-51, 52

x

*Coolidge v. New Hampshire*,
    403 U.S. 443 (1971) .........................................103

*Dickerson v. Napolitano*,
    604 F.3d 732 (2d Cir. 2010) ...............................81

*FDIC v. Giammettei*,
    34 F.3d 51 (2d Cir. 1994) ..................................126

*G.M. Leasing Corp. v. United States*,
    429 U.S. 338 (1977) .........................................107

*Garcia v. Hartford Police Dep't*,
    706 F.3d 120 (2d Cir. 2013) ........................43, 48

*Gelb v. Bd. of Elections*,
    224 F.3d 149 (2d Cir. 2000) ...................54, 63, 80

*Giannullo v. City of New York*,
    322 F.3d 139 (2d Cir. 2003) ...............................58

*Groh v. Ramirez*,
    540 U.S. 551 (2004) .........................................103

*Harris v. City of New York*,
    186 F.3d 243 (2d Cir. 1999) .............................123

*Herring v. United States*,
    555 U.S. 135 (2009) .........................................111

*Howley v. Town of Stratford*,
    217 F.3d 141 (2d Cir. 2000) ...............................56

*Illinois v. Gates*,
    462 U.S. 213 (1983) .........................................102

*Isabella v. Kooubek*,
    733 F.3d 384 (2d Cir. 2013)...............................49

*Jackson v. Fed. Exp.*,
    No. 12 Civ. 1475, 2014 U.S. App.
    LEXIS 17387 (2d Cir. Sept. 9, 2014)................42

*Koon v. U.S.*,
    518 U.S. 81 (1996)...........................................126

*Ledbetter v. Goodyear*,
    550 U.S. 618 (2007).........................................138

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997).............................48

*Lipton v. Nature Co.*,
    71 F.3d 464 (2d Cir. 1995).................................54

*Mancusi v. DeForte*,
    392 U.S. 364 (1968).........................................107

*Maryland v. Garrison*,
    480 U.S. 79 (1987)...........................................102

*Mastrio v. Sebelius*,
    No. 13 Civ. 2529, 2014 U.S. App.
    LEXIS 17837 (2d Cir. Sept. 17, 2014).............126

*Matusick v. Erie County Water Auth.*,
    739 F.3d 51 (2d Cir. 2014).................................52

*Merck & Co. v. Reynolds*,
    559 U.S. 648 (2010).........................................122

*Mohasco Corp. v. Silver*
    447 U.S. 807 (1980).........................................138

xii

*Murray v. United States*,
  487 U.S. 533 (1988) .........................................120

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) .........................................123

*Nathanson v. United States*,
  290 U.S. 41 (1933) ...........................................102

*Nix v. Williams*,
  467 U.S. 431 (1984) .........................................116

*O'Connell v. Shalala*,
  79 F.3d 170 (1st Cir. 1996) ...............................51

*One 1958 Plymouth Sedan v. Pennsylvania*,
  380 U.S. 693 (1965) ...........................98, 107, 108

*Pa. Bd. of Prob. & Parole v. Scott*,
  524 U.S. 357 (1998) .........................................113

*Ramsey v. Coughlin*,
  94 F.3d 71 (2d Cir. 1996) .................................130

*Rhodes-Bradford v. Keisler*,
  507 F.3d 77 (2d Cir. 2007) ................................51

*Rule v. Brine, Inc.*,
  85 F.3d 1002 (2d Cir. 1996) ..............................42

*Scholastic, Inc. v. Harris*,
  259 F.3d 73 (2d Cir. 2001) ................................59

*SecuraComm Consulting, Inc. v.
  Securacom, Inc.*,
  166 F.3d 182 (3d Cir. 1999) ..............................57

xiii

*Shomo v. City of New York*,
  579 F.3d 176 (2d Cir. 2009)............................123

*Silverthorne Lumber Co. v. United States*,
  251 U.S. 385 (1920)..........................................119

*Spiegel v. Schulmann*,
  604 F.3d 72 (2d Cir. 2010).................................42

*Stichting Ter Behartiging Van De Belangen*
  *Van Oudaandeelhouders in Het Kapitaal*
  *Van Saybolt Int'l B.V. v. Schreiber*,
  407 F.3d 34 (2d Cir. 2005)....................43, 49, 60

*Sudler v. City of New York*,
  689 F.3d 159 (2d Cir. 2012).......................42, 126

*Swatch Grp. Mtmt. Servs. Ltd. v. Bloomberg*,
  742 F. 3d 17 (2d Cir. 2014).............................130

*United States v. $515,060.42 in U.S. Currency*,
  152 F.3d 491 (6th Cir. 1998)....122, 123, 132, 136

*United States v. 500 Delaware St.*,
  113 F.3d 310 (2d Cir. 1997).......................98, 108

*United States v. 5443 Suffield Terrace,*
  *Skokie, Ill.*,
  607 F.3d 504 (7th Cir. 2010)................... 124, 134

*United States v. Abboud*,
  438 F.3d 554 (6th Cir. 2006)...........................104

*United States v. Anguilo*,
  897 F.2d 1169 (1st Cir. 1990)...........................66

xiv

*United States v. Approximately 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others*,
No. 03 Civ. 8004 (GBD), 2008 U.S. Dist. LEXIS 67452 (S.D.N.Y. Sept. 5, 2008)............66

*United States v. Bajakajian*,
524 U.S. 321 (1998)............... 139, 140, 142, 146

*United States v. Banco Cafetero Panama*,
797 F.2d 1154 (2d Cir. 1986)............................77

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2011)...........................54, 62

*United States v. Bianco*,
998 F.2d 1112 (2d Cir. 1993)..................103, 104

*United States v. Black*,
526 F. Supp. 2d 870 (N.D. Ill. 2007) ...............68

*United States v. Calandra*,
414 U.S. 338 (1974).........................................111

*United States v. Capoccia*,
503 F.3d 103, 116 (2d Cir. 2007)......................66

*United States v. Castello*,
611 F.3d 116 (2d Cir. 2010)............................145

*United States v. D'Andrea*,
648 F.3d 1 (1st Cir. 2011) ...............................110

*United States v. Diaz*,
841 F.2d 1 (1st Cir. 1988) ...............................104

xv

*United States v. Eng*,
   971 F.2d 854 (2d Cir. 1992).....116, 117, 118, 119

*United States v. Eng*,
   997 F.2d 987 (2d Cir. 1993)............113, 115, 117

*United States v. Evanson*,
   No. 05 Cr. 805 TC, 2008 U.S. Dist.
   LEXIS 58981 (D. Utah Aug. 4, 2008) ..............69

*United States v. Falso*,
   544 F.3d 110 (2d Cir. 2008)...........................101

*United States v. Galpin*,
   720 F.3d 436 (2d Cir. 2013)...........................103

*United States v. George*,
   975 F.2d 72 (2d Cir. 1992)......................102, 103

*United States v. Getto*,
   729 F.3d 221 (2d Cir. 2013)..............................97

*United States v. Haleamau*,
   887 F. Supp. 2d 1051 (D. Haw. 2011) ..............68

*United States v. Harris,*
   79 F.3d 223 (2d Cir. 1996)......................135, 136

*United States v. Heath*,
   455 F.3d 52 (2d Cir. 2006).......113, 115, 116, 117

*United States v. Homa Int'l Trading Corp.*,
   387 F.3d 144 (2d Cir. 2004)........................54, 62

*United States v. Horak*,
   833 F.2d 1235 (7th Cir. 1987)...........................66

*United States v. Kow*,
   58 F.3d 423 (9th Cir. 1995)..............................104

*United States v. Kubrik,*
   444 U.S. 111 (1979) .........................................124

*United States v. Kivanc,*
   714 F.3d 782 (4th Cir. 2013)............ 124-125, 135

*United States v. Leon*,
   468 U.S. 897 (1984) .........................................111

*United States v. MacPherson*,
   424 F.3d 183 (2d Cir. 2005)..............................81

*United States v. Matias*,
   836 F.2d 744 (2d Cir. 1988)............................105

*United States v. McCarthy*,
   271 F.3d 387 (2d Cir. 2001)..............................79

*United States v. Napoli,*
   54 F.3d 63 (2d Cir. 1995)..................................78

*United States v. Ness*,
   565 F.3d 73 (2d Cir. 2009)................................80

*United States v. Ofchinick*,
   883 F.2d 1172 (3d Cir. 1989).....................66, 67

*United States v. One Lincoln Navigator 1998*,
   328 F.3d 1011 (8th Cir. 2003)..........................52

*United States v. Payne*,
   591 F.3d 46 (2d Cir. 2010)......................123, 136

xvii

*United States v. Pole No. 3172, Hopkinton*,
  852 F.2d 636 (1st Cir. 1988) ............................. 66

*United States v. Porcelli*,
  865 F.2d 1352 (2d Cir. 1989) ............................ 66

*United States v. Rem*,
  38 F.3d 634 (2d Cir. 1994) ................................ 61

*United States v. Riccardi*,
  405 F.3d 852 (10th Cir. 2005) .......................... 103

*United States v. Santos*,
  553 U.S. 507 (2008) .......................................... 79

*United States v. Schlesinger,*
  396 F. Supp. 2d 267 (E.D.N.Y. 2005) ......... 67, 80

*United States v. Sum of $185,336.07*
  *United States Currency*,
  731 F.3d 189 (2d Cir. 2013) ............. 140-141, 142

*United States v. Tilley,*
  18 F.3d 295 (5th Cir. 1994) ............................ 143

*United States v. Van Alstyne*,
  584 F.3d 803 (9th Cir. 2009) ............................ 79

*United States v. Ventresca*,
  380 U.S. 102 (1965) ................................ 100, 101

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990) ........................................ 107

*United States v. Wagner*,
  989 F.2d 69 (2d Cir. 1993) .............................. 101

xviii

*United States v. Waker*,
　534 F.3d 168 (2d Cir. 2008)............................103

*United States v. Walsh*,
　712 F.3d 119 (2d Cir. 2013)..............................77

*United States v. Wittig*,
　333 F. Supp. 2d 1048 (D. Kan. 2004) ...............66

*von Hofe v. United States*,
　492 F.3d 175 (2d Cir. 2007)......................*passim*

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,
　373 F.3d 241 (2d Cir. 2004).........................42, 64

*Ybarra v. Illinois*,
　444 U.S. 85 (1979)..........................................100

## STATUTES

18 U.S.C. § 981...............................................*passim*

18 U.S.C. § 983...............................................*passim*

18 U.S.C. § 984...............................................76, 77

18 U.S.C. § 1956.............................................*passim*

18 U.S.C. § 1957...................................................78

18 U.S.C. § 1960...................................................78

19 U.S.C. § 1621.............................................*passim*

21 U.S.C. § 881...................................................77

28 U.S.C. § 1291...................................................4

28 U.S.C. § 1345 ......................................................4

28 U.S.C. § 1355 ......................................................4

50 U.S.C. § 1701 ......................................................6

I.R.C. § 501 ..........................................................13

N.Y. N-PCL § 501 ...................................................13

N.Y. N-PCL § 510 ...................................................17

N.Y. N-PCL § 511 ...................................................17

N.Y. N-PCL § 601 ...................................................13

## OTHER AUTHORITIES

26 C.F.R. § 1.501 ...................................................13

31 C.F.R. § 560 ..................................................6, 89

31 C.F.R. § 560.204 ..........................................  24, 62

31 C.F.R. § 560.301 ...............................................24

31 C.F.R. § 560.313 ...............................................63

U.S.S.G. § 8C2 ...................................................146

Fed. R. App. P. 4 ....................................................4

Fed. R. Civ. P. 54 ...............................................4, 12

Fed. R. Civ. P. 56 .............................................61, 130

Fed. R. Civ. P., Supp. R. Adm. G ...................52, 119

xx

Fed. R. Crim. P. 12....................................................114

Fed. R. Crim. P. 41....................................................108

American Heritage Dictionary of the English
    Language 1064 (5th Ed. 2011)..........................130

## PRELIMINARY STATEMENT

This appeal arises from a judgment ordering the forfeiture of properties belonging to a forty-year old New York charity and a real estate partnership of which the charity is the majority partner.  The Alavi Foundation ("Alavi" or the "Foundation") is a New York not-for-profit corporation with a charitable mission to promote and support Islamic culture and the study of Persian language, literature, and civilization in the United States.  Alavi fulfills this mission largely by financially supporting various educational, religious, and cultural institutions throughout the United States, including community centers, schools, and major universities like Columbia University, Harvard University, and Sacred Heart University.  A number of nonprofit organizations also depend on the rent-free use of Alavi's real properties for their charitable and educational missions.

The 650 Fifth Avenue Company (the "Fifth Avenue Company" or the "Partnership") is a partnership established in 1989 for the purpose of holding title to a 36-story office tower located at 650 Fifth Avenue in midtown Manhattan (the "Building").  Alavi is the majority partner of the Fifth Avenue Company, and its minority partner is Assa Corporation ("Assa"), a New York corporation wholly owned by a company based in Jersey in the Channel Islands called Assa Company Limited ("Assa Ltd.").

In the underlying forfeiture action, the Government has alleged, and the District Court found, that Assa Ltd. is owned and controlled by an Iranian bank, Bank Melli, which has been "blocked" from doing business in the United States. Official records from the Jersey Financial Services Commission, however, show that Bank Melli transferred its indirect ownership in Assa Ltd. in 1995, and that it has had no ownership interest in Assa Ltd. since that time.

In November 2009, the Government brought this civil forfeiture action against Alavi's and the Fifth Avenue Company's interests in several defendants-*in-rem*, alleging that Alavi provided services to its partner, Assa, in violation of the International Emergency Economic Powers Act ("IEEPA") and the Iranian Transaction Regulations ("ITRs"). The Government alleged that the defendants-*in-rem*, including Alavi's interest in the Partnership, the Building, seven other real properties, and several bank accounts (the "Defendant Properties") were subject to forfeiture as proceeds of Alavi's unlawful services (*i.e.*, IEEPA violations) and as property involved in money laundering transactions. Alavi and the Fifth Avenue Company (collectively, "Claimants") timely filed claims to the Defendant Properties, denying, among other things, that they ever knowingly provided services to Bank Melli.

The parties litigated this forfeiture action for the next five years. Though the forfeiture claims were predicated on alleged violations of the IEEPA and the ITRs, the Government's evidence overwhelmingly related to conduct *before* 1995, the year when the first of the relevant Executive Orders imposing sanctions on Iran was issued. The Government's *post*-1995 evidence was minimal and simply did not show that Alavi knowingly provided services to Bank Melli or any other Iranian entity. Despite the limited evidence from the relevant time period, only days before a six-week trial was scheduled to begin, the District Court granted summary judgment as to the forfeitability of the majority of the Defendant Properties and, *sua sponte*, against Claimants on their statute of limitations defense. Several months later, the District Court granted summary judgment as to the remaining Defendant Properties. In reaching its decisions, the District Court improperly refused to credit, or flat-out ignored, substantial evidence presented by Claimants

2

and disregarded well-established summary judgment principles.

The District Court entered summary judgment in error because disputes of material fact existed as to the Government's theories of forfeiture, as well as to threshold issues, including whether Assa was in fact owned or controlled by Bank Melli after 1995, and if so, whether Alavi was aware of it. With respect to all of these issues, Claimants presented admissible evidence consisting of documents, deposition testimony, and sworn declarations that rebutted the Government's claims. Rather than crediting that evidence and drawing inferences in favor of Claimants as the nonmoving parties, the District Court either refused to give the evidence any weight or to consider it at all. The District Court also improperly relied on materials unlawfully seized from Alavi's offices, having previously denied a motion to suppress the evidence without even conducting a proper Fourth Amendment analysis. These serious legal errors and factual mistakes require reversal of the District Court summary judgment decisions granting forfeiture of the Defendant Properties and denying, *sua sponte*, Claimants' statute of limitations defense.

On May 28, 2014, judgment was entered, forfeiting hundreds of millions of dollars of Claimants' property. The forfeiture judgment was grossly disproportional to the gravity of the alleged conduct, and legally could not have been entered by way of summary judgment.

This Court should reverse the District Court's suppression and summary judgment orders, and vacate the forfeiture judgment.

3

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The Alavi Foundation and the 650 Fifth Avenue Company appeal from summary judgment orders, an order denying suppression, and a final judgment ordering forfeiture of their interests in multiple properties, including an office tower located at 650 Fifth Avenue in midtown Manhattan, real properties at other locations throughout the United States, and several bank accounts, entered pursuant to Federal Rule of Civil Procedure 54(b) in the United States District Court for the Southern District of New York (Forrest, J.) on May 28, 2014. (SPA 181-82.)

Claimants filed a timely notice of appeal on June 6, 2014. (A 4570-73.) Subject matter jurisdiction in the District Court was conferred by 28 U.S.C. §§ 1345 and 1355. This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure Rule 4(a).

## STATEMENT OF THE ISSUES PRESENTED

1. Whether the District Court erroneously granted summary judgment forfeiting the Defendant Properties where genuine issues of material fact exist as to whether Alavi or the Fifth Avenue Company knowingly provided unlawful services to Iran in violation of the International Emergency Economics Powers Act, and further, whether the Defendant Properties constitute the proceeds of such unlawful activity or were involved in a money laundering transaction?

2. Whether the District Court erred in not suppressing evidence unlawfully seized from Claimants' offices based on its finding that the Fourth Amendment was not implicated in this forfeiture action, which was premised on information gleaned from the seized materials, because preservation and discovery obligations purportedly would have required

4

Claimants to produce some of the same materials if they had not already been unlawfully seized years earlier?

3. Whether the District Court erred in granting, *sua sponte,* summary judgment on Claimants' statute of limitations defense, finding as a matter of law that despite ██████████and the "discovery" of the alleged unlawful conduct in the mid-1990s, the statute of limitations for this civil forfeiture action had not run because Claimants' services constituted separate acts, some of which occurred within five years of the filing of the amended complaint?

4. Whether the District Court erred in not reducing the amount of property subject to forfeiture where the forfeiture of Claimants' property interests, including those obtained years before the Iranian sanctions took effect, was grossly disproportional to the gravity of the alleged offenses and constitutionally excessive?

## STATEMENT OF THE CASE

This case involves an appeal from a judgment entered in the United States District Court for the Southern District of New York and several underlying orders, forfeiting property owned by two New York entities—Alavi, a charity established as a New York not-for-profit corporation in 1973, and the Fifth Avenue Company, a New York partnership formed in 1989 for the purpose of holding title to the Building located at 650 Fifth Avenue—under the federal civil forfeiture statute, 18 U.S.C. § 981. This case was heard in the District Court by the Honorable Katherine B. Forrest, after having been reassigned from the Honorable Richard J. Holwell in 2012.

5

## A. Procedural History Of This Civil Forfeiture Action

### 1. The Forfeiture Complaint And The Amended Complaint

On December 17, 2008, the Government filed a civil forfeiture complaint (the "Complaint") in the Southern District of New York seeking forfeiture of property belonging to Assa, a New York corporation, and its parent company, Assa Ltd., a corporation formed in 1989 in the Channel Islands, alleging that both entities were owned and controlled by an Iranian government bank called Bank Melli. (A 4578-99.) In 1997, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") designated Bank Melli as a Specially Designated National ("SDN") and blocked all of its assets in the United States. (A 4584.) The Complaint alleged that Assa's and Assa Ltd.'s property interests were subject to forfeiture as proceeds of violations of the International Emergency Economic Powers Act, codified at 50 U.S.C. § 1701 *et seq.*, and the Iranian Transaction Regulations, 31 C.F.R. Part 560, and as property involved in or traceable to money laundering transactions. (A 4580-81.) Among the properties sought to be forfeited was Assa's minority interest in the Fifth Avenue Company, a partnership between Assa and Alavi. (A 4580.)

The Government filed the Complaint at the same time as it was conducting a parallel criminal investigation of the same issues. On the same date the Complaint was filed, the Government served a grand jury subpoena on Alavi, requiring the production of documents related to Assa, Assa Ltd., the Fifth Avenue Company, and Bank Melli from January 1, 1989 to the present. (A 4886-90.) Alavi had been the partner of Assa in the Fifth Avenue Company since the Partnership's formation in 1989. (A 6226-66.)

6

On December 19, 2008, two days after the grand jury subpoena was served, the Government obtained and executed a warrant to search Alavi's offices and seized virtually every shred of paper and electronic storage device maintained by the Foundation, including documents over thirty years old. (A 5140-81; A 4890-940.) Though they were not provided to Alavi until more than three years after the search, the search warrant application and the accompanying affidavit contained no facts to establish probable cause that the Foundation committed an unlawful act, or that evidence of a crime would be found at the premises to be searched. (*See* A 5140-81.) Additionally, the search warrant itself lacked particularity, authorizing a virtually limitless search without describing the items to be seized, the suspected violation for which evidence was being sought, or the temporal scope of documents to be seized.

On November 12, 2009, after spending almost a year reviewing the unlawfully-seized materials, the Government filed an amended forfeiture complaint (the "Amended Complaint") premised on the seized documents. (A 2423-2519.) The Amended Complaint sought forfeiture of properties belonging to Alavi and the Fifth Avenue Company (*i.e.*, the Defendant Properties). (*Id.*) Like the initial Complaint, the Amended Complaint alleged that the Defendant Properties were subject to forfeiture as proceeds of IEEPA violations and as property involved in money laundering transactions. (A 2427-28.) The Amended Complaint alleged that, since 1995, the Foundation provided unlawful services to Assa and Assa Ltd., knowing of their alleged ownership by Bank Melli. (A 2439.) Despite the fact that all but one of Alavi's real properties were purchased years before the Iranian sanctions went into effect in 1995, the Government averred that the properties were the "proceeds" of Alavi's unlawful services and were involved in money laundering transactions. (A 2427-28.)

7

The vast majority of evidence cited in the Amended Complaint consists of letters and documents from the 1980s and early 1990s, before the Iranian sanctions—established by Executive Orders and the ITRs—went into effect. These materials suggest that in the years after the Iranian Revolution of 1979, the Iranian government sought to influence Alavi's operations and was involved in the formation of the Fifth Avenue Company in 1989. (A 2443-64.) The allegations concerning events after 1995, when the relevant sanctions first took effect, refer only to a handful of meetings that Iranian ambassadors to the United Nations had with a Foundation Board member and its former president over a decade-long period and assistance that the Iranian ambassador provided in mediating a dispute. (A 2464-75.) The minimal evidence regarding post-1995 conduct came largely from the unlawful search of Alavi's offices in December 2008 and evidence derived from that search. (*See, e.g.*, A 2466-72.)

## 2. Claimants' Inability To Obtain Meaningful Discovery

In the years following the filing of the Amended Complaint, the forfeiture action proceeded slowly as the Government continued poring through the illegally-seized evidence and prepared for civil discovery. Despite Claimants' document requests (served in May 2011), the Government refused to produce a single document in discovery for nearly a year, and delayed several months more before producing any of the Government's investigative files. (*See* A 2617-71; A 2811-48.) When those files were finally produced, after repeated extensions of the discovery deadline, they were so heavily redacted that they were virtually impossible for Claimants to use in preparing to rebut the Government's proof. (A 9959-9980.) Many other documents were entirely withheld, based on unsupported claims of law enforcement privilege and

8

deliberative process privilege, or simply because the Government was unable to complete its production of materials within the time permitted by the District Court. (A 9981-84; A 10049-51.) Claimants' proposals to undergo security clearance review or submit to other previously-employed procedures to allow Claimants' counsel to review the Government's evidence were summarily rejected. (*See, e.g.* SDNY Dkt. No. 547.)

Some of the documents the Government refused to produce, with the District Court's approval, were those documenting  (A 10981.) The withheld evidence ███████████ was critical for Claimants to offer at trial a statute of limitations defense because the civil forfeiture statute of limitations provides that where the Government *discovers or reasonably should have discovered* a continuing crime more than five years before filing a civil forfeiture action, the forfeiture action must be dismissed as untimely. *See* 19 U.S.C. § 1621. Nonetheless, the District Judge refused to order the Government to produce records of ███████ ███████████ and issued a protective order preventing Government witnesses from being deposed regarding ███ ███████████ (A 3259-66; A 3271-73.)

9

### 3. The Suppression And Summary Judgment Motions

On July 1, 2013, two-and-a-half months before trial was scheduled to begin, Claimants filed a motion to suppress evidence unlawfully seized from their offices in December 2008. (A 3155.) Claimants alerted the District Court of its intention to file the motion over a year earlier, but stated that they were waiting for the Government to complete document discovery so that all documents potentially subject to suppression—either as unlawfully seized documents or as "fruits" of the unlawfully-seized evidence—could be identified. (A 2636-37.) Additionally, the Government did not produce the search warrant application until three-and-a-half years after the warrant was executed. (A 12089-90.) On September 9, 2013, the District Court denied the motion, ruling, without any constitutional analysis, that the Fourth Amendment was "not implicated" in the forfeiture action and refusing to hold a hearing to determine what evidence from the search, if any, would have been inevitably discovered absent the illegal seizure. (SPA 1-18.)

Also in the lead up to trial, the parties to the forfeiture action filed motions for summary judgment. Despite the fact that the Government was still producing documents in discovery and that Claimants' depositions of Government witnesses had not yet been completed, the District Court ordered all summary judgment motions to be filed on August 16, 2013, so that briefing could be completed before the September 16, 2013 trial date. Claimants moved for summary judgment as to one of the Government's theories of forfeiture—the theory that the Foundation and the Fifth Avenue Company violated the ITRs in their every-day operations because they were allegedly controlled by Iran. (A 3212.) As Claimants' motion demonstrated, the Government's evidence of purported control consisted almost exclusively of documents from the 1980s and early

10

1990s, before the Iranian sanctions went into effect, and a few pieces of largely innocuous or ambiguous evidence from after 1995 that in no way showed Iranian control. (*See* A 6665-6686.) Claimants presented declarations and testimony from Alavi's employees and a former director establishing that the Foundation was an independent organization not subject to outside interference. (*See id.*)

The Government moved for summary judgment as to the forfeitability of the Defendant Properties, arguing that they were the "proceeds" of Alavi's building management services and its services in concealing Bank Melli's purported minority ownership interest in the Building. (A 3213.) The Government also argued that the Defendant Properties were involved in promotion, concealment, and international money laundering transactions because the Fifth Avenue Company generated and transferred rental income from the Building to its partners (Alavi and Assa). (A 9910-37.) In opposition, Claimants noted the multitude of genuine issues of material fact. (A 10746-99.) Alavi and the Fifth Avenue Company offered official corporate records proving that Bank Melli had divested its ownership interest in Assa in 1995, that Alavi did not know Assa's ownership in 1995 or after, and that the Defendant Properties were neither the proceeds of IEEPA violations nor involved in a money laundering transaction. (*See id.*)

On September 11, 2013, just days before trial, the District Judge informed the parties by teleconference that she planned on granting the Government's motion for summary judgment, which would result in the forfeiture of Claimants' interests in Fifth Avenue Company and the Building. On September 12, 2013, the District Court issued an Order reflecting its decision, and on September 16, 2013, the District Court filed its Opinion and Order granting summary judgment as to the forfeitability of the Fifth Avenue Company, the Building, and a number of bank accounts.

11

(SPA 20-103.)   The District Court reserved decision on Alavi's other properties, stating that the Government had not presented evidence justifying forfeiture of those Defendant Properties, and permitting further briefing.

After additional briefing, on March 28, 2014 (with an amended opinion issued on April 18, 2014), the District Court held that the remaining Defendant Properties owned by the Foundation were also subject to forfeiture in part or in full.  The District Court granted forfeiture of the entirety of Alavi's bank accounts and, with respect to seven real properties owned by Alavi, the District Court granted forfeiture in amounts even greater than those sought by the Government.  (SPA 104-69.)   Finally, the District Court rejected a petition Alavi filed under 18 U.S.C. § 983(g) to limit the forfeiture of the Defendant Properties to avoid a violation of the Eighth Amendment's Excessive Fines Clause, finding that the Building and other Defendant Properties were proceeds of IEEPA violations and not constitutionally excessive, despite the fact that the Foundation had obtained all but one parcel of the Properties prior to the imposition of the relevant sanctions.  (SPA 170-76.)

On May 27, 2014, the District Court directed the Clerk of Court to issue Rule 54(b) final judgment as to the forfeitability of Alavi's and Fifth Avenue Company's interests in the Defendant Properties; judgment was entered on May 28, 2014.  (SPA 178-92.)   On June 6, 2014, Claimants timely filed their notice of appeal.  (A 4570-71.)

12

## B. Relevant Facts For Appellate Review

### 1. The Alavi Foundation Is And Has Been A New York Not-For-Profit Corporation For Over Forty Years

Alavi is a not-for-profit corporation organized under the laws of New York State and under the supervision of the New York Attorney General's Office. (A 5953-79; A 6662-64.) It is also recognized as a charitable organization under § 501(c)(3) of the Internal Revenue Code. (A 5846-57; A 6322-24.) The Foundation was established in 1973 by the Shah of Iran, Shah Mohammad Reza Pahlavi, as the Pahlavi Foundation. After the Shah was deposed, Alavi was renamed the Mostazafan Foundation of New York in 1980, and then the Alavi Foundation in 1992. (A 5953-85; A 6662-64.) Alavi does not have—and has never had—any owners, members, or shareholders. (A 5605-44; A 6563-68.) As a matter of New York not-for-profit law, the Foundation is not and cannot be owned by any individual or entity, including the Iranian government or any other Iranian entity. *See* N.Y. N-PCL §§ 501, 601.

In Alavi's forty-year history, the New York Attorney General's Office has never taken any action against it or its directors, officers, or employees, or sought to discipline the Foundation in any way. (A 5626-27.) The New York Attorney General's Office also has never taken steps to dissolve Alavi or otherwise remove its corporate status. (A 5627.) Even today, it remains a non-profit corporation in good standing. (A 5626-27.)

As a New York not-for-profit corporation, Alavi is prohibited from generating a profit for itself or for the members of Alavi's Board of Directors (the "Board"), officers, or employees. I.R.C. § 501(c)(3) (2013); 26 C.F.R. § 1.501(c)(3)-1(c).

13

2. **The Foundation's Charitable Mission: Donating Money And The Use Of Its Real Property To U.S.-Based Charities And Educational Institutions**

Since its inception, Alavi's mission has been to promote and support Islamic culture and the study of Persian language, literature, and civilization in the United States. Its Certificate of Incorporation states that the purpose of the Foundation is, *inter alia*, to "render support and assistance for the study and promotion of the arts and sciences," to "contribute to religious instructions regardless of creed for the purpose of promoting understanding and harmony among persons of all faiths," and to support "established charitable, philanthropic, educational and civic endeavors." (A 5971-72.)

Alavi fulfills this mission by financially supporting various educational, religious, and cultural programs. (A 5953-79; A 6563-68; A 6650-53.) These activities include making grants to colleges and universities; donations to Persian schools and Islamic organizations; and grants to Persian art and literature programs. (A 5882-952; A 6563-68; A 6650-53.) The Foundation's grants and loans are directed to charitable entities and individuals in the United States or, in a few cases, entities in Canada. (A 12063-82.) Alavi has also provided on an annual basis donations to a number of colleges and universities, including Columbia University, Harvard University, Rutgers University, and Sacred Heart University, among others. (A 6638.) The Foundation has also been involved in humanitarian projects such as helping victims of earthquakes, hurricanes, and floods in different parts of the world. (A 6565.)

The Foundation owns several real properties throughout the United States that it provides on a rent-free basis to community organizations to use for religious, educational, and health care purposes, including properties in Queens,

14

New York; Rockville, Maryland; Carmichael, California; and Houston, Texas. (A 3981-4054.) The Queens Center, for example, houses the Islamic Institute of New York, an institution where community members come to practice their religion and congregate, and the Razi School, a not-for-profit school created to educate children in an Islamic environment. (A 3992-4002; A 4014-23.) The Maryland Center houses the Islamic Education Center, which operates a mosque, and the Muslim Community School, a not-for-profit educational corporation. (A 4049.)

As part of its charitable mission, Alavi allows nonprofit organizations to use its properties without payment of rent, exclusively for their charitable purposes. (A 3981-4054; A 4063-123.) To help defray their expenses, Alavi has for years donated funds to the nonprofit organizations. (A 12063-82.) The community has also contributed to the centers' upkeep—paying for maintenance, repairs, and some improvements. (*See, e.g.,* SDNY Dkt. No. 992-13.)

### 3. The Foundation Is Controlled By Its Board And President Without Influence By The Iranian Government

Pursuant to its bylaws, Alavi's Board has "the general power to manage and control the affairs of the Foundation." (A 6641; A 6270; A 6565-66.) The Board selects the officers and any new directors of the Foundation in accordance with its bylaws. (A 6565-66; A 6269-70; A 6275; A 6641-44.) The President of the Foundation is the chief executive officer, responsible for supervising its operations and its employees. (A 6645; A 6276.) The President serves subject to the control of the Board. (*Id.*)

Alavi was and is operated and controlled by its Board and its employees, who serve the interests of the Foundation. At all relevant times prior to this litigation, decisions regarding Alavi's operations—charitable, management, personnel, and

15

otherwise—were made by the Board and President on behalf of the Foundation and nobody else. Alavi's Board determined which charities would receive donations; the Iranian government did not participate in, let alone control, its charitable decision-making. (A 5703-06; A 6653.) The donations themselves were made on behalf of the Foundation and not for, or on behalf of, Iran. (A 5706.) Neither the Iranian government nor any Iranian official influenced how Alavi's programs were managed or operated, or how its funds were allocated. (A 6653.)

Alavi, through the Fifth Avenue Company, holds an ownership interest in and manages the Building in midtown Manhattan. The vast majority of the Foundation's activities are funded by the rental income generated from the Building. (A 6566.) Alavi neither receives funds from the government of Iran nor provides funds to it. (A 6566.) The Foundation manages its own assets and chooses its own employees, without any influence from the Iranian government. (A 6566-67.)

### 4. The 650 Fifth Avenue Company Is A Partnership Between Alavi And Assa Corporation That Was Created For Lawful Tax-Savings Purposes

In 1974, Alavi acquired property located at 650 Fifth Avenue, New York, New York, pursuant to a mortgage. (A 5869-70; A 6163-80.) In 1975, Alavi borrowed $42 million from Bank Melli, an Iranian bank with offices in New York, to retire the existing mortgage on the property and to construct an office tower on the property—the Building. (A 6163-6199.) Although Alavi was then and remains today a tax-exempt non-profit organization, the fact that the property was debt-financed caused Alavi's rental receipts from the Building to be taxed as debt-financed unrelated business taxable income. (A 6151.)

16

In 1989, Alavi and Assa formed the Fifth Avenue Company, a partnership under New York State law. (A 5846-57; A 6226-66.) Under a partnership agreement entered into on July 31, 1989, Alavi contributed the Building, valued at $83,200,000, to the Fifth Avenue Company, and Assa contributed $44.8 million, which was used to satisfy the mortgages extended by Bank Melli. (A 6147-55; A 6226-66.) By eliminating the Bank Melli mortgages, this transaction (the "1989 Partnership Transaction") freed Alavi from paying unrelated business income tax on the Building's rental receipts. (A 6147-55.)

As is required whenever a New York not-for-profit corporation divests a substantial portion of its assets, *see* N.Y. N-PCL §§ 510, 511, Alavi notified its regulating authority, the Charities Bureau of the New York Attorney General's Office, of its intent to transfer its ownership interest in the Building, and sought the Attorney General's consent. (A 5625.) Alavi described the substantial tax savings as the primary motivation for the transaction, explaining that due to the Bank Melli mortgages on the Building, "virtually all of the Foundation's net rental income (*i.e.*, virtually all of the Foundation's income) is taxable . . . as unrelated business income." (A 6151.) Alavi stated that, "[i]n order to relieve itself of the liability represented by the Mortgages and to eliminate the annual burden of unrelated business income tax on the income from the [Building], the Foundation proposes to contribute the [Building] . . . to a partnership," and that a contribution from a partner "is expected to be used to discharge the Mortgages, which discharge would free the Foundation from its unrelated business income tax liability." (A 6152.) With the Attorney General's consent, on October 23, 1989, the Foundation sought and obtained approval by the Supreme Court of the State of New York, New York County, to transfer its ownership of the Building in exchange for a majority interest in the Fifth Avenue Company. (A 6156-60.)

17

Based on their respective contributions, Alavi received a 65% interest and Assa received a 35% interest in the Fifth Avenue Company. (A 6231.) Subsequently, the Foundation sold 5% of its interest in the Partnership to Assa. (A 5597.) Accordingly, at the time the Amended Complaint was filed, Alavi owned a 60% interest in the Fifth Avenue Company, while Assa maintained a 40% interest. (A 5597.)

The Government has introduced documents from the late 1980s and early 1990s to suggest that Bank Melli, the mortgagor of the property located at 650 Fifth Avenue, was involved in establishing the Fifth Avenue Company in connection with the 1989 Partnership Transaction. These same documents do not, however, indicate ongoing ownership and control of Assa by Bank Melli.

Government witness 

18

(A 10395.)

Alavi served as the managing partner of the Fifth Avenue Company from its inception. (A 6226-66; A 6563-68.) Prior to the Government's forfeiture action, Alavi administered the day-to-day business and affairs of the Fifth Avenue Company, including the management of the Building. (A 6266-66; A 6563-68.) Assa played no role in the daily management and affairs of the Fifth Avenue Company or the Building. (A 6226-66; A 6563-68.) The Fifth Avenue Company has never had any employees, and has contracted for management services from established real estate management companies operating in New York. (A 6563-68.) Pursuant to the partnership agreement, Alavi and Assa received distributions from the income of the Fifth Avenue Company "on a pro rata basis" based on their respective percentage interests each calendar quarter. (A 6226-66.) The Fifth Avenue Company made its last quarterly distribution to Assa on December 5, 2007.[1] (*See* SDNY Dkt. No. 689 at 44.)

### 5. Assa Corporation And Its Changing Ownership Structure Over The Years

Assa is a corporation duly-formed under New York State law, and is wholly owned by Assa Ltd., a corporation domiciled in Jersey, Channel Islands. (A 5594-604;

---

[1] The District Court incorrectly stated that the Fifth Avenue Company made quarterly distribution payments to Assa "until December 1, 2008." (SPA 45.) The document that the District Court cited does not support this proposition (*see* A 7182-777), and the Government has admitted that the last distribution to Assa was made on December 5, 2007 (*see* SDNY Dkt. No. 689 at 44).

19

A 5858-65.)  Corporate records from Jersey show that from 1989 to 1999, Assa Ltd. was owned by Harter Holdings Ltd. (A 10303-25.)  Until 1992, Harter Holdings, in turn, was held primarily by two individuals, Mohammad Hossein Behdadfar and Mohsen Kakavand, who each held 49% of the shares. (A 10345-53.)

In 1993, Behdadfar's and Kakavand's interests in Harter Holdings were together transferred to Bank Melli, where they remained until 1995.  (A 10354-59.)  In 1995, ownership of Harter Holdings transferred from Bank Melli to two individuals, Davood Shakeri and Fatemeh Aghamiri, who each held 50% of the shares. (A 10360-61.)  In 1998, Harter Holdings was removed from Assa's ownership structure, and Shakeri and Aghamiri took direct ownership of Assa Ltd.'s shares.  (A 10324-25.)  Since 1995, Shakeri and Aghamiri have been the sole owners of Assa Ltd., either through Harter Holdings or directly. (A 10318-44; A 10360-65.)  Below is a summary of the ownership status of Assa Ltd. and Harter Holdings between 1990 and 2008:

20

| Owners of Assa Ltd. | | Owners of Harter Holdings Ltd. | |
|---|---|---|---|
| **Years** | **Owners** | **Years** | **Owners** |
| 1990-1995 | Harter Holdings (98%) <br> Riviera Nominees Ltd. (1%) <br> Peter Charles St. George (1%) | 1990-1992 | Behdadfar (49%) <br> Kakavand (49%) <br> Riviera Nominees Ltd. (2%) |
| | | 1993-1995 | Bank Melli Iran (98%) <br> Riviera Nominees Ltd. (2%) |
| 1996-1998 | Harter Holdings (98%) <br> Shakeri (1%) <br> Aghamiri (1%) | 1996-1998 | Shakeri (50%) <br> Aghamiri (50%) |
| 1999-2008 | Shakeri (50%) <br> Aghamiri (50%) | | |

(A 10303-10365.)

After divesting its ownership interest in Assa in 1995,



21

A 7135-43.) None of these documents were copied to Alavi or the Fifth Avenue Company, and there is no evidence that any one affiliated with Claimants ever saw them until they were produced in discovery.

Starting in 1995, Alavi engaged in repeated efforts to identify Assa's ownership and to set up a meeting with its directors. The Foundation's efforts to determine Assa's ownership included letters in 1995 specifically asking "Who owns the stock of ASSA Corp." and "Who are the owners or stock holders of ASSA Ltd. of Channel Island?" (A 10694; *see also* A 10691-92 ("Who are [Assa Ltd.'s] owners?").) Again, on November 7, 2003, the Foundation (through its attorneys) asked Assa to identify "the intermediate and ultimate owners and principals of Assa Corp. as well as their countries of origin." (A 10697-98.) While by 2003 the Foundation understood that the directors of Assa were Shakeri, Aghamiri, and Tafti, Alavi requested information concerning Assa Ltd.'s "officers, directors, shareholders and ultimate beneficial owners[.]" (*Id.*) On November 11, 2003, Assa's attorney responded by expressing "surprise" that Alavi was requesting this information because "the parties have been engaged in a partnership enterprise for almost 15 years, and I am sure your clients know the names of the *individuals*." (A 10715 (emphasis supplied).) On November 19, 2003, Assa's counsel, in correspondence to the Foundation, identified Shakeri, Aghamiri, and Tafti as the directors of Assa Ltd., though he still did not identify Shakeri and Aghamiri as the owners. (A 12358-62.) Still unsatisfied with Assa's repeated refusals to answer questions about its owners, the Board discussed Assa's identity at a

22

November 12, 2004 Board meeting and resolved to ask its lawyers to find answers to questions about Assa's identity. (A 12350-51.) The minutes from that Board meeting corroborate that "Assa's identity and related issues" were questions that "the Foundation [would] ask its lawyer to take all steps necessary to ensure that in the future such questions can be answered." (*Id.*)

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████ (A 5722-23.) The Foundation continued its efforts through 2007, when Alavi sent letters trying to set up a meeting with Assa's directors. (A 10708-11.) Though Assa never disclosed all of the requested information, the Fifth Avenue Company partnership agreement provided no means for Alavi to compel Assa to do so or penalty for not doing so. (*See* A 6226-66; A 10691-92.)

### 6. The Iranian Sanctions: Issuance Of Executive Orders In 1995 And The Promulgation Of The Iranian Transaction Regulations

On March 15, 1995, pursuant to the IEEPA, President Clinton issued Executive Order 12,957, stating that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat." Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) (SPA 219). On May 6, 1995, the President issued Executive Order 12,959, which imposed broad financial sanctions on Iran, including a prohibition on "the exportation from the United States to Iran, the Government of Iran, or to any entity owned or controlled by the Government of Iran, or the financing of such exportation, of any goods, technology, . . .

23

or services." Exec. Order 12,959, 60 Fed. Reg. 24,757 (May 6, 1995) (SPA 221).

Pursuant to the IEEPA and Executive Orders Nos. 12,957 and 12,959, the Department of Treasury's OFAC promulgated the Iranian Transactions Regulations (ITRs) that, prohibited United States entities from conducting business or providing services to Iran. As applicable to the Government's claims, § 560.204—which first went into effect on August 20, 1997—prohibits:

> the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran . . .

31 C.F.R. § 560.204 (SPA 228); *see also* 31 C.F.R. § 560.301 (SPA 229). Also in August 1997, President Clinton issued a third Executive Order that revised the restrictions in the previous executive orders by prohibiting all exportation and re-exportation, direct and indirect, with Iran. Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) (SPA 224-27).

24

**7.** 

### 8. For Nearly Twenty Years, Iran Has Had No Influence Over Alavi's Operations

Although Alavi operates independently, the Government alleged that Iranian officials interacted with Alavi or attempted to influence its operations since its incorporation more than forty years ago. The evidence reveals, however, that any purported Iranian influence over the Foundation occurred in the 1980s and early 1990s—*i.e.*, before Iranian sanctions went into effect. Indeed, other than two private meetings with the Iranian ambassador to the United Nations, *all* of the alleged interactions between Alavi and Iranian

25

officials predate even the 1995 Executive Orders limiting interaction with Iran and the issuance of the ITRs.

According to undated journal entries, the Iranian ambassador met with Alavi's president on two occasions at his residence after 1995. (A 9927.) There is no evidence as to how the meetings were set up, their purpose, or what action was taken, if any, as a result of these meetings. One of the meetings at the ambassador's residence occurred in October 2007, and notes from the meeting describe a discussion between Alavi's president, a Board member, and the ambassador regarding Alavi's leadership, its revenue from the Building, and the nature of its charitable giving. (A 9927-28.) There is no evidence to support a finding that Alavi acted at the direction of the Iranian ambassador or altered its plans in any way as a result of his opinions. In fact, though notes from the meeting reflect the ambassador's view that the Foundation's donations should be limited to Shia organizations, Alavi's tax records show that in the following year, 2008, it donated hundreds of thousands of dollars to non-Shia organizations, including the FDNY Foundation, Doctors Without Borders USA, Harvard University, and Sacred Heart University. (A 9927-28; A 11268.) Similarly, although the ambassador allegedly discussed altering the composition of Alavi's Board and increasing its membership, there were no changes in the Board's composition until years later, after the forfeiture case was filed and a court-appointed monitor was put in place. (A 6673-74.) As to the alleged second meeting, neither the Government nor the Iran Creditors offered any evidence concerning the date of the meeting, its purpose, or the topics of discussion. (*See* A 9927.) Other than these two

26

private meetings, the Government offered no evidence suggesting any Iranian influence on Alavi since 1995.[2]

### 9. Alavi's Other Properties

In addition to the Building, Alavi acquired several other properties in the 1980s and 1990s. These included:

1. A parcel of land at 7917 Montrose Road, Rockville, MD 20854, purchased in 1981 (A 11339-47);

2. A parcel of land at 8100 Jeb Stuart Road, Rockville, MD 20854, purchased in 1984 (A 11348-55);

3. A property at 2313 South Voss Road, Houston, TX 77057, purchased in 1988 (A 11360-67);

4. A property at 4836 Marconi Avenue, Carmichael, CA 95608, purchased in 1989 (A11425-427);

5. A parcel of land at 4204 Aldie Road, Catharpin, VA 20143-1133, purchased in 1990 (A 11370-87);

---

[2] The District Court noted that on December 17, 2008, Farshid Jahedi, president of the Foundation at the time, was observed discarding several torn documents into a public trash can. (SPA 5.) Jahedi later pleaded guilty to charges resulting from that conduct and was sentenced to three months' imprisonment. (See *United States v. Jahedi*, 09-cr-00460 (SDNY Dkt. No. 53).) These facts were irrelevant to the resolution of the Government's summary judgment motion: the discarded documents (which were recovered and reconstructed) were not among the evidence submitted by the Government in support of its motion, and the District Court was not permitted to draw inferences against Claimants based on Jahedi's conduct.

27

6. A parcel of land at 4300 Aldie Road, Catharpin, VA 20143-1133, purchased in 1990 (A 11388-406); and

7. A block of lots at 55-11 Queens Boulevard, Queens, NY 11377, purchased in 1991 and 1997 (A 11158; A 11321-32).

Since acquiring these properties, Alavi has made all but the Virginia properties available to nonprofit charitable and educational organizations for their rent-free use. (A 3982-4054; A 4063-4123.) Alavi also provided funding for many of the organizations using these properties. (*See, e.g.*, A 11176-11200.) In addition to funds from Alavi, these community organizations also received significant financial support from their members, congregants, and supporters to pay for maintenance, upkeep, and improvements of the properties. (SDNY Dkt. No. 1025-4 at ¶¶ 2-3, Exs. 1-2; SDNY Dkt. No. 1025-3 at ¶¶ 4-5.)

## SUMMARY OF THE ARGUMENT

Serious errors by the District Court throughout this forfeiture action deprived Claimants of the legal protections guaranteed by law: a trial by jury to resolve disputed issues of material fact and to hold the Government to its burden of proof; the right to be free from unreasonable search and seizure; the ability to present a viable affirmative defense to a jury with adequate access to discovery necessary to support the defense; and protection from excessive fines imposed in violation of the Eighth Amendment. These errors require that the summary judgment and suppression orders be reversed, and the judgment of forfeiture as to Claimants' interests in the Defendant Properties be vacated.

28

I.     **The District Court Disregarded Disputed Issues Of Material Fact In Ordering The Forfeiture Of The Defendant Properties**

The series of errors over the course of this litigation culminated in the District Court's orders granting summary judgment as to the forfeitability of the Defendant Properties, despite the existence of disputed issues of material fact. The Government sought to forfeit the Defendant Properties under two distinct theories:  first, that the Properties constitute or are derived from "proceeds" of specified unlawful activity— here, violations of the IEEPA; and second, that the Properties were involved in money laundering transactions.  As a threshold to establishing forfeiture under either theory, the Government bore the burden of proving that Alavi provided services to Iran, in violation of the IEEPA, or at a minimum, that Claimants caused the transfer of funds with the intent of promoting or concealing IEEPA violations.  To succeed on summary judgment, the Government was required as a threshold matter to offer proof that Assa was owned or controlled by Bank Melli after the Iranian sanctions went into effect, that Claimants were aware of such ownership or control, and that Claimants specifically intended their services to benefit Iran.  And if those threshold determinations were made, the Government still bore the burden on summary judgment to prove that each Defendant Property constituted the proceeds of an IEEPA violation, or that each Property was involved in a money laundering transaction.  For each of these issues, the Government failed to meet its burden; the Government's evidence was substantively disputed and issues of material fact remained.

Initially, there were genuine issues of material fact as to whether Alavi and the Fifth Avenue Company knowingly provided services intended for the benefit of Iran.  Claimants presented substantial evidence that Bank Melli sold or transferred its interest in Assa in 1995—before the Iranian

29

sanctions took effect. This included corporate records obtained directly from the Jersey Financial Services Commission in Jersey, Channel Islands (where Assa's parent, Assa Ltd., was incorporated) demonstrating that from 1995 forward Assa Ltd. was owned by two individuals, Davood Shakeri and Fatemah Aghamiri, *not* Bank Melli. Assa's ownership status in 1995 was also corroborated by the testimony of two ████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Nevertheless, the District Court refused to credit the corporate records evidencing a transfer in ownership, stating without explanation that the records only showed the transfer of "nominal" ownership. The District Court improperly disregarded the corroborating testimony as well, and erroneously concluded that there was no genuine issue of material fact concerning Assa's ownership after 1995.

The District Court disregarded issues of fact on other threshold issues as well. Claimants offered substantial evidence demonstrating that Alavi was unaware of Bank Melli's purported ownership of Assa after 1995. Among other pieces of relevant evidence, Claimants offered deposition testimony from ████████████████████████ ████████████████ (another witness identified by the Government), who testified that ████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████ This testimony was corroborated by a series of letters from Alavi's officers and lawyers to Assa from 1995 to 2007, requesting information about Assa's ultimate

30

beneficial owners and a meeting with these owners. Assa provided only limited information in response; however, Alavi had no ability to compel more. Once again, the District Court refused to credit this testimony. Assuming the role of the jury, the District Court rejected Claimants' evidence as not convincing. But the decision as to how much weight should be given to evidence is exactly the type of question a district judge is not permitted to decide in resolving a motion for summary judgment.

The District Court's errors continued when it concluded, without citation to any evidence, that the allegedly unlawful "services" (*e.g.*, managing the Building and the Fifth Avenue Company) were specifically intended for Iran. Alavi was the majority owner of the Fifth Avenue Company, and thus indirectly of the Building. Its services as the general partner of the Fifth Avenue Company were intended to serve its own interests, in large part because the Building was the Foundation's primary source of revenue and it funded nearly all of the Foundation's charitable giving. Indeed, Alavi's purported services were nothing more than the same activities that it had engaged in since the 1970s with respect to the Building and 1989 with respect to the Partnership—*i.e.*, years before the first Executive Order was issued prohibiting services to Iran or the promulgation of the ITRs. The purpose of its actions did not change in 1995 when the Iranian sanctions were implemented. The Government did not present evidence concerning Alavi's intent in providing management services, and the District Court was not at liberty to assume Alavi's intent in deciding the motions for summary judgment. As this Court has repeatedly recognized, questions of state of mind are particularly ill-suited for resolution on summary judgment.

These threshold issues precluded the entry of summary judgment on both of the Government's theories of forfeiture. But there were additional issues of material fact that were

31

specific to each particular theory that also precluded summary judgment. With respect to the Government's "proceeds" theory, alleged pursuant to 18 U.S.C. § 981(a)(1)(C), questions of material fact existed as to which Defendant Property, if any, constitutes or is derived from proceeds of unlawful services, and if so, to what extent. For the Government to succeed on its summary judgment motion, it was required to establish with undisputed facts that the Defendant Properties were obtained *as a result of* Alavi's unlawful services. But the Foundation acquired the Defendant Properties (with one minor exception) *years before* the Iranian sanctions went into effect. With respect to the Building, the District Court concluded that it was subject to forfeiture based on impermissible speculation that was legally irrelevant to the question of whether the Building was obtained, or even retained, as a result of the unlawful services. The District Court assumed that the Defendant Property would have been forfeited if the Government had learned of Alavi's alleged services earlier, but there was simply no evidence of this. Further, there was no logical basis to find that Claimants would not have obtained the Building in the 1970s, or retained it after 1995, but for the alleged unlawful services.

As to the Defendant Properties that received funds generated by the Building's rental income, the District Judge ordered the forfeiture of 89% of each of Alavi's seven real properties as being derived from proceeds of the alleged IEEPA-violating services, even though that percentage bore no relation to the amount of funds each Defendant Property actually received, and the undisputed facts demonstrated that a far smaller percentage of each Property's value (whether proceeds or not) was derived from funds invested in the Property by Claimants after 1995. Indeed, the Government did not even seek forfeiture of the Defendant Properties in the amount ordered by the District Court. Further, when evaluating the effect of appreciation on the portions of the

32

Defendant Properties subject to forfeiture, the District Court improperly required *Claimants* to *disprove* the Government's allegations rather than holding the Government to its burden as the plaintiff and moving party. The District Court's findings and legal conclusions were erroneous with respect to these Properties, as were those made with respect to Alavi's bank accounts, all of which were determined by the District Court to be forfeitable in their entirety under § 981(a)(1)(C).

Finally, there were disputed issues of material fact that prevented summary judgment under the Government's second theory of forfeiture, that the properties were forfeitable under 18 U.S.C. § 981(a)(1)(A) as property involved in a money laundering transaction. To establish domestic or international money laundering under 18 U.S.C. § 1956, the Government bore the burden to prove that Claimants engaged in transactions involving the proceeds of specified unlawful activity with the intent of promoting or concealing unlawful activity, or that they transferred funds internationally with the intent to promote specified unlawful activity. The Government offered no evidence whatsoever as to Alavi's intent with respect to the transfers, and the Fifth Avenue Company had no employees, and therefore, could not have had a separate unlawful intent. The District Court erred by impermissibly *inferring* Claimants' intent when granting summary judgment. All inferences had to be drawn in favor of the nonmoving parties—here, Alavi and the Fifth Avenue Company. Among other inappropriate inferences, the District Court inexplicably claimed that Alavi's intent in entering into the 1989 Partnership Transaction with Assa was to evade the Iranian sanctions—even though those sanctions were not implemented until *six years later* in 1995.

This Court must reverse the summary judgment orders and vacate the forfeiture judgment because the District Court repeatedly erred in rejecting evidence that it was required to

33

credit and by drawing inferences in favor of the Government. There were issues of material fact that precluded summary judgment. The District Court improperly assumed the role of the jury, weighing evidence—including evidence the admissibility and authenticity of which had not been properly ruled upon—and making factual findings based on its own views of the evidence. The District Court did not conduct a proper summary judgment analysis; this Court should reverse the summary judgment orders and vacate the forfeiture judgment.

## II. The District Court Erred In Not Suppressing Evidence Seized In Violation Of Claimants' Fourth Amendment Rights And By Relying On That Evidence In Granting Summary Judgment

The District Court erred by denying Claimants' motion to suppress evidence that was unlawfully seized from Alavi's offices in violation of the Fourth Amendment, and then relying on that evidence to grant the Government's motion for summary judgment.

On December 19, 2008, the Government obtained a warrant to search Alavi's offices without presenting probable cause to believe that Alavi had committed a crime or that evidence of any crime would be found at the premises. The search warrant itself lacked particularity and improperly authorized an overbroad search and seizure of hard copy and electronic materials. The FBI agents who executed the search exceeded even the overbroad limitations that existed in the warrant and indiscriminately seized virtually all of Alavi's and the Fifth Avenue Company's paper and electronic records. These critical errors required that the seized evidence be suppressed, along with any "fruits" of the unlawful search. But in denying Claimants' motion to suppress, the District Court, on the basis of legally and

34

factually erroneous rulings, refused even to *consider* the Fourth Amendment violations.

First, the District Court concluded that the Fourth Amendment was "not implicated" because Alavi had a preexisting obligation to *preserve* relevant documents and because the Fifth Avenue Company was obliged to produce documents relevant to its ongoing operations (a very small volume of documents not at all pertinent to the allegations purportedly giving rise to forfeiture). But it was legal error for the District Court to analyze the issue of suppression without recourse to the Fourth Amendment doctrine, which requires particularized findings before a court can conclude that seized evidence would have been discovered via separate means. Moreover, and contrary to the District Court's broad assertions, Alavi had no production requirements at the time of the search and the Fifth Avenue Company's obligations were minimal. The December 2008 Protective Order on which the Court allegedly relied simply did not require the production of documents as the District Court asserted, and would not have yielded anything close to the materials unlawfully seized in the search. Further, the District Court erred in relying on the Government's 2011 discovery requests to avoid a Fourth Amendment analysis because, as the Supreme Court and this Court have held, after-the-fact legal process cannot serve to "validate" an unlawful search and seizure. The District Court's analysis—if adopted—would relegate the Fourth Amendment to mere words.

The District Court also denied suppression on the basis of a novel but legally unsupportable "waiver" theory, by which it held that Alavi and the Fifth Avenue Company gave up their Fourth Amendment rights and remedies because they had not objected to the preservation and production obligations set out in the *District Court's* Protective Order and had participated in discovery in this action. But the

35

Fourth Amendment violation was complete at the time the search was executed, and the exclusionary remedy—which applies in civil forfeiture actions—cannot be "waived" as a result of compliance with a court order or required discovery. The District Court offered no legal basis for its conclusion that a party must object to an unlawful search within a certain period of time (other than before trial) or risk waiving the remedy of exclusion. Further, the District Court ignored that the information needed to make the motion— *i.e.*, the search warrant application, the affidavit in support, the seized materials, and the "fruits" of the unlawful search—were not produced by the Government until more than three years after the search took place. The District Court found a non-legal "waiver" although Claimants did everything reasonably possible to preserve their rights.

Lastly, the District Judge erred in finding that the materials seized in the search would have been "inevitably discovered" absent the unlawful search. Despite Claimants' request, the District Court refused to hold a hearing on this issue, and the District Judge ruled without conducting the detailed analysis that this Court requires for each piece of evidence to be admitted on an inevitable discovery basis. Contrary to the District Court's finding, post-search conduct, including the Government's service of discovery requests in this forfeiture action, did not obviate the need for such analysis. As the District Court acknowledged, the Amended Complaint was premised on the unlawfully-seized evidence, and therefore, the Government's discovery requests, which were informed by that evidence, were irrelevant to the determination of what would have happened if not for the constitutionally-defective search. The circularity of the District Court's reasoning is patent: it would justify an "inevitable discovery" finding where police conducted a search without a warrant, then used the fruits of that search to gain access to the very same documents the police had just seized illegally.

36

The District Court's errors in considering the suppression motion requires reversal of not only the order denying suppression, but also the District Court's summary judgment orders, which were based in substantial part on the unlawfully-seized evidence. The case should be remanded with instructions to consider the constitutional issues presented in the suppression motion and, if necessary, to hold a hearing as to the appropriate boundaries of the seizure, the extent of any "taint" resulting from the illegal search, and inevitable discovery.

### III. The District Court Erred By *Sua Sponte* Granting Summary Judgment Against Claimants' Statute Of Limitations Defense

On its own initiative and without a motion by the Government or notice to the parties, the District Court considered and granted summary judgment against Claimants' statute of limitations defense. The District Court's decision was procedurally improper and substantively erroneous. As a matter of procedure, the Court's order rejecting Claimants' affirmative defense was in violation of the Federal Rules of Civil Procedure, which required the District Judge to provide notice to Claimants and an opportunity to respond before issuing a ruling against them on their affirmative defense. The District Court did not do so. And substantively, the District Court erred by resolving issues of fact that Claimants should have been able to present to the jury. For both of these reasons, the District Court's order granting summary judgment on this defense should be reversed.

Under 19 U.S.C. § 1621, the Government must commence a civil forfeiture action within five years of the date that it *discovered* or *should have discovered* the offense giving rise to forfeiture. Courts that have considered the statute have held that it requires an action to be brought within five years

37

of learning of the unlawful conduct, even if the criminal conduct is a continuing offense and some portion of the offense is committed within five years of the filing of the action. Based on the Government's allegations in the Amended Complaint, Alavi's purportedly unlawful services—managing the Building and the Partnership and conspiring to conceal Assa's identity—were all continuing offenses. Further, evidence turned over by the Government in discovery revealed ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Claimants sought discovery on ████████████████████████████ in order to prepare their statute of limitation defense, but the District Court denied these requests.

The District Court erroneously characterized Alavi's conduct, which the Government alleged was a scheme from 1989 through 2008, as a series of separate and distinct legal infractions, some of which occurred after November 2004 (and therefore within the five-year limitations period). This characterization was inconsistent with the facts, the Government's allegations in the Amended Complaint, and the District Court's own description of the conduct elsewhere in its opinions. But more importantly, the issue of whether Claimants' conduct fell within the limitations period was a question of fact for a jury to decide in connection with Alavi's and the Fifth Avenue Company's affirmative defense. The District Court erred in taking the issue away from the jury.

The District Court also disregarded the necessary implications of its ruling on the statute of limitations defense. If the District Court were correct that the conduct at

38

issue was made up of separate and distinct acts, each of which violated the IEEPA or the money laundering statutes, then the District Court was required on summary judgment to consider only Claimants' acts *since* November 2004 for the purpose of forfeiture; the "proceeds" subject to forfeiture or which were available to launder should have been limited to those dates as well. The Court did not impose such a limitation. And because the evidence demonstrates that there were no international transfers to Assa Ltd. or any other relevant entity after November 2004, the Government's international money laundering theory should have been rejected entirely. That did not happen. Instead, the District Court issued contradictory rulings: holding that Alavi's services in violation of the IEEPA were made up of separate and distinct acts, for statute of limitations purposes, while simultaneously ordering forfeiture of proceeds generated since 1995 based on an alleged continuing scheme that began after the Iran sanctions went into effect in 1995.

The District Court's order granting summary judgment against Claimants' statute of limitations defense should be reversed, with instructions for the District Court to allow full and fair discovery on the ██████████████████████ ███████████████████████████.

## IV. The District Court Erred By Ordering The Forfeiture Of Property In Amounts Grossly Disproportional To The Gravity Of The Alleged Offenses And Constitutionally Excessive Under The Eighth Amendment

Claimants petitioned the District Court pursuant to 18 U.S.C. § 983(g) for a reduction in the forfeiture amount because the amount ordered to be forfeited was grossly disproportional to the gravity of the alleged offenses. The District Court denied the petition without a hearing, thereby permitting its summary judgment decisions to result in the

39

forfeiture of property interests of Alavi and the Fifth Avenue Company worth over $300 million. This was error.

When a claimant petitions the Court under § 983(g), the court is required to hold a hearing. *See* 18 U.S.C. § 983(g)(3). But just as it deprived Claimants of other necessary hearings—including an "inevitable discovery" hearing in connection with the motion to suppress—the District Court here, too, prejudged the outcome of a proportionality hearing and refused to hear evidence on the subject. Further, the District Court erred in its application of the factors that this Court has instructed courts to use in evaluating proportionality.

Among other errors, the District Court repeatedly referred to Claimants' *pre*-1995 conduct as justifying the severity of the forfeiture. While the District Judge may have found pre-1995 conduct personally distasteful or politically objectionable, there can be no dispute that it was perfectly lawful. The District Court also declined to evaluate the potential penalty Claimants would have faced if the purported IEEPA violations had been charged criminally. The District Court exaggerated the significance of Alavi's and the Fifth Avenue Company's conduct, and the harm it may have caused. Even as alleged, however, Claimants' conduct had nothing to do with terrorism, inappropriate charitable donations, or material support for the Iranian regime.

The District Court ordered forfeiture in amounts that were grossly disproportional to the gravity of the alleged offenses and that were constitutionally excessive under the Excessive Fines Clause of the Eighth Amendment. If the summary judgment decisions are not reversed entirely, the case should be remanded with instructions for the District Court to hold a proportionality hearing.

40

## **ARGUMENT**

### I.    **The District Court Erred In Granting Summary Judgment Because There Are Genuine Issues Of Material Fact**

The District Court erred by granting summary judgment in favor of the Government because genuine disputes of material fact exist as to the forfeitability of each and every one of the Defendant Properties. The Government sought to forfeit the properties under two distinct theories. First, it asserted that the Defendant Properties are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) as "proceeds" of IEEPA violations. Second, it contended that the Defendant Properties are forfeitable under 18 U.S.C. § 981(a)(1)(A) as properties involved in a money laundering transaction. Under the latter theory, the funds allegedly laundered were purportedly proceeds of IEEPA violations or were transferred overseas with the intent to promote specified unlawful activity (*i.e.*, an IEEPA violation). Under either theory of forfeiture, as a threshold matter, the Government bore the burden of proving that Claimants violated the IEEPA by knowingly providing services to Iran. The Government also bore the burden to prove that the Defendant Properties constitute or are derived from the proceeds of an IEEPA violation or involved in a money laundering transaction. Claimants presented substantial admissible evidence rebutting the Government's "proof" as to both forfeiture theories, raising genuine issues of material fact precluding summary judgment. The District Court repeatedly ignored Claimants' proffered evidence, substituted its opinion for that of a jury, and improperly shifted the burden of proof to Claimants. At the same time, the District Court relied on evidence whose admissibility and authenticity had been challenged and never properly ruled upon. Disputes of material fact exist as to the forfeitability

41

of the Defendant Properties; therefore, the District Court's grant of summary judgment must be reversed.

## A. Applicable Legal Principles For Summary Judgment

A district court's grant of summary judgment is reviewed *de novo*. *Sudler v. City of New York*, 689 F.3d 159, 168 (2d Cir. 2012). To obtain summary judgment, a moving plaintiff must show that no genuine issue of material fact exists as to each and every element of its claim. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.") (internal citations and quotations omitted)); *see also Jackson v. Fed. Exp.*, No. 12 Civ. 1475, 2014 U.S. App. LEXIS 17387, at *11 n.3 (2d Cir. Sept. 9, 2014) (explaining that a "grant of summary judgment to a plaintiff who bears the burden of proof of material facts must be supported by a strong proffer of evidence"). A district court's function in considering a summary judgment motion is "not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). In making such determination, a court may rely on admissible evidence only. *Spiegel v. Schulmann*, 604 F.3d 72, 82 (2d Cir. 2010). Further, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule*, 85 F.3d at 1011.

In ruling on a motion for summary judgment, a court must view the admissible evidence "in the manner most favorable to the nonmoving party." *Sudler*, 689 F.3d at 168 (internal quotations omitted). All ambiguities and reasonable inferences must be drawn in favor of the nonmovants. *See,*

42

*e.g., Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126-127 (2d Cir. 2013). Inferences from the unavailability of a witness or a witness' invocation of the Fifth Amendment cannot be drawn against a nonmoving party in resolving a summary judgment motion; while a factfinder is permitted to draw an adverse inference from a witness' failure to testify at trial, on a motion for summary judgment a court cannot. *See Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 57 (2d Cir. 2005). To do otherwise would convert the permissible inference into a nonrebuttable presumption.

### B. Material Issues Of Fact Exist As To Whether Claimants Knowingly Provided Services To Iran In Violation Of The IEEPA

Under both of its theories of forfeiture, the Government bore the burden to prove that Claimants knowingly provided services to Iran in violation of the IEEPA. The District Judge erred in holding that there was no genuine dispute of material fact with respect to this threshold issue.[3] Indeed, there were multiple such disputes that precluded a grant of summary judgment on this very issue. First, Claimants disputed that Assa was owned or controlled by Bank Melli, and thus by Iran, after the Iranian sanctions went into effect, and they presented substantial evidence challenging such ownership and control. Second, even if Iran had in fact owned or controlled Assa since 1995, Claimants presented testimony and documentary evidence demonstrating that they were unaware of the purported Iranian ownership and

---

[3] The District Court did not find that the Fifth Avenue Company independently provided any unlawful services, nor could it since Fifth Avenue Company never had any employees. (*See* A 6567.)

43

control, thereby negating an essential element of the Government's claims. Finally, Claimants disputed that the Foundation's alleged services were *specifically intended for* Iran, as opposed to tangentially and incidentally benefiting Iran. In light of these issues, and the District Court's reliance on evidence that had not been properly authenticated, the summary judgment orders should be reversed and the forfeiture judgment vacated.

### 1. The Record Before The District Court Presented A Genuine Issue Of Material Fact As To Bank Melli's Alleged Ownership And Control Of Assa

The District Court disregarded admissible evidence and misapplied the law in finding that Bank Melli owned and controlled Assa after 1995. The District Court concluded that "there is substantial, uncontradicted evidence that Assa is owned and controlled by Bank Melli, and that Bank Melli is wholly owned and controlled by Iran." (*See* SPA 69.) But Claimants did offer evidence contradicting Bank Melli's ownership of Assa; however, the District Court erroneously refused to credit it.

#### a. The District Court Disregarded Evidence Showing That Bank Melli Divested Its Ownership Interest In Assa In 1995

The evidence presented by the Government on the issue of Assa's ownership was far from uncontradicted. Though Claimants did not challenge Iran's ownership of *Bank Melli*, Claimants offered documentary evidence and corroborating testimony demonstrating that Bank Melli did not own or control *Assa* at the time the Iranian sanctions went into effect or anytime thereafter. Claimants presented the District Court with documentary evidence demonstrating that Bank Melli transferred its ownership interest in Assa before the Iranian sanctions went into effect, and two years before OFAC

44

designated Bank Melli as an SDN. Official corporate records from the Jersey Financial Services Commission in Jersey, Channel Islands, where Assa Ltd. was incorporated, establish that in 1995, Bank Melli transferred its ownership interest in Harter Holdings—the majority owner of Assa Ltd.—to two individuals, Davood Shakeri and Fatemah Aghamiri. (*See* A 10361.) From 1995 through 1998, Shakeri and Aghamiri each owned 50% of the shares of Harter Holdings, and after Harter Holdings was dissolved in 1998, Shakeri and Aghamiri became the sole shareholders of Assa Ltd. directly. (A 10361-65; A 10325-44.) Accordingly, the official corporate records for Assa Ltd. *contradicted* the District Judge's finding that Iran owned Assa after 1995.

Claimants also presented testimony from two Government witnesses—███████████████ ████—corroborating the records showing Bank Melli's transfer of its indirect ownership interests in Assa in 1995.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

45



The Government offered minimal evidence to support its allegations of Bank Melli's continued ownership or control of Assa after 1995.



4

(A 10385-86.)

46



### b. The District Court Improperly Shifted The Burden To Claimants To Prove A Lack Of Ownership And Control

Time and again, the District Court minimized, explained away, or completely ignored evidence refuting Bank Melli's ownership and control of Assa after 1995, and placed the burden on Claimants to provide evidence that the District Judge would find compelling. Most significantly, the District Court disregarded Assa's corporate records showing that Bank Melli divested its ownership interest in Assa, as well as the testimony of former Bank Melli officers corroborating the records. The District Court referenced Assa's corporate records only once, in footnote 22 of its September 2013 summary judgment decision, and immediately minimized their importance, stating that only "*nominal ownership* was transferred from Bank Melli to Davood Shakeri and Fatemeh Aghamiri." (SPA 42 n.22 (emphasis added).) The District Court's summary judgment opinions do not even reference the relevant testimony of ███

The District Court had no basis to conclude that Bank Melli only transferred its "nominal ownership" of Assa in 1995. The only documents cited in support of this statement were the records themselves, which state no such thing. Likewise, the District Judge found "there is no evidence that [Assa] ever made a break with its ultimate owner [Bank Melli]," but cited as supporting evidence one document from

47

1989 and another from 1990—*five years or more before the ownership transfer.*[5] (SPA 69.)

By treating the corporate records as evidence of a mere "nominal" transfer and failing to credit testimony cited by Claimants of a break in ownership and control, the District Judge effectively placed the burden on Claimants—the nonmoving party—to offer conclusive evidence of a break in control. (SPA 27 ("No evidence in the record indicates that, despite changes in who owned shares in Assa on paper, that the ultimate owner and beneficiary of Assa was anyone other than Bank Melli."); SPA 62 ("Alavi does not offer affirmative evidence that raises a triable issue with respect to whether Bank Melli Iran had taken actions to sever its ultimate control—through intermediaries—of Assa.").) In essence, the District Court demanded evidence that *it* would find convincing, not evidence that *might* convince a *jury*. This was improper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126-127 (2d Cir. 2013) (the court "must resolve all ambiguities and draw all inferences against the moving party").

The District Court also erred in drawing adverse inferences *against Claimants* based on the refusal of *Assa's* officers and shareholders—Tafti, Shakeri, and Aghamiri—to testify in deposition. While a factfinder at trial *may* draw negative inferences from a party's or a party's representative's refusal to testify, *see LiButti v. United States*, 107 F.3d 110, 121 (2d Cir. 1997), a district court is

---

[5] In other sections of the summary judgment decision, the District Judge stated that the Government put forward evidence demonstrating that after 1995 Bank Melli continued to control Assa. But the document the District Court cited for this conclusion was a June 25, 1994 letter—that is, one written *before* the ownership transfer. (SPA 62.)

48

not permitted to draw negative inferences against a nonmoving party in ruling on a motion for summary judgment. *See Stichting Ter*, 407 F.3d at 57. All inferences must be drawn in favor of the nonmoving party. *Isabella v. Kooubek*, 733 F.3d 384, 387 (2d Cir. 2013).

Notwithstanding these legal principles, the District Court "assume[d]" on summary judgment that the *Assa* witnesses' testimony would have been unhelpful, and applied this inference against *Alavi*:

> This Court therefore assumes that the testimony of Shakeri and Aghamiri would have given to material issues in the case, including whether Assa Co. Ltd. is in fact owned entirely by Bank Melli and whether they act on Bank Melli's behalf, whether proceeds of partnership distributions made to Assa Co. Ltd. have been made to Bank Melli, and whether they have participated in hiding the true ownership of Assa, would have been unhelpful to their position.

(SPA 55.) Without deposition testimony from Shakeri and Aghamiri, and with a previous declaration from Shakeri stricken from the record, the District Judge concluded that there was "no record evidence disputing Bank Melli's ultimate ownership and control." (SPA 69.) But that finding is flatly contradicted by the Assa Ltd. corporate records and the ███████████████ testimony. It reflected the District Court's subjective determination that testimony from Assa was necessary to refute Bank Melli's alleged ownership. By refusing to credit Assa Ltd.'s official corporate records without testimony from its owners of record, the District Court drew adverse inferences against Alavi and the Fifth Avenue Company regarding Assa's ultimate ownership. The District Court erred in drawing these inferences against Claimants and in favor of the Government.

49

Furthermore, the unfairness of drawing those adverse inferences in the circumstances of this case is profound. The Government, by commencing a parallel criminal investigation at the commencement of this action, virtually assured that it could intimidate potential witnesses and prevent them from providing testimony helpful to Claimants. When that tactic succeeded, the Government—with the District Court's approval—reaped the benefit of its intimidation tactics by using affirmatively the absence of the testimony it had effectively suppressed.

### c. The District Court Improperly Deferred To The Government's Own Designation Of Assa As A Blocked Entity

The District Court also erred by deferring to the Government's own designation of Assa as a blocked entity as being determinative of Assa's purported ownership and control by Bank Melli. The District Judge rejected evidence of Shakeri's and Aghamiri's ownership of Assa Ltd. because "this additional intermediary layer did not prevent the U.S. Treasury from placing Assa on the SDN list as a front for Iran in 2004."[6] (SPA 69 n.31; *see also* SPA 55 n.26 ("Assa's presence on the SDN list as a front for Bank Melli—which dated from 2008, when Shakeri and Aghamiri had purportedly been Assa's owners since 1995—also indicates that Assa is itself Iranian.").) The District Court held that OFAC's designation was entitled to deference, noting that "Bank Melli was placed on the SDN list in 1997, that Assa was placed on the SDN list as an entity owned and controlled by Bank Melli in 2008 (after Shakeri and Aghamiri's entrance on the scene)," and Assa did not properly contest the designation. (SPA 70 (citing *Consarc Corp. v. Iraqi*

---

[6] As the District Court acknowledged elsewhere, OFAC's designation of Assa was actually made in December 2008. (SPA 55 n.26.)

50

*Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994); *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844-45 (1984)).)

In so doing, the District Court improperly ceded to a litigant—*i.e.*, the Government—the power to decide a critical factual issue that otherwise would have been decided by a jury at trial. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."); *Rhodes-Bradford v. Keisler*, 507 F.3d 77, 80 (2d Cir. 2007) ("The agency's claim that the BIA has the power to do so is merely a litigation position taken before this Court, and, as such, is not entitled to *Chevron* deference."); *O'Connell v. Shalala*, 79 F.3d 170, 178-179 (1st Cir. 1996) ("[C]ourts customarily withhold *Chevron* deference from agencies' litigating positions."). As a matter of law, this was error.

Under *Chevron*, a court must defer to an agency's interpretation of its authorizing statute unless the statutory language is unambiguous or the agency's proposed interpretation is not a "permissible construction." *Chevron*, 467 U.S. at 842-43. A similar doctrine, *Auer* deference, applies to an agency's interpretation of its own regulations. *See Auer v. Robbins*, 519 U.S. 452 (1997).

Here, however, the District Court did not defer to OFAC's interpretation of a statute or a regulation; it deferred to OFAC's determination of a purported fact—that Assa was owned or controlled by Bank Melli. No deference to OFAC's determination of *fact* (as opposed to its interpretation of law or regulation) was appropriate.[7] The

───────────────

[7] There are two limited circumstances under which an agency's findings of fact may be entitled to deference. First, a prior administrative decision may have a preclusive effect on subsequent litigation, but only where a litigant was a party to the proceedings and had an opportunity to present

51

issues of Assa's ownership and control were reserved for the jury. *See* Fed. R. Civ. P., Rule G(9); *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1014 n.2 (8th Cir. 2003) (holding the Seventh Amendment guarantees a jury trial for civil forfeiture matters). The District Court supplanted Claimants' right to a jury trial by delegating decision making authority to the Executive Branch of the Government—*the plaintiff in this case*.

The District Court cited *Consarc* as support for the proposition that "[t]he facts underlying [an OFAC] designation, provided that the listed entity had an opportunity to contest the administrative determination, are entitled to deference," but the decision simply does not support that proposition. (SPA 70.) In *Consarc*, the plaintiff obtained a default judgment against an Iraqi Ministry and attempted to execute the judgment against funds held in the Ministry's account at the Bank of New York. OFAC intervened, arguing that the funds at issue were within the class of Iraqi assets that had been frozen by presidential order and thus not subject to attachment. *See Consarc*, 27 F.3d at 698-99. The district court ruled in favor of Consarc, but the Court of Appeals reversed. The Court held that the lower court should have given deference to OFAC's interpretation of its own regulation: "That judgment, as a contemporaneous application of OFAC's own regulations receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation." *Id.* at 702 (citations omitted). Unlike here, however, the issue in *Consarc*

---

evidence. *Matusick v. Erie County Water Auth.*, 739 F.3d 51, 65-66 (2d Cir. 2014). Second, deference may be warranted if the agency action itself is directly challenged—for example, if Assa had directly challenged OFAC's designation. Those circumstances are inapplicable here.

involved deference afforded to an agency's interpretation of its own *regulation* (*see id.* at 701 ("OFAC may choose and apply its own definition of property interests")), not deference to an agency's findings of fact. There simply was no legal basis for the District Court to defer to OFAC's designation of Assa and Assa Ltd. as SDNs as somehow proving the existence of Iranian ownership or control.

Because issues of material fact exist as to whether Assa was owned or controlled by Iran after the Iranian sanctions went into effect—a threshold issue in determining whether there was an IEEPA violation—the District Court erred in granting summary judgment as to each Defendant Property. The summary judgment orders should be reversed.

### 2. The District Court Refused To Credit Evidence Demonstrating That Claimants Were Unaware Of Bank Melli's Purported Ownership And Control Of Assa After 1995

The District Court also erred in finding that there was "no triable issue that, at various times over the years, Alavi knew that Bank Melli continued to control Assa." (SPA 73.) In reaching that conclusion, the District Court improperly relied on evidence dating back to *before* the Iranian sanctions took effect and *before* Bank Melli divested its ownership interest in Assa; shifted the burden to Claimants to prove their *lack of knowledge* of Assa's ownership after 1995; and substituted its own judgment for that of a jury by weighing and ultimately rejecting evidence that demonstrated Claimants' lack of knowledge of Bank Melli's alleged ownership or control of Assa after 1995. For all of these reasons, the District Court's grant of summary judgment was improper.

To establish that Claimants committed a violation of the IEEPA for purposes its forfeiture claims, the Government was required to prove that Alavi knowingly and willfully

53

provided services to Iran. (SPA 64; A 12214-15); s*ee also United States v. Banki*, 685 F.3d 99, 106 (2d Cir. 2011) ("Those who 'willfully' violate the ITR are subject to criminal penalties."); *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146-147 (2d Cir. 2004) (finding that to establish an IEEPA violation, the Government must show that the conduct was knowing and willful). In other words, the Government was required to prove that Claimants knew Assa was owned or controlled by Bank Melli. Issues involving a party's state of mind are particularly ill suited for resolution on summary judgment. *See, e.g.*, *Gelb v. Bd. of Elections*, 224 F.3d 149, 157 (2d Cir. 2000) ("[S]ummary judgment is generally inappropriate where questions of intent and state of mind are implicated."); *Lipton v. Nature Co.*, 71 F.3d 464, 472-473 (2d Cir. 1995) ("[C]ourts are generally reluctant to dispose of a case on summary judgment when mental state is at issue[.]").

The District Court's error emanated from a fundamental disregard of the evidence advanced by Claimants on the issue of whether Bank Melli owned or controlled Assa after 1995. Having failed to establish that no genuine issue of material fact remained regarding Bank Melli's ownership or control of Assa after 1995, the Government could not possibly have put forth conclusive facts establishing that Alavi *knew* of such purported ownership or control. But even accepting Iran's purported ownership of Assa as true, the District Court committed reversible error by drawing inferences from the evidence *against* Claimants rather than in their favor.

The critical issue concerned Assa's owners—and Alavi's knowledge thereof—*after* the Iranian sanctions went into effect in May 1995 and after Bank Melli was blocked in 1997, not *before* when Bank Melli's ownership was perfectly legal. On this issue, the District Court refused to credit Claimants' evidence, asserting time and again that because

54

Alavi and its Board members were present *in 1989* when it partnered with Bank Melli, through Assa, to form the Fifth Avenue Company, Alavi must have known that Assa was owned by Bank Melli *after 1995*. (SPA 61 ("Alavi was present at the creation and birth of Assa (its midwife) along with Bank Melli."); *see also id.* at 27 (Alavi could not have "lost track of Bank Melli's previously clear control of Assa.").)

In a series of related errors, the District Court failed to give any weight to documentary and testimonial evidence showing Claimants' lack of knowledge concerning Assa's ownership in 1995 and later. Despite acknowledging that the Government bore the burden of proof in its motion for summary judgment, the District Court reversed the burden when evaluating the evidence: "[i]n order to avoid forfeiture of assets for this violation, Claimants thus bear the burden of raising a triable issue as to their *lack* of knowledge or *lack* of willful blindness with respect to the unlawful conduct (*i.e.*, money laundering and IEEPA violations." (SPA 60; *see also* SPA 62 ("Alavi does not offer affirmative evidence that raises a triable issue with respect to whether Bank Melli Iran had taken actions to sever its ultimate control—through intermediaries of Assa.").)

In shifting the burden to Claimants, the District Court further erred by requiring Claimants to provide conclusive evidence demonstrating "(1) some act showing a true exit by Bank Melli from its ultimate control, or (2) collective amnesia." (SPA 73.) The District Court ignored that regardless of whether *it* credited the evidence showing Assa's change in ownership in 1995 (which itself was more than sufficient), *Alavi* may have *believed* there was a transfer in ownership. Alavi never argued that it "forgot" about Bank Melli's ownership. To the contrary, Alavi presented evidence demonstrating that Assa's ownership changed and that Alavi took repeated steps from 1995 forward to learn

55

about Assa's new owners. Claimants were not required to prove "collective amnesia"; summary judgment was improper where, like here, "there is *any* evidence in the record from any source from which any reasonable inference could be drawn in favor of the nonmoving party." *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000) (emphasis supplied).

The District Court's "collective amnesia" argument was also erroneous because it improperly assumed that Alavi officers and Board members "knew" in 1995 and later that Bank Melli owned Assa, simply because some Board members served on the Board both before *and* after 1995. The District Court cited Dr. Houshang Ahmadi's long tenure on the Board (from 1980 to 2013) as proof that he *must have known* of Bank Melli's purported ownership of Assa (SPA 52); but neither the District Court nor the Government cited any evidence that Dr. Ahmadi knew Assa's owners at any point in time, either before or after 1995. The District Court identified Mohammad Badr-Taleh as having had interactions with Bank Melli in connection with the 1989 Partnership Transaction,[8] but Badr-Taleh resigned from the Board in 1991 and there was no evidence offered that Badr-Taleh informed other Alavi Board members about the identity of Assa's alleged owners. Thus, Badr-Taleh's knowledge of

---

[8] The District Court also relied on evidence that Mohammad Geramian, a former president of the Foundation, met with Bank Melli officials in Iran *before* 1995 as support for the argument that Alavi must have known Assa's owners *after* 1995. (*See* SPA 75.) But there is no evidence that Geramian was aware of Assa's owners *after* the 1995 ownership transfer; to the contrary, Geramian wrote a letter to Assa in 1995 specifically asking: "[w]ho owns the stock of Assa Corp." and "[w]ho are the owners or stock holders of Assa Ltd." (A 10694.)

historical events (*i.e.*, what happened in 1991 and earlier) cannot be used to prove Alavi's knowledge after he left.[9]

Ultimately, the Court relied almost exclusively on irrelevant, pre-1995 evidence to establish Alavi's knowledge, because that is all that existed in the record.[10] The only post-1995 evidence the District Judge cited as demonstrating Alavi's purported knowledge of Assa's alleged ownership were notes taken by an Alavi director at an October 2007 meeting with the Iranian ambassador to the United Nations.  The District Court cited a portion of the notes, where it is written:  "Assa → Bank Melli 40% share," as evidence of continued Bank Melli ownership of Assa.  But the notes say nothing about ownership, control, or the period of time to which they relate.  The District Court inferred that the notes were indicative of ownership and the Board member's knowledge of ownership, but that is just one inference a jury could have drawn.  Another, more logical

---

[9] Other courts of appeals have specifically held that a former executive's prior knowledge cannot be used to establish the knowledge of the company after his departure.  *See SecuraComm Consulting, Inc. v. Securacom, Inc.*, 166 F.3d 182 (3d Cir. 1999).  The same reasoning applies here:  where "[t]here is nothing to suggest that" that the prior executives (here, Badr) told the new executives (*i.e.*, the post-1995 Board members) the relevant piece of information, there is "no reasonable basis for inferring" knowledge.  *See id.* at 188.

[10] The District Court assumed Alavi must have known that Bank Melli owned Assa *after* 1995 because of "the many documents in the 1990s regarding Bank Melli's role." (SPA 74.)  It is unclear exactly what documents the District Court was referencing; in any event, historical documents discussing Bank Melli's role in Assa's formation do not reveal that Bank Melli owned Assa at times after 1995.

57

interpretation, is that the notes reflect the 1989 transaction in which Assa provided funds to satisfy the Bank Melli mortgages in return for a 40% share of the Fifth Avenue Company. The District Court's interpretation of the meaning of the notes had no place in a decision on a motion for summary judgment. And the Government, having failed to put forward any probative evidence showing Bank Melli's ownership of Assa after 1995 or the Foundation's knowledge thereof, failed to meet its initial burden on summary judgment. *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) ("summary judgment must be denied, even if no opposing evidentiary matter is presented" when the moving party "fails to fulfill its initial burden") (internal citations and quotations omitted).

But in addition to excusing the Government's failure to satisfy its initial burden, the District Court also erred by disregarding the affirmative evidence Claimants put forward. This is apparent by its treatment of the deposition testimony of Dr. Abbas Mirakhor, an Alavi Board member from 1991 to 2005, and a series of letters that Alavi sent to Assa inquiring about its ownership after 1995.

███████████████████████████████████

(A 5722-23.)

To corroborate Dr. Mirakhor's testimony, Claimants proffered letters from Alavi and its counsel from August 1995 through August 2007 seeking information regarding Assa's ownership and requesting a meeting with Assa's principals. The first letter, from Alavi's attorneys to an Assa board member and its lawyer on August 30, 1995, specifically asked: "Who are [Assa Ltd.'s] owners?" (A 10691-92.) Another written on November 7, 1995 by

58

Alavi's president at the time, Mohammad Geramian, shortly after the Iranian sanctions went into effect similarly seeks information of Assa's Ltd.'s owners and stockholders. (*See* A 10694 ("Who are the owners or stock holders of Assa Ltd. of Channel Island?").) In a letter from 2003, Alavi sought additional information regarding Assa's ownership structure: "[W]e need to know the identity of the intermediate and ultimate owners and principals of Assa Corp. as well as their countries of origin." (A 10697-98.) Several letters from 2006 and 2007 seek to set up a meeting with Assa's principals. (*See, e.g.*, A 10707 ("Alavi Foundation would like to set up a meeting with the directors of ASSA Corporation, especially with those directors residing outside of the United States."); A 10709-10 ("for almost two years the Foundation's directors have requested (orally and in writing) a meeting with Assa's directors. However, Assa's U.S. representative, Dehaghani Tafti, has refused to arrange one."); A 10700, 10705, 10713.)

Instead of crediting Dr. Mirakhor's testimony and Alavi's numerous letters, as required when resolving a motion for summary judgment, the District Judge improperly rejected them on the basis of her own subjective views regarding the credibility and weight of the evidence. *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87-88 (2d Cir. 2001) ("The district court's failure to credit the deposition testimony, in particular, was an inappropriate resolution of a witness' credibility on a motion for summary judgment."). With respect to Dr. Mirakhor's testimony, the District Court found that it was not convincing since he "spent his time in Washington, D.C. and . . . the other members of the board knew more." (SPA 53.)[11] It was not the District Court's

---

[11] The District Court erroneously believed that it was permitted to draw an adverse inference from the fact that other former members of Alavi's Board exercised their rights under the Fifth Amendment to the United States Constitution

59

prerogative to weigh the value of the evidence. Moreover, the District Judge's assertion simply ignores that ██████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ (A 5719; 5722-23; A 12351 (11/12/04 Board resolution stating that Alavi intended to "take all steps necessary to ensure that in the future such questions" about "Assa's identity and related issues" can be answered.).)

The District Judge disregarded the letters, too, finding that they may have been written by individuals who did not "underst[an]d the long history between Alavi, Bank Melli, and Assa" or lacked specific language that would have entitled them to greater weight.[12]  (SPA 74.)  The District Court went so far as to reject certain letters because they did not include precise language that the District Judge believed was necessary to make them credible:  "[t]he letters never, in fact, use the word 'Iran' at all; they carefully avoid direct, revealing questions." (*Id.*)[13]  In essence, the District Judge

_____

and declined to testify at trial.  (*See, e.g.,* SPA 56 n.28; SPA 77.)  While a *jury* would have been *permitted* to draw an adverse inference, the District Court was not permitted to do so on the Government's motion for summary judgment. *Stichting Ter*, 407 F.3d at 57.

[12]  The District Court rejected letters written by Alavi's attorneys, asserting that the lawyers may not have been as knowledgeable as a person at Alavi itself.  (SPA 74.)  But ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ (A 5719; A 5722-23.)

[13]  Contrary to the District Court's statement, Alavi's November 12, 2003 letter specifically states that its questions concerning Assa's ownership were motivated in part by

60

awarded to herself the role of the jury in evaluating and weighing the evidence, and refused to credit Claimants' evidence. This was error because "choices between conflicting versions of the facts are matters for the jury." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)

Claimants' testimonial and documentary evidence from 1995 through 2007 raised a genuine dispute of material fact as to whether they knew of Assa's purported ownership by Iran. The District Court erred in granting summary judgment.[14]

### 3. The District Court Failed To Consider Whether Alavi's Alleged Services Were Specifically Intended For Iran

The District Court also erred by resolving on summary judgment the disputed issue of whether Claimants provided services *specifically intended for* Iran. The District Judge found no triable issue that the Foundation provided two types of services to Iran: (1) "managing the partnership on behalf of an entity ultimately owned and controlled by Iran"; and (2) a "broader violation" of providing services to Iran "by shielding and concealing Iranian assets." (SPA 26, 85.)[15] In

---

allegations that "Assa Ltd. is 'under investigation by international financial institutions for alleged connection with an Iranian governmental bank.'" (A 12353-55.)

[14] The District Court also erred by dismissing Claimants' innocent owner defense, *sua sponte*, without providing Claimants with notice or an opportunity to respond. *See* Fed. R. Civ. P. 56(f) (stating that a court may grant summary judgment *sua sponte* only "after giving notice and a reasonable time to respond").

[15] In the Amended Complaint, the Government alleged overlapping but different services to Iran, including

61

granting summary judgment based on these alleged services, the District Court ignored substantial evidence that Alavi's services may have been intended for itself and the Fifth Avenue Company, and not specifically for Assa or Iran. The intended beneficiary of these services was a question for a jury.

Executive Order 12,959 prohibits "the exportation from the United States to Iran . . . [of any] services." Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995); *see also* Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997). This Court has defined services to "refer[] to the performance of something useful for a fee," *Homa Int'l*, 387 F.3d at 146; *see also United States v. Banki*, 685 F.3d 99, 106 (2d Cir. 2011). The ITRs implementing the Executive Order define "prohibited services" as those "undertaken with knowledge or reason to know that . . . [the] services are intended specifically for . . . Iran or the Government of Iran" 31 U.S.C. § 560.204. To grant summary judgment, therefore, the District Court was required to find no genuine issue of material fact as to whether Alavi provided unlawful

---

"managing a commercial building for the Iranian Government, running a charitable organization for the Iranian Government, and transferring funds from 650 Fifth Avenue Company to Bank Melli." (A 1515). The District Court expressly found that there were disputed issues of fact as to the other services alleged by the Government. (*See* SPA 85 n.35) ("The Government has asserted other IEEPA violations, but the Court has found triable issues of fact as to those violations.").) Moreover, the Government's allegations that Alavi provided services to Iran by "running a charitable organization for the Iranian Government" (A 1515 ¶¶ 21, 23) were not at issue before the District Court. (*See* SPA 64 n.29 ("the possible IEEPA violations of being 'itself' controlled by Iran are not at issue on this motion").)

62

services "intended specifically for" Iran. *Gelb*, 224 F.3d at 149 ("[S]ummary judgment is generally inappropriate where questions of intent and state of mind are implicated.").

There was no evidence that either of the services identified by the District Court was intended specifically for Iran. Alavi owned the property at 650 Fifth Avenue since 1973 and worked with a professional property management company to manage the Building since it was constructed in the late 1970s. When Alavi entered the Fifth Avenue Company partnership with Assa in 1989, it continued performing the same basic services in its role as managing partner as it had before. Alavi's services were done on behalf of the Fifth Avenue Company, of which it has always been the majority partner. (A 6563-68.)

In addition, OFAC has explained, in relevant part, that an "entity owned or controlled by the Government of Iran includes any corporation, partnership, association, or other entity in which the Government of Iran owns a 50 percent or greater interest or a controlling interest[.]" (A 5650 n.2); 31 C.F.R. § 560.313. Accordingly, services provided to an entity, like the Fifth Avenue Company, alleged to be *minority* owned by Iran, do not violate the IEEPA. It was thus error for the District Court to find—without any evidence concerning Alavi's intent—that the relevant services were specifically intended for Iran. The issue should have been left to a jury to decide whether the services were performed for the benefit of Alavi or Fifth Avenue Company (with Assa or Iran merely as an incidental beneficiary). At minimum, the District Court should have drawn all reasonable inferences in favor of Claimants, not the Government. *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("It is not the province of the summary judgment court itself to decide what inferences should be drawn."). If inferences had properly been drawn

in Claimants' favor, the inquiry would have been presented to a jury.

Moreover, with respect to what it termed a "broader violation" of the IEEPA—conspiring with Bank Melli to conceal Assa's identity (*see, e.g.,* SPA 26; SPA 72-79)—neither the District Court nor the Government identified *any* action that Alavi actually took in furtherance of this service. Having failed in that burden, summary judgment in favor of the Government was in error. *Vt. Teddy Bear Co.*, 373 F.3d at 244 ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.") (internal citations and quotations omitted). And even if the Government had offered some act by Alavi that had the effect of concealing Assa's identity, it still would have remained in the jury's province to determine Alavi's intent. Neither the Government nor the District Court cited any evidence demonstrating that any of Alavi's actions after 1995, when the relevant sanctions went into effect, were taken with the intent to conceal Assa's purported ownership by Bank Melli. As a result, an issue of material fact exists. The District Court's summary judgment decisions should be reversed.

### C. Issues Of Material Fact Exist Concerning Whether, And To What Extent, The Defendant Properties Constitute Proceeds Of Unlawful Activity

Separate and apart from the threshold issue of whether Claimants knowingly provided services to Iran in violation of the IEEPA, the District Court's forfeiture judgment should be vacated because there are issues of material fact as to whether the Defendant Properties constitute or are derived from proceeds of the alleged IEEPA violations and, if so, to

what extent. In granting summary judgment, the District Judge erroneously concluded that the Building, Claimants' bank accounts, and the majority of the remaining Defendant Properties were subject to forfeiture as proceeds of unlawful services. (SPA 64-65; SPA 156-58; SPA 163-68.) But the District Court conducted no legally-valid analysis and cited no evidence supporting its finding that the Defendant Properties—most of which were purchased *before* the Iranian sanctions went into effect and before OFAC placed Bank Melli on the SDN list—would not have been obtained or retained but for the Foundation's purportedly unlawful services. The District Court's unsupported speculation does not withstand a reasoned review.

### 1. Legal Standard For The Forfeiture Of Proceeds Of Specified Unlawful Activity

Under § 981(a)(1)(C) of Title 18 of the United States Code, property which "constitutes or is derived from proceeds traceable to" specified unlawful activity, including a violation of the IEEPA, is subject to forfeiture. *See* 18 U.S.C. § 981(a)(1)(C). Section 981 includes a definition of "proceeds" that is dependent on whether the conduct at issue involved the provision of illegal goods or services, on the one hand, or lawful goods and services provided unlawfully, on the other. Where a case involves "illegal goods, illegal services, [or] unlawful activities," proceeds means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." *Id.* § 981(a)(2)(A). But where a case involves "lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id.* § 981(a)(2)(B).

65

Under either statutory definition, "proceeds" are strictly limited to property obtained *as the result* of or *through* an offense; it does not indiscriminately include anything that arguably may be related to or connected with an offense. *See id.* § 981(a)(2); *see also United States v. Approximately 250 Documents Containing the Forged Handwriting of President John F. Kennedy and Others*, No. 03 Civ. 8004 (GBD), 2008 U.S. Dist. LEXIS 67452, at *10 (S.D.N.Y. Sept. 5, 2008) ("*250 Documents*"); *United States v. Wittig*, 333 F. Supp. 2d 1048, 1051-1053 (D. Kan. 2004). Courts have consistently held that forfeitable proceeds are limited to what would not have been obtained "but for" the offense giving rise to forfeiture. *See, e.g.*, *United States v. Anguilo*, 897 F.2d 1169, 1213 (1st Cir. 1990); *United States v. Ofchinick*, 883 F.2d 1172, 1183 (3d Cir. 1989); *United States v. Porcelli*, 865 F.2d 1352, 1363, 1365 (2d Cir. 1989); *United States v. Horak*, 833 F.2d 1235, 1243 (7th Cir. 1987). Accordingly, an asset acquired *before* the forfeitable conduct occurs cannot constitute the proceeds of such conduct because it was not obtained as a result of the unlawful act. *See United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) ("[T]he government has not established (nor logically could it) that the funds involved in the pre-May 2000 transfers were 'obtained . . . as a result' of the later, particular transfers of which [defendant] was convicted."); *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 641 (1st Cir. 1988) (reversing forfeiture where the property was purchased two years before the alleged illegal activity began).

The Seventh Circuit's decision in *Horak* effectively illustrates this point. In *Horak*, the Seventh Circuit reversed a RICO forfeiture order, finding that the district court's analysis of what constituted an interest "acquired or maintained" by the unlawful conduct was "overly expansive." 833 F.2d at 1242. The district court had ordered the forfeiture of the defendant's salary, bonuses, and

66

profit-sharing and pension plans because his illegal acts "enhanced" his job performance. In remanding for further consideration, the Court of Appeals instructed:

> [O]n remand, the court must determine what portion of Horak's interests would not have been acquired or maintained "but for" his racketeering activities. That is, in order to win a forfeiture order, the government must show on remand that Horak's racketeering activities were a cause in fact of the acquisition or maintenance of these interests or some portion of them.

*Id.* at 1243. Because the Government had not established that defendant's interests in his salary, bonuses, and benefit plans resulted from the crime, reversal of the forfeiture order was necessary. *Id.*

Similarly, in *Ofchinick*, the Third Circuit reversed a RICO forfeiture order, holding that the Government failed to link the defendant's decision to acquire or maintain ownership of stock in a privately held company to the fraudulent scheme. 883 F.2d at 1183-84. The court noted that the purpose of forfeiture is "not to seize legitimately acquired property," but to forfeit the gains of illegal acts. *Id.* at 1183. In holding that the stock was not subject to forfeiture, the court found that the company's existence pre-dated the scheme, the stock was issued before the scheme began, and therefore the stock was not acquired or maintained because of the scheme. *Id.* at 1184. The Government could not satisfy the "but for" test because the defendant's interest in the stock resulted from his legitimate ownership, not from the criminal conduct. *Id.* at 1183-84.

In all instances, the Government bears the burden of proving both that a particular type of property is forfeitable and the actual dollar amount to be forfeited. *United States v. Schlesinger*, 396 F. Supp. 2d 267, 278 (E.D.N.Y. 2005). In

67

the absence of sufficient evidence that a *specific* property or funds constitute proceeds of an offense, the Government is not entitled to forfeiture. *United States v. Black*, 526 F. Supp. 2d 870, 887-89 (N.D. Ill. 2007) (finding the Government's evidence and tracing analysis insufficient); *United States v. Haleamau*, 887 F. Supp. 2d 1051, 1063 (D. Haw. 2011) (concluding that tracing was insufficient and rejecting Government's argument that the evidence was sufficient to allow assumptions to bridge gaps in evidence).

### 2. The District Court Erred In Finding The Foundation's Partnership Interest In The Fifth Avenue Company And The Building To Be Unlawful Proceeds

The District Court found that Alavi performed two types of services that generated forfeitable proceeds: first, services in managing the partnership; and second, services in acting as general partner of the Fifth Avenue Company and, in so doing, enabling Bank Melli to conceal its identify as alleged owner of Assa and receive partnership distributions.[16] (SPA 85.) As to the pure management services, the District Judge found them to be lawful services provided in an illegal manner and held that the proceeds "obtained as a result of this offense" to be "all management fees received." (SPA 85.) As to the broader services of concealing Bank Melli's alleged ownership interest in Assa, however, the District Judge found the proceeds to include Alavi's entire partnership interest:

> If it had been known earlier that Alavi was providing such services, its interest would have been forfeited. Thus Alavi retained its

---

[16] The District Court noted that the Government had alleged other IEEPA violations, but "found triable issues of fact as to those violations." (SPA 85 n.35.)

partnership interest through its concealment service. Alavi's entire partnership interest is therefore traceable to illegal services; those illegal services also separately allowed the partnership assets to be retained.

(SPA 85-86 (citing *United States v. Evanson*, No. 05 Cr. 805 TC, 2008 U.S. Dist. LEXIS 58981, at *7-8 (D. Utah Aug. 4, 2008)).) But in providing this explanation of her finding, the District Judge revealed that she did not employ a "but-for" test in determining proceeds at all; instead, the District Court considered proceeds to be what it suspected would have been lost if Alavi's alleged services "*had been known earlier*."

The relevant inquiry in a "but for" analysis is what assets or property would not have been obtained *but for* the unlawful services, or conversely, what was obtained *as a result of* the unlawful services. As applied to Alavi's alleged concealment services, therefore, forfeitable proceeds consisted of the property the Foundation obtained as a result of concealing Bank Melli's alleged ownership of Assa.

There can be no dispute that the Building and Alavi's partnership interest in the Fifth Avenue Company were not *acquired* or *obtained* as a result of the alleged forfeitable conduct. Alavi purchased the property at 650 Fifth Avenue in the early 1970s and finished construction of the Building later that decade. (*See* A 5866-73.) In 1989, Alavi exchanged its 100% interest in the Building for a majority partnership interest in the Fifth Avenue Company; accordingly, the Fifth Avenue Company acquired its ownership of the Building at that time. (*See* A 6226-66.) All of these events occurred well before the Iranian sanctions went into effect and OFAC designated Bank Melli as an SDN. Thus, these Defendant Properties could not have been *obtained* as a result of the alleged unlawful services provided to Iran. And to the extent unlawful proceeds were reinvested

69

in the Fifth Avenue Company or the Building after 1995 for capital improvements or renovations, only that portion of the Properties traceable to the reinvested funds would be subject to forfeiture under a § 981(a)(1)(C) proceeds theory, not "Alavi's entire partnership interest." (SPA 85.)

The Defendant Properties were also not *retained* as a result of the alleged forfeitable acts. The District Court found Alavi's entire partnership interest in the Fifth Avenue Company was subject to forfeiture by asserting that it would have been lost "[i]f it had been known earlier that Alavi was providing [unlawful] services." (SPA 85.) But that was the wrong test, and the District Court offered no evidentiary basis to support its conclusion even under that test. Indeed, there is absolutely no evidence as to what would have occurred with respect to Alavi's or the Fifth Avenue Company's property interests if they did not allegedly help conceal Bank Melli's purported ownership of Assa and instead disclosed that information to the Government or more generally.[17] The District Court assumed that *but for* the concealment, (1) the Government would have sought to forfeit Alavi's property (though it is entirely unclear on what theory of forfeiture), (2) the Government would have prevailed at trial or on a motion for summary judgment, and (3) Claimants' interests in the Partnership and the Building would have been lost. This reasoning is circular and speculative. Indeed, because the concealment services are what purportedly gives rise to forfeiture, but for those services, the Government would not have had a forfeiture case to bring. In other words, without the services, there

---

[17] There is no evidence cited or in existence to suggest that disclosure by Alavi of Bank Melli's purported ownership of Assa would have resulted in the loss of *Alavi's* interest in the Fifth Avenue Company, of which Assa was a minority owner.

70

would have been no basis for forfeiture. The District Court's finding on this issue was the result of an improper test and was entirely speculative. At a minimum, what would have happened as a result of the alleged concealment services was a question for a jury.

Because there was no basis to conclude that Claimants obtained or retained their interest in the Building or the Fifth Avenue Company as a result of any purported concealment services (or any other IEEPA violation), the District Court's grant of summary judgment on this issue must be reversed.

### 3. The District Court Erred In Holding That The Foundation's Seven Real Properties And Bank Accounts Were Subject To Forfeiture As Proceeds Of The IEEPA Violations

#### a. *The District Court Did Not Properly Analyze The Amount Of Proceeds, If Any, That Were Spent On Alavi's Real Properties*

As with its partnership interest, with the exception of one plot of land, Alavi acquired its ownership interests in the seven real properties located in Houston, Texas; Queens, New York; Carmichael, California; Catharpin, Virginia; and Rockville, Maryland before the Iranian sanctions went into effect. Alavi purchased the Houston property in 1988 (A 11360-67.) It bought the Queens property in three lots in 1991 and one in May 1997. (A 11258 ¶ 2; A 11321-32.) Alavi purchased the California property in 1989. (A 11425-27.) And it bought the two Virginia properties in 1990. (A 11370-87; A 11388-406.) The Maryland properties were purchased in 1981 and 1984. (A 11339-55.) Other than a single lot in Queens, none of these properties, therefore, could have been initially obtained using proceeds of an alleged IEEPA violation.

71

Nonetheless, the District Court found that "each of the seven properties is forfeitable to the extent that Alavi spent forfeitable proceeds from the Building on the property, whether in the form of repairs, improvements, or payments of real estate taxes." (SPA 151.)  According to the District Court, rental income received from the Building constituted proceeds of the alleged concealment services, and therefore, any funds spent on the seven properties traceable to the Building were subject to forfeiture. (SPA 152-53.)  But the explanation for why the Building's total income constituted proceeds of IEEPA violations was fundamentally flawed. With respect to Alavi's alleged unlawful "management services," the District Court specifically concluded the proceeds were the "management fees" received by the Foundation from the Fifth Avenue Company.  (SPA 85.) Alavi generally received ████████ a month for management services for the relevant time period. (A 9934 at ¶ 88.)  But these fees were used to pay a portion of the Foundation's staff salaries tied to the time devoted to Building management responsibilities; they did not go to any of Alavi's seven real properties, and the Government did not attempt to trace these management fees to any of the Defendant Properties.

The District Judge also found that rental income from the Building constituted IEEPA proceeds, assuming that the Foundation would not have retained its partnership interest if the Government knew of the services earlier.  (SPA 153.) But as described above, *see supra* Section I.C.2, this finding is without evidentiary or logical support.  Further, even if rental income from the Building were considered to be proceeds of an IEEPA violation, there are issues of material fact as to the amount of forfeitable funds expended on Alavi's seven real properties and, therefore, the extent to which they were subject to forfeiture.  Despite recognizing that each of the seven properties received different amounts of funds from the Foundation and had a different value, the

72

District Court concluded that 89% of *each* property was subject to forfeiture because that amount is "equivalent mathematically" to the ratio of partnership distributions received by Alavi and Alavi's total income. (SPA 158 n.23.) In reaching this conclusion, the District Judge completely avoided doing any tracing analysis and granted forfeiture in amounts far greater than the Government even sought as to the seven properties. The District Court's conclusion was erroneous for at least three reasons.

First, the District Court erred in accepting the Government's argument that because, on average, 89% of Alavi's income reported on its tax returns was attributed to the Building's rental income, 89% of its expenditures represented forfeitable proceeds. (SPA 156-57.) The District Judge inaccurately stated that Claimants did not submit evidence to refute the Government's evidence, but Claimants did exactly that. Claimants challenged the Government's assertions with expert testimony by a forensic accountant, who attested that reportable income is not equivalent to partnership distributions, citing IRS regulations, and that the Foundation's actual receipts of income from the Fifth Avenue Company made up less than 89% of its total income. (SDNY Dkt. No. 979 at 8-9; A 4307-08 ¶ 4-6; A 4317-18.) Accordingly, the funds from the Building that Alavi received and had available to spend on the various properties was less than 89% of its income.

Second, the percentage of Alavi's post-1995 income that may have been subject to forfeiture has little bearing on the percentage of each property that is subject to forfeiture. The critical inquiry is how much in forfeitable proceeds each property received. The District Court's premise completely ignored the actual expenditure of allegedly forfeitable proceeds on each property, *as well as all of the money spent purchasing the properties and maintaining them before*

73

*1995*.[18] (SPA 158 n.23.) As Claimants argued below, the extent to which each property is subject to forfeiture is a function of many factors, including the amount of forfeitable proceeds spent on the property compared to the total spending on the property (*i.e.*, the total basis of the property). For tracing purposes, the basis of each Defendant Property includes its purchase price, all expenditures on the Property before the Iranian sanctions went into effect, and all expenditures after the Iranian sanctions went into effect. In concluding that 89% of the seven real properties were subject to forfeiture, the District Judge ignored all of these relevant figures *except* the post-1995 expenditures.[19]

By way of example, the California property was purchased and appraised at approximately $220,000 in 1989,

---

[18] Although this discussion of proceeds assumes, as the District Court did, that expenditures after 1995 were derived from unlawful proceeds, the reality is the five year statute of limitations governing this civil forfeiture action potentially limited the IEEPA violations, and resulting proceeds, to those occurring after November 2004. (SPA 9-102); *see infra* Section III.

[19] In fact, the Government sought a much more limited forfeiture. The Government argued that the District Court should order forfeiture of each property based on the amount of forfeiture proceeds spent on the property divided by the sum of the purchase price, unlawful funds spent on the property, and certain documented expenditures after 1995. (*See* SDNY Dkt. No. 957 at 5-7.) The District Court incorrectly believed that the Government's analysis included pre-1995 expenditures (*see* SPA 161); it did not (SDNY Dkt. No. 957 at 5-7). As Appellants argued, *all* expenditures— pre-1995 and post-1995—should be included in determining the total basis, which could then be used in determining the accurate forfeitable percentage of each property.

74

and the alleged post-1995 funds that were invested in the Defendant Property (and this number is itself disputed) was $35,000 donation to a not-for-profit operating at the Property. (*See* A 4316; A 4317.) Despite the limited donation (which Alavi maintains was not an investment in the Property itself) and the relatively stable appraisal value (*see* A 11425-33), the Court concluded that 89% of this Defendant Property was forfeitable to the Government. (SPA 158.) In effect, the District Court's analysis meant that $35,000 of alleged proceeds that Alavi donated to the California center resulted in a forfeiture of property valued at over $200,000.

Third, the District Court erred in calculating appreciation on the Foundation's seven real properties without considering the timing of the investments in the Defendant Properties. Specifically, the District Judge found that post-1995 expenditures using unlawful proceeds resulted in an equal percentage of appreciation as an investment in the property made ten or more years earlier. For instance, Alavi invested at least ███████ dollars of undisputedly clean funds in the early 1980s to purchase the Maryland properties (A 11159 ¶¶ 9-10), and allegedly invested approximately ████████ in the property between 2000 and 2008 (A 11160 ¶ 14). These properties were appraised at approximately ████████ in 2013. (A 11159 ¶¶ 12-13). The District Court found that the investments in the 2000s resulted in 89% of the Defendant Property being forfeited. The Court ignored the facts that, first, the basis attributable to post-1995 investments was nowhere near 89%, and second, that the investments in the Property in the 1980s likely resulted in more appreciation than those made in the 2000s. The District Judge's conclusion that 89% of the ████████ property was forfeitable is simply unsupportable through facts or logic. (SPA 158.)

The District Court's substantive error on this issue reflects another instance where the District Judge turned the summary judgment standard on its head. The District Judge rejected Claimants' arguments on appreciation as not supported by "proffered facts regarding actual rates of appreciation or an expert opinion" (SPA 161-62), but failed to acknowledge that the Government—the party who actually bore the burden of proof—did not present either the rates of appreciation or the expert testimony that the District Court erroneously required from Claimants. No explanation was provided why Claimants were held to a higher standard of proof than the burden-bearing Government.

> b. *The District Court Did Not Engage In A Required Tracing Analysis Of The Funds In Alavi's Bank Accounts*

The Court concluded that the entirety of the funds in Alavi's bank accounts—over $1,400,000—was forfeitable because Alavi received millions of dollars in partnership distributions from 1996 through 2009, and the Government had demonstrated (based on "extrapolation" and past patterns) that its accounts must have received amounts exceeding the total seized balance. (SPA 164-70.) These inferences were impermissible at the summary judgment stage but, more importantly, were unsupported by the Government's tracing analysis.

With respect to two of the accounts that together held over $500,000 at the time of seizure, the Government traced only $695 of funds from the Fifth Avenue Company accounts into the accounts. (A 12024-25; A 11712.) Thus, no more than $695 from these accounts was subject to forfeiture under either 18 U.S.C. §§ 981 or 984. With respect to a third account, which held approximately $900,000 at the time of seizure, the Government traced only $392,613.34 in potential proceeds to the account in the year before its seizure. (A 12023-24; A-11694; A 11695.) But

76

Alavi offered undisputed evidence that this account had a low intermediate balance of $258,540.52 after the alleged unlawful proceeds were deposited, and that Alavi deposited $1,500,000 of clean funds after that lowest intermediate balance. (SDNY Dkt. No. 1086 at 6 n.3; A 11695.) Thus, at most, $392,613.34 of this account is forfeitable under 18 U.S.C. § 984 (as fungible property), and $258,540.52 is subject to forfeiture under 18 U.S.C. § 981 (as traceable proceeds). *See United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158-62 (2d Cir. 1986) (applying Pre-Civil Asset Forfeiture Reform Act tracing requirements to 21 U.S.C. § 881); *United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013) (approving of district court's use of the tracing methods described in *Banco Cafetero*). The Court erred in forfeiting the entirety of Alavi's bank accounts.

### D. Issues Of Material Fact Exist Concerning What Defendant Properties, If Any, Were Involved In A Money Laundering Transaction

As it did in its discussion of the Government's "proceeds" theory of forfeiture, the District Court overlooked disputes of material fact as to whether the Defendant Properties were involved in a money laundering transaction. The District Judge concluded that Alavi's interest in the Fifth Avenue Company, portions of its seven real properties, and its bank accounts were all involved in promotional, concealment, and international money laundering. (SPA 90-99; SPA 154-155; SPA 158-159; SPA 164.) But in making such findings, the District Judge substituted her own judgment for that of a jury and made assumptions not supported by the facts. The District Court's rulings with respect to money laundering forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) provide additional grounds for reversal.

77

1. **Legal Standard For The Forfeiture Of Property Involved In A Money Laundering Transaction**

Under § 981(a)(1)(A), property "involved in a transaction or attempted transaction" in violation of §§ 1956, 1957, or 1960 of Title 18 of the United States Code is subject to forfeiture. 18 U.S.C. § 981(a)(1)(A). The Government alleged and the District Court found no issue of fact that the Defendant Properties were subject to forfeiture as property involved in transactions in violation of § 1956. (SPA 86-87.) Section 1956 prohibits three types of money laundering relevant to the summary judgment orders: laundering of criminal proceeds for the purpose of promoting the carrying on of specified unlawful activity, *see* 18 U.S.C. § 1956(a)(1)(A); laundering intended to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds specified unlawful activity, *see id.*, § 1956(a)(1)(B); and international money laundering, *see id.* § 1956(2).

To prove either form of domestic money laundering, the Government must prove a "two-step analytical process" in which the laundering party "(1) acquire[d] the proceeds of a specified unlawful activity, and then (2) engage[d] in a financial transaction with those proceeds." *United States v. Napoli,* 54 F.3d 63, 68 (2d Cir. 1995).[20] If a transaction does

---

[20] Prior to 2009, the money laundering statute provided that funds could be forfeited as proceeds of a money laundering offense only where they were *obtained* as a result of the unlawful activity. *Compare* 18 U.S.C. § 1956 (2007) *with* 18 U.S.C. § 1956 (May 2009). While the statute was amended in May 2009 to include within the definition of proceeds *retained* property, the alleged illegal conduct in this action took place prior to the filing of the original complaint in December 2008, and the amendments to these sections of

78

not involve proceeds of an unlawful activity, there can be no domestic money laundering offense. *See United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001) ("[W]hen the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction."). "Proceeds" in the money laundering context is limited to the profits obtained as a result of specified unlawful activity. *United States v. Santos*, 553 U.S. 507 (2008).[21]

Unlike promotion and concealment money laundering, international money laundering does not necessarily require a transfer of the proceeds of a specified unlawful activity. *See* 18 U.S.C. § 1956(a)(2). Section 1956(a)(2) identifies two types of international money laundering: (1) where a person engages in an international transaction "with the intent to promote the carrying on of specified unlawful activity," or (2) when a person engages in an international transaction using the proceeds of unlawful activity. To succeed under the second theory of international money laundering, § 1956(a)(2)(B), the Government must set forth undisputed facts proving the claimants (1) attempted to transport the funds across the United States border; (2) knew the funds were proceeds; and (3) knew that the transport of

_____

1956 and 1957 are not retroactive. *See United States v. Van Alstyne*, 584 F.3d 803, 814 n.12 (9th Cir. 2009).

[21] The *Santos* Court, in a plurality decision, noted that "Congress has defined 'proceeds' in various criminal provisions, but sometimes has defined it to mean 'receipts' and sometimes 'profits.'" 553 U.S. at 511-12 (citations omitted). Finding the statute ambiguous, the Court interpreted proceeds to mean profits. *Id.* at 51 ("Because the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts' definition, the rule of lenity dictates that it should be adopted.").

79

the funds was designed to conceal the nature of the funds. *United States v. Ness*, 565 F.3d 73, 76 (2d Cir. 2009).

The Government bears the burden of proving that property is forfeitable, and the dollar amount of that property to be forfeited. *United States v. Schlessinger*, 396 F. Supp. 2d 267, 278 (E.D.N.Y. 2005). In addition, before any property can be forfeited on a facilitation or "involved in" basis, the Government "shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

### 2. The District Court Erred In Finding No Genuine Issue Of Material Fact As To Whether The Defendant Properties Were Involved In A Money Laundering Transaction

To establish the forfeitability of the Defendant Properties under a money laundering theory, the Government first bore the burden to prove that Bank Melli owned Assa and that the Foundation had knowledge of such ownership. Further, with respect to its money laundering theory under § 981(a)(1)(A), the Government bore the burden to prove that Claimants engaged in a financial transaction *with the intent* to promote specified unlawful activity or to conceal the proceeds of purported unlawful activity, or caused an international transaction *with the intent* to promote the carrying on of specified unlawful activity. *See* 18 U.S.C. § 1956. "[S]ummary judgment is generally inappropriate where questions of intent and state of mind are implicated." *Gelb*, 224 F.3d at 157.

The District Court assumed—without considering evidence put forward by Claimants—that Alavi's financial transactions using funds derived from the Building were made with the intent to promote IEEPA violations or to conceal the nature and source of the alleged unlawful proceeds. (SPA 92-94.) As to promotion money laundering,

80

the District Judge found: "when Alavi was engaging in any number of financial transactions to manage the Building, when it sent Assa its partnership distributions, and when it utilized funds from the Building to purchase other properties or improve or maintain the Building, it engaged in promotion money laundering." (SPA 92.) The District Court cited no evidence of Alavi's intent in participating in these transactions, and other explanations of Alavi's intent are equally if not more likely. While a jury can infer intent from a series of actions, *United States v. MacPherson*, 424 F.3d 183 (2d Cir. 2005), in ruling on the Government's motion for summary judgment, the District Judge was required to "construe all evidence in the light most favorable to the nonmoving party, draw[] all inferences and resolv[e] all ambiguities in [Claimants'] favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).

The District Court's conclusion as to concealment money laundering suffered from similar flaws. The District Judge held that the Fifth Avenue Company was "designed to disguise where money was going, the partnership was no different than a 'front' business set up to disguise the origins and destinations of the proceeds of the IEEPA offenses." (SPA 94.) But the Fifth Avenue Company was set up in 1989, *six years before the Iranian sanctions began and eight years before OFAC listed Bank Melli on the SDN list*. Accordingly, there was clearly an issue of material fact as to whether Alavi and Bank Melli had the foresight to predict that sanctions would be imposed on Iran years later and to set up Fifth Avenue Company in preparation. The District Judge's inference as to the "design[]" behind the Fifth Avenue Company was not only impermissible, *Dickerson*, 604 F.3d at 740, but it is also not supported by the evidence. Indeed, contemporaneous documents prove that Alavi's motivation in engaging in the 1989 Partnership Transaction, including establishing the Fifth Avenue Company, was to avoid unrelated business income taxes. (A 6842-6855.) The

81

District Judge detailed much of that evidence in a section of her decision entitled "The 1989 Tax Transaction," but simply ignored it when addressing Alavi's intent in establishing Fifth Avenue Company. (*See* SPA 37-41.) There was no basis for the District Court to remove from a jury's consideration the issue of Claimants' intent in setting up the Fifth Avenue Company in 1989 and, more importantly, whether transactions *after 1995* were intended to conceal information about the funds being spent or transferred.

Finally, the District Court's conclusion that Claimants engaged in international money laundering was also in error because of the existence of genuine issues of material fact. As an initial matter, the international money laundering theory suffered from the same problems that plagued the promotion and concealment money laundering theories—*i.e.*, that no evidence was offered as to Claimants' intent in engaging in the financial transactions. Additionally, the international money laundering theory failed because there is no evidence to support the District Judge's finding that "Alavi knew that it's (*sic*) transfer of assets from the 650 Fifth Ave. Co. to Assa Corp. was for the purpose of making an international transfer to Assa Co. Ltd. that would further the violations of IEEPA." (SPA 98.) The District Court cited no evidence to support this finding, and none exists in the record. In the paragraph of the Government's statement of purportedly undisputed facts that addresses the international transfers (A 9923 ¶ 57), Assa was described as making four transfers to Assa Ltd. in the Channel Islands between April 2002 and April 2004, but *nothing* was said about the Foundation's knowledge of the transfers. The Government bore the burden to prove that Alavi conspired with Assa to make international transfers or was aware of such transfers, and the Government did not even attempt to meet that burden. (SDNY Dkt. No. 689 at 46-47.)

Sidestepping the absence of proof that Alavi knew about and participated in the international transfers, the District Court once again improperly shifted the burden onto Alavi to prove it *did not know* of the transfers. The District Judge stated: "Alavi does not dispute that it knew such transfers took place, and no triable issue exists as to its participation in a conspiracy to violate the IEEPA by making such transfers." (SPA 98.) Alavi was not required to rebut evidence that simply did not exist.

There were disputes of material fact as to which of the Defendant Properties, if any, were involved in a money laundering transaction; the District Court's findings with respect to money laundering forfeiture were in error.

### E. The District Court Erred By Relying On Inadmissible And Unauthenticated Evidence In Granting Summary Judgment

In concluding there were no issues of material fact precluding summary judgment, the District Court relied on evidence whose admissibility and authenticity had been challenged and not properly ruled on. The District Court improperly considered this evidence, and its decisions based on such evidence were entered in error.

In moving for summary judgment, the Government cited documents purporting to support its allegations concerning Alavi, the Fifth Avenue Company, and Iranian officials who attempted to assert control over Alavi (though virtually all of the documents were from before 1995). (*See, e.g.*, A 6798-801; A 6856-59; A 6881-88; A 6914-24; A 7091-103.) Many of these documents were not sent by or to an Alavi employee or director, and were not found in Alavi's offices or produced by Claimants in discovery. Indeed, a substantial number of the documents the Government offered to support its claims were produced with FBI bates numbers, where the source was not disclosed. (*See id.*; *see also* A 12092-94).

83

Many of the documents were in Farsi, and very few of them were accompanied by a certified translation.[22] None of these documents should have been relied upon by the District Court, at least until there was a proper ruling as to their admissibility.

Notwithstanding this, the District Court relied on these documents or the Government's description of what the documents said, in granting summary judgment, explaining that "a party may rely on evidence which, while not in an admissible form on the motion, presents the type of facts that could be introduced in an admissible form at trial." (SPA 31.) In support of this statement, the District Court cited a decision by this Court that actually reached the opposite conclusion. *Id.* Specifically, in *Brink v. Union Carbide*, 210 F.3d 354, 2000 U.S. App. LEXIS 7150, at *4-6 (2d. Cir. Apr. 18, 2000), the Court affirmed the district court's decision to *exclude* from consideration at the summary judgment stage an affidavit that was not based on personal knowledge and that referenced evidence that would properly be considered as hearsay at trial. *Id.* The Court affirmed the district court's rejection of materials that "were largely representations as to hearsay statements that would have been excludable at trial, or opinions as to which the court deemed the affiants insufficiently qualified to present at a trial," noting that exclusion of hearsay evidence is appropriate "absent a showing that admissible evidence will be available at trial." *Id.* Contrary to the District Court's

---

[22] The District Court noted that the Government's declaration and exhibits submitted in support of summary judgment contained "errors and/or omissions," but nonetheless credited the documents, noting that the documents were authenticated by FBI Agent Jennifer McReynolds, whose capability to authenticate these documents is completely unexplained. (SPA 37 n.21.)

84

assertion, *Brink* does not condone the reliance on materials that were "not in admissible form on the motion," particularly where, as here, the Government did not overcome Claimants' objections and demonstrate that the cited documents would have been admissible at trial. (SPA 31.)

The District Judge incorrectly assumed (despite Claimants' objections to the contrary) that many documents were "business records" of Alavi and the Fifth Avenue Company, or that they would have been admissible as admissions, statements by a co-conspirator, or notes revealing present sense impressions or "then-existing state of mind." (SPA 33-34.) Apart from a wholesale disregard of Claimants' admissibility objections, the District Court did not actually analyze the admissibility of *any* of the documents cited in the summary judgment opinions and never described the multiple conspiracies that would have been necessary to support the admissibility of documents written by individuals not affiliated with the Foundation or the Fifth Avenue Company from years before the Iranian sanctions went into effect. As to the alleged "business records," the District Judge found that they could be "separately authenticated by Agent Jennifer McReynolds, the FBI custodian involved in an investigation of Alavi," though the District Court did not explain how an FBI agent was qualified to testify as to what constitutes a business record of an entity she was investigating. (SPA 33 n.18.) Needless to say, Agent McReynolds could not.

Because disputed issues of material fact exist, the Court should reverse the District Court's summary judgment decisions and vacate the forfeiture judgment.

85

## II. The District Court's Summary Judgment Decisions Must Be Reversed Because The Court Relied On Evidence Seized In Violation Of The Fourth Amendment

In granting summary judgment as to the forfeitability of the Defendant Properties, the District Court improperly relied on evidence that was seized in violation of the Fourth Amendment and should have been suppressed. The FBI executed an unlawful search of the Foundation's offices in December 2008, and the Government filed the Amended Complaint relying on the seized evidence eleven months later. The Amended Complaint was drafted as a direct result of the unlawful search. In denying Claimants' motion to suppress, the District Judge refused to even to consider the constitutional violation, asserting that the Fourth Amendment was "not implicated" because Claimants were required to preserve, and subsequently produced, the seized evidence in discovery in this civil forfeiture action. For essentially the same reasons, the District Court assumed the search evidence would have been "inevitably discovered" without the unlawful search and seizure, and it refused to hold a hearing at which the Government would have had the burden of proving such inevitable discovery. The District Court erred on multiple levels in denying suppression, and these errors require reversal of the suppression order and the summary judgment decisions, which were substantially based on the illegally-seized evidence.

86

A. **Facts And Circumstances Of The December 2008 Search And Seizure**

1. **The Filing Of The Complaint Against Assa's And Assa Ltd.'s Assets; The Post-Complaint Protective Order; And The Service Of The Grand Jury Subpoena On Alavi**

On December 17, 2008, the Government filed the Complaint, initiating this forfeiture action and specifically seeking forfeiture of *only* properties belonging to Assa, Assa Ltd., and Bank Melli. (A 4578.) The Complaint alleged that Assa and Assa Ltd. were set up as "shell companies" to disguise Bank Melli's ownership interest in the Fifth Avenue Company, and that Assa, through an employee in the United States, Mohammad Hassan Dehghani Tafti, was providing unlawful services for the Bank. (A 4585-4593 ¶¶ 16, 21, 26-31.) According to the Complaint, Alavi was Assa's partner in the Fifth Avenue Company, which was established in 1989 to decrease the Foundation's tax liability. (*Id.* ¶¶ 16-23). The Complaint did not seek the forfeiture of any property interest belonging to Alavi or allege that Alavi violated the law or knew that Assa and Assa Ltd. were purportedly violating the law.

On the same day the Complaint was filed, the Honorable Richard J. Holwell, who was presiding over the case at the time, entered a Post-Complaint Protective Order (the "Protective Order"), directing "[a]ll persons and entities having actual knowledge" of the Protective Order not to take any action that would in any way diminish the value of the properties named in the Complaint and not to "destroy any documents relating in any manner or part to the allegations in the Complaint." (A 5185 ¶¶ 1, 2.) The Protective Order also directed the Fifth Avenue Company and the Building's outside management company, Jones Lang LaSalle ("JLL") to preserve or make available certain documents and to

87

produce "a complete list of the Fifth Avenue Company's assets" and "a report of monthly income and expenses from December 2007 through the Present." (A 5185-86 at ¶¶ 3, 4.) Apart from its general reference to "[a]ll persons and entities having actual knowledge," the Protective Order imposed no obligation on Alavi.

Also on December 17, 2008, the FBI served Alavi with a grand jury subpoena, revealing a criminal investigation of potential IEEPA and money laundering violations. The subpoena required Alavi to produce: "any and all documents relating or referring to" the Fifth Avenue Company, Assa, Assa Ltd., and Bank Melli" from "January 1, 1989 to the present." (A 5193.) It did *not* require the production of documents relating to Alavi's own activities, including its finances, assets, or leadership structure. The subpoena listed December 30, 2008 as the return date (A 5192); however, because the FBI executed a search warrant of Claimants' offices two days later, and seized the documents covered by the subpoena and a huge volume more, Alavi's production did not occur on that date and ultimately consisted of very few documents.

### 2. The Application For And Issuance Of A Warrant Permitting A Nearly Limitless Search And Seizure Based On A Single 19-Year Old Transaction

On December 19, 2008, former Magistrate Judge Theodore H. Katz issued a warrant authorizing the FBI to search for and seize financial records and computer storage devices from Alavi's offices at 500 Fifth Avenue in New York City. (*See* A 5140.) Judge Katz issued the warrant based on an application consisting of a twelve-paragraph affidavit signed by FBI Special Agent George J. Ennis (the "Ennis Affidavit") (A 5143-51), which incorporated the original forfeiture Complaint (A 5155) and a list of "Items

88

To Be Seized At The Premises" (A 5153). The relevant portion of the Ennis Affidavit comprised two perfunctory paragraphs, asserting that the Government had been investigating

> [A] 1989 transaction involving 650 Fifth Avenue, New York, New York, a Manhattan office tower . . . which is largely filled by commercial tenants. The Building was constructed in 1970s with a loan from Bank Melli to Alavi's predecessor organization. In 1989, in order to avoid a substantial anticipated tax liability, Alavi repaid its mortgage to Bank Melli by selling a 40% interest in the Building to Assa Corp., a subsidiary of Assa Co. Ltd., both of which were shell companies owned by Bank Melli. In 1999, the U.S. Treasury Department's Office of Foreign Asset Control identified Bank Melli and its offices worldwide as entities "owned or controlled by the Government of Iran." 31 C.F.R. Part 560, App. A. Accordingly, Bank Melli is subject to the Iranian Transactions Regulations ("ITR"), Title 31 United States Code of Federal Regulations, Part 560, and Assa Co.'s interest in the Building and its rents is subject to civil forfeiture, as fully set forth in [the Assa Complaint].

(A 5144-46.) The Ennis Affidavit also attached a boilerplate document entitled "Methods To Be Used To Seize and Search Computers and Computer-Related Equipment." (A 5177.) These documents ostensibly set forth probable cause to justify the warrant and, therefore, the FBI's subsequent search of the Foundation's offices.

The Ennis Affidavit did not assert that the 1989 Partnership Transaction in which Alavi and Assa formed the

Fifth Avenue Company was illegal or improper under the IEEPA, the ITRs, or U.S. tax laws.  Indeed, as Agent Ennis reported, the 1989 Partnership Transaction occurred *years before* OFAC "blocked" Bank Melli as being owned or controlled by Iran.  While Agent Ennis attested that *Bank Melli* was subject to the ITRs and that *Assa*'s properties were subject to forfeiture, the Ennis Affidavit said nothing about Alavi being subject to any regulation and nothing about its properties.   Apart from the brief mention of the 1989 Partnership Transaction, the Ennis Affidavit did not set out any additional details regarding Alavi's conduct or its relationship with Assa or Bank Melli.

Instead, the Ennis Affidavit incorporated the Complaint by reference and made the unsupported claim that the 1989 Partnership Transaction was somehow improper:

> As the Verified Complaint sets forth, although the property and funds which are subject to forfeiture belong to Bank Melli and its related entities, the transactions underlying Bank Melli's acquisition of its interest in the Building was not an arms-length transaction with Alavi, but rather was structure[d] both to evade Alavi's tax liability and to conceal Bank Melli's interest in the Building.

(A 5146.)   The Ennis Affidavit offered absolutely no support, however, for the claims that:  (1) the acquisition of the Building at 650 Fifth Avenue was not an arms-length transaction; (2) the 1989 Partnership Transaction was anything other than a lawful mechanism to reduce Alavi's tax exposure; or (3) the transaction was intended to conceal Bank Melli's interest in the Building.  Yet, based on these unsupported claims, the Ennis Affidavit concluded that "there is probable cause to believe that Alavi committed the same crimes alleged as a basis for the forfeiture sought in the

90

Complaint, and that Alavi and its directors, employees, and other agents, committed, conspired to commit, and aided and abetted the same violations by Alavi and Bank Melli, among others." (*Id*.)

The Ennis Affidavit did not offer any explanation why the 1989 Partnership Transaction provided probable cause to believe the Foundation committed the "same crimes" as alleged in the Complaint, and no explanation was self-evident. The Complaint attached to the Ennis Affidavit did not accuse Alavi of crimes or suggest that the 1989 Transaction was illegal. The Complaint alleged only that Assa was a straw company owned and operated by Bank Melli, and that Assa had been "transferring rental income generated from the Fifth Avenue Company to Bank Melli, following Bank Melli's instructions with regard to Assa Corp.'s affairs, reporting back to Bank Melli on Assa Corp.'s financial situation and business dealings, and managing the affairs of Assa Corp. for the benefit of Bank Melli." (*See* A 4581-95 ¶¶ 6-13, 16, 38-48.) The Complaint further alleged that, through these actions, Assa had been violating the IEEPA, and that these alleged IEEPA violations constituted underlying "unlawful activity" supporting separate money laundering charges. (A 4581-97 ¶¶ 5-13, 40-48.)

Importantly, the Complaint did *not* allege that the Foundation violated the IEEPA, or any other law for that matter, and did not seek forfeiture of *any* of Alavi's property. The Complaint's only mention of the Foundation involved the same 1989 Partnership Transaction referenced in the Ennis Affidavit. (*See id*. ¶¶ 16, 18-22.) Like the Ennis Affidavit, the Complaint asserted that the Foundation entered the 1989 Partnership Transaction to "avoid paying U.S. taxes on revenue from the Building," but did not offer any basis by which a reader could conclude that the 1989 Partnership Transaction was unlawful. (*Id*. ¶ 22.) The Complaint did not allege that Alavi had any further dealings with Assa or

91

Bank Melli after 1989, and did not allege that Alavi ever knew or had reason to know that Assa or its parent company, Assa Ltd., was owned or controlled by Bank Melli. The Complaint did not include information about any Government investigation of Alavi, and did not cite any sources to support the allegations regarding Alavi.[23] (*See id.* ¶¶ 16, 18-22.) Accordingly, the Complaint provided no basis whatsoever to conclude that the Foundation committed the "same crimes" or "same violations" that Assa was alleged to have committed in the Complaint.

Despite the paucity of evidence in the Ennis Affidavit and the rest of the warrant application, Magistrate Judge Katz issued a warrant authorizing the government to seize all documents listed in Exhibit A to the Ennis Affidavit, namely: (1) "[a]ny and all documents . . . concerning or relating to" ownership interests in Assa, Assa Ltd., the Fifth Avenue Company, the Building, and Bank Melli; (2) "[a]ny and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records" of Assa, Assa Ltd., the Fifth Avenue Company, Bank Melli, the Foundation, "or any of the officers and employees of these entities"; and (3) "[a]ny and all computers" and related equipment and data storage devices without limitation. (*See* A 5140-41.) Neither the

---

[23] It was not until November 12, 2009—almost eleven months after the search warrant issued—that the Government filed the Amended Complaint alleging for the first time that Alavi had provided services to Iran, and seeking forfeiture of Alavi's properties on that basis. (*See* A 1289.) Further, while Alavi's president at the time had been arrested for obstruction of justice on December 17, 2008, his arrest and the conduct underlying the charges were nowhere mentioned in the warrant application or Ennis Affidavit. (A 5142; A 5143.)

92

warrant nor Exhibit A to the Ennis Affidavit identified the purported crimes for which evidence could be searched and seized, the type or nature of computer files permitted to be seized, or a date restriction or date guidance for documents that could be seized.

### 3. Execution Of The Unlawful Warrant And Seizure Of Virtually All Of Claimants' Hard Copy And Electronic Records

FBI agents executed the warrant the day it was issued, seizing virtually every document and digital media device in the Foundation's offices, regardless of its content, age, or apparent relevance to the investigation described in the warrant application. The FBI carried off all of Alavi's computers, all of its servers, and over 200 boxes of materials from its offices. The boxed materials included virtually all of Alavi's hard-copy files, containing all of the its records going back to the 1970s. (A 4881 ¶¶ 3,4; A 4891-97; A 4899-4940.) Materials seized ranged from financial documents to transit checks, letters of credit, employee benefit information, personal diaries, Alavi's checks, documentation concerning its 401(k) and pension plans, utilities bills, health insurance and dental expense plan records, asbestos survey reports, and files regarding the Islamic centers to which the Foundation donated. (A 4881 ¶ 6.) Virtually nothing was left behind.

Following the search, Alavi repeatedly sought the return of its documents. (*See* A 4881 ¶¶ 6, 14; A 4960; A 4966.) The Government agreed to return the seized materials, or copies of the materials, after they had been reviewed and duplicated. (A 4881 ¶ 7.) However, this process of review and return literally took years to complete. It was not until shortly before the Court-ordered close of discovery in April

93

2012,[24] almost three and a half years after the search, that the Government completed its production of documents back to Alavi—some 733,000 pages of documents in all. (A 2636; A 2640-42; A 12089-90; A 5420-21.) The Government produced the application for the search warrant and the affidavit submitted in support of the warrant for the first time in its April 2012 production. (A 12089-90.)

### 4. Use Of Unlawfully-Seized Evidence In Drafting The Amended Complaint And Formulating Civil Discovery Requests

On November 12, 2009—nearly eleven months after the search and seizure—the Government filed the Amended Complaint seeking forfeiture of properties belonging to Alavi and the Fifth Avenue Company. The Amended Complaint alleged for the first time that Alavi was controlled by the government of Iran and had been providing services to Iran in violation of the IEEPA and conducting transactions in violation of the money laundering statutes. (A 2439 ¶ 21.)

The Amended Complaint was premised on materials seized during the December 19, 2008 search, including Alavi Board minutes, letters to and from Alavi Board members and employees, the personal journals of Alavi Board members, Alavi financial and tax records, and records of bank accounts

---

[24] The deadline for fact discovery was extended numerous times to accommodate the Government's inability to complete its production of documents. Ultimately, the deadline for the production of documents was extended until April 1, 2013, although the Government failed to meet that deadline as well. In the two months before trial was scheduled to start, the Government produced over 40,000 pages of documents. (A 10934.)

94

and real property held by Alavi. (A 2440-2512 ¶¶ 24, 27, 29, 31, 41-46, 53, 61, 66, 68-74, 96-100, 106, 124-43.) The Government also used the unlawfully-seized records to identify or trace potentially forfeitable properties and monies belonging to Alavi and the Fifth Avenue Company. (*Id*. ¶¶ 97-100, 124-43.)

On June 24, 2011, over one-and-a-half years after the Amended Complaint was filed and two-and-a-half-years after the search, the Government and a group of private judgment creditors (the "Iran Creditors") together propounded a First Set of Consolidated Document Requests to Claimants. (A 5401.) These requests were tailored to the factual allegations in the Amended Complaint and reflected information learned through the Government's review of documents illegally-seized from Alavi's files. (*See*, *e.g.*, A 5407-08, 5411-14.) Because the FBI seized virtually all of Alavi's materials in December 2008 and held onto those materials, Claimants' "discovery production" largely involved returning to the Government and providing to the Iran Creditors a subset of those documents on May 31, 2012 and on June 28, 2012, with privileged and non-responsive documents removed. (A 5417, A 5420-21, A 2651-52.) That is, the relevant "production" consisted of copies of the very same documents that the Government had already been reviewing, sharing with other federal agencies, and using as the basis for its own investigations for the previous three-and-a-half years. Even the bates numbers identifying the documents returned by Claimants were Government bates numbers.

95

### 5. The Motion To Suppress And The District Court's Order Denying Suppression Without A Hearing Or Any Fourth Amendment Analysis

At a status conference before the District Court on March 28, 2012, Claimants indicated that they would likely be filing a motion to suppress the evidence seized in the December 2008 search, but were awaiting the Government's production of the search warrant application and accompanying affidavit and the remainder of the search evidence. Claimants explained:

> [W]e have not been able to [file a suppression motion] because we have never had access to either the warrant [application] or the affidavit in support. So once we get that, we'll want to look at that, we'll want to examine the entirety of the search evidence, because we have had access to a good portion of that but not in a processed way and not the full batch of evidence, but we will want to move to suppress the search evidence.

(A 2636-37.) The District Court inquired whether it would be submitted as a motion *in limine* to exclude evidence at trial, and Claimants' counsel explained that the motion would address Fourth Amendment violations that warrant suppression in the civil forfeiture action. (A 2637.) The District Court instructed counsel to "do what you need to do." (*Id.*)

On April 13, 2012, only weeks before the close of fact discovery, the Government for the first time turned over the warrant application, including the Ennis Affidavit and attachments, to Claimants. (A 12090.) The application and Ennis Affidavit revealed that the warrant was not based on probable cause, that it lacked particularity and authorized an

96

overbroad seizure of materials, and that the Government's seizure exceeded the scope of the warrant.

Though the District Judge initially ordered the production of all documents by April 2012 (SDNY Dkt. No. 234), that deadline was repeatedly extended at the Government's request and the Government continued producing records up through the weeks before trial. In July and August of 2013 alone, the Government produced over 40,000 pages of documents. (A 10934.) On July 1, 2013, Claimants filed a motion to suppress the evidence seized during the December 19, 2008 search and all evidence derived from the unlawful search. (*See* A 3155; SDNY Dkt. Nos. 536.)

In a Memorandum and Order entered on September 9, 2013, the District Court denied Claimants' motion to suppress, holding that the Fourth Amendment was "not implicated" by the relevant facts. (SPA 15.) The District Judge did not consider whether the December 19, 2008 search and seizure violated the Fourth Amendment, instead finding that "separate and preexisting civil discovery retention and production requirements obviate the need for any Fourth Amendment analysis." (SPA 11.) The District Court also refused to hold an evidentiary hearing on the issue of inevitable discovery because it concluded that there were no contested fact issues as to the likelihood that the Government would have obtained the seized evidence absent the search. (SPA 16.)

## B. The December 19, 2008 Search And Seizure Violated Claimants' Fourth Amendment Rights

This Court reviews the denial of a suppression motion for clear error as to the district court's factual findings and *de novo* as to its legal conclusions. *See United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013). The December 2008 search and seizure violated Claimants' right under the Fourth Amendment to be free from unreasonable searches and

97

seizures; therefore, evidence seized during the search and "fruits" of the search should have been suppressed, and should not have served as a basis for the District Court's rulings on summary judgment. Because forfeiture proceedings are "quasi-criminal in character," the object of which, "like a criminal proceeding, is to penalize for the commission of an offense against the law," the Fourth Amendment's exclusionary rule applies to such proceedings. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 700-01 (1965); *United States v. 500 Delaware St.*, 113 F.3d 310, 313 n.3 (2d Cir. 1997).

Here, there are three separate and independent bases for suppression. First, the seized evidence should have been suppressed because the Government's warrant application failed to establish probable cause that Alavi had committed a crime or that evidence of a crime would be found at its premises. Second, the warrant itself is constitutionally infirm because it fails to identify with particularity the evidence to be seized, and thereby authorizes an overbroad search. Third, the Government's execution of the search violated the Fourth Amendment because the agents seized materials far exceeding the scope of the warrant. The District Court did not disagree that the search violated the Fourth Amendment; it simply never undertook the required constitutional analysis.[25]

---

[25] For the sake of brevity, Appellants offer here a condensed explanation of why the search and seizure were illegal under the Fourth Amendment. For a more thorough treatment, the Court should refer to Appellants' opening motion and reply brief filed with the District Court. (SDNY Dkt. Nos. 536, 598.)

98

1. **The Search Warrant Application And Attached Affidavit Failed To Establish Probable Cause For The Issuance Of The Warrant**

The evidence seized on December 19, 2008 from the Foundation's offices should have been suppressed because the warrant application provided no basis to conclude that Alavi committed a crime, or that evidence of a crime would be discovered in its offices or in its business or computer records. The only information in the warrant application regarding the Foundation's conduct related to a single real-estate transaction from 1989—*i.e.*, *nineteen years before the Government applied for the warrant.*

As described in the Ennis Affidavit, the Government's investigation "concern[ed] a 1989 transaction involving 650 Fifth Avenue, New York, New York.," in which "Alavi repaid its mortgage to Bank Melli by selling a 40% interest in the Building to Assa Corp., a subsidiary of Assa Co. Ltd., both of which were shell companies owned by Bank Melli." (A 5145 ¶ 4.) But Agent Ennis did not attest, and the Government did not otherwise assert in the application, that the 1989 Partnership Transaction was unlawful or in any way improper. Nor could they: the application itself established as a matter of fact and law that the 1989 Partnership Transaction could not have violated the ITRs, because the ITRs were promulgated in 1995—*six years after the 1989 transaction*. (A 4582-84, ¶¶ 7-11.) Moreover, as the Ennis Affidavit explained, it was not until 1999—*ten years after the transaction*—that OFAC "identified Bank Melli and its offices worldwide as entities 'owned or controlled by the Government of Iran,'" thereby making it illegal to transact with Bank Melli.[26] (A 5145 ¶ 4.)

---

[26] The search warrant application stated that Bank Melli was added to OFAC's SDN list in 1999. The District Court

99

The application did not assert that Alavi engaged in *any actions of any kind*—legal or illegal—after the 1989 Partnership Transaction. (A 5144-46 ¶¶ 4-5; A4585-87 ¶¶ 18-22.) Indeed, the Ennis Affidavit stated only that the Government's investigation "concerns a 1989 transaction involving 650 Fifth Avenue, New York, New York"; it did not mention any later conduct. (*See* A 5144-46 ¶ 4.) Likewise, the attached Complaint, which was focused on *Assa*'s actions, was essentially silent about Alavi's post-1989 activities. In fact, the warrant application did not allege that the Foundation had *any other contact whatsoever* with Assa, Bank Melli, or any person or entity that could be said to represent Iran's interests after the 1989 Partnership Transaction. The application contained no evidence that Alavi provided any services or gave anything of value to Assa or Bank Melli after 1989 (when the Partnership Agreement was consummated), much less after 1995 (when the first Executive Order prohibited transactions with Iran) or after 1999 (when, according to the application, transacting business with Bank Melli was first prohibited). Accordingly, there was simply no basis in the warrant application to conclude that Alavi committed a crime.

The warrant application also failed to establish probable cause that evidence or instrumentalities of Assa's or anyone else's purported crimes would be found in Alavi's files or its computer records. *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965). The bare fact that Alavi entered into a business arrangement with Assa *nineteen years* before the warrant application was not sufficient to establish probable cause to search Alavi's records. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[M]ere propinquity to others independently suspected of criminal activity does not,

---

found that OFAC added Bank Melli to the list in 1997. (SPA 48.)

without more, give rise to probable cause to search that person.").

Moreover, the facts set forth in the warrant application were unquestionably stale. Facts supporting the issuance of a search warrant "must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993). Here, the only relevant allegation in the warrant application concerned a single, legal transaction that occurred *almost two decades* before the application. *Cf. United States v. Falso*, 544 F.3d 110, 122-23 (2d Cir. 2008) (18-year-old conviction for sex offense too stale to support probable cause for child-pornography offense).

The warrant application was also fatally flawed because it consisted almost entirely of unsubstantiated allegations, rather than facts grounded in Agent Ennis' personal knowledge. Probable cause cannot be made out by "affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based." *Ventresca*, 380 U.S. at 102, 108-109. The warrant application consisted of a bare-bones affidavit by Agent Ennis accompanied by a civil forfeiture complaint that primarily addressed conduct by Assa and Bank Melli. The Ennis Affidavit did not cite any documents, testimony, or personal observations to support its allegations against Alavi. The Complaint provided substantial detail concerning *Assa*, but contained only conclusory allegations regarding *Alavi*. (*See* A 4585-87 ¶¶ 18-22.) It did not cite any document, testimony, or personal observation to support its allegations regarding the Foundation or its relationship

101

with Assa or Bank Melli.[27]  (*See id.*).  Accordingly, the statements in the Ennis Affidavit and the entire warrant application were too vague and unreliable to establish probable cause to search Alavi's offices or its computer records.

### 2. The Search Warrant Violated The Fourth Amendment Because It Lacked Particularity And Improperly Authorized An Overbroad Seizure Of Documents And Electronic Media

The Fourth Amendment's particularity requirement guards against "wide-ranging exploratory searches," *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), by requiring warrants to identify clearly the evidence subject to seizure. *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). The search warrant here violated this requirement because it did not describe the suspected violation for which evidence was being sought, did not limit the seizure to specific types

---

[27]  Though Agent Ennis, the warrant affiant, verified the Complaint by attesting that its contents were "true to the best of his knowledge, information, and belief," (*see* A 4599), such a verification does not establish the *basis* for his knowledge that any particular allegation in the Complaint was true or correct.  *See Illinois v. Gates*, 462 U.S. 213, 239 (1983) (affiant's conclusory statements based upon information and belief insufficient to establish probable cause); *Nathanson v. United States*, 290 U.S. 41, 44, 46 (1933) (rejecting warrant issued upon sworn allegation that the affiant "has cause to suspect and does believe" that merchandise was in a specified location because "a mere affirmation of suspicion and belief without any statement of adequate supporting facts" is insufficient to support probable cause).

102

of records, and contained no limit on the temporal scope of documents to be seized.

First, the search warrant failed to limit the search by reference to any specific crimes alleged. *George*, 975 F.2d at 77; *United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993). Under the Supreme Court's decision in *Groh v. Ramirez*, the description of the alleged crimes must appear in either (1) the warrant itself, or (2) in a supporting application if "the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." 540 U.S. 551, 557-58 (2004). The Second Circuit has explained that an attached affidavit will be properly incorporated into a warrant under *Groh* only if the warrant contains "deliberate and unequivocal language of incorporation." *United States v. Waker*, 534 F.3d 168, 172, 173 n.2 (2d Cir. 2008). The warrant in this case was a boilerplate form, and did *not* identify the crimes to which the seized documents relate. (*See* A 5140-41.) The only document incorporated by reference was a list of items to be seized, which did not identify *any* alleged crime, much less limit the documents to be seized to those containing evidence of the crimes listed in the Ennis Affidavit or Assa Complaint. (*See* A 5153.) The warrant therefore gave the Government carte blanche to engage in an extended, exploratory rummaging of the Foundation's belongings—precisely what the Fourth Amendment is intended to prevent. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

Second, the search warrant was insufficiently particular because it authorized a wholesale seizure and search of Alavi's computer storage devices, without particularly identifying the categories of files or information sought. *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005); *see also United States v. Galpin*, 720 F.3d 436, 445-47 (2d Cir. 2013) (discussing application of particularity requirement to computer searches). The warrant authorizing

103

the search of the Foundation's offices permitted the seizure of "[a]ny and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMS, hard disks, floppy disks; and related or connected computer or data storage equipment." (A 5153.) A warrant to seize all data-storage devices on the premises, without limitation, is just as impermissible as a warrant to seize all paper documents on the premises, regardless of type or relevance. *Cf. Bianco*, 998 F.2d at 1115 (warrant lacked particularity where it authorized the seizure of all "Notes, Ledgers, Envelopes, Papers, and Records Containing Initials, Names, Addresses, Dollar Amounts, Codes, Figures, and the Like; United States Currency").

Third, the search warrant was unconstitutionally overbroad because it authorized the search and seizure of documents that pre-date and post-date the 1989 Partnership Transaction between Alavi and Assa. Where, as here, the conduct under investigation was a one-time transaction, the warrant must impose a corresponding date limitation to avoid authorizing searches and seizures for which there is no probable cause. *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995); *United States v. Diaz*, 841 F.2d 1, 4–5 (1st Cir. 1988). But the warrant itself contained no time-frame limitation, thereby permitting the arbitrary seizure of records dating from Alavi's formation as a not-for-profit corporation in the 1970s all the way into the present. Unsurprisingly, the agents in this case did in fact seize and search all of the Foundation's hard-copy and computer records, regardless of their dates. The resulting prejudice is evident from the Amended Complaint, which relies heavily on documents seized from the Foundation's files dating as far back as 1981 (*see* A 2442 ¶ 29) and as recently as October 2007 (*see* A 2566-68 ¶¶ 68-74).

104

### 3. The Government's Execution Of The Search And Seizure Was Unreasonable And Violated The Fourth Amendment

The Government ignored whatever limitations existed in the warrant and indiscriminately seized almost all of Alavi's papers and electronic records for plenary search and review. As a result, even if this Court were to determine that the warrant were valid, any evidence seized in the December 19, 2008 search outside of the scope of the warrant should have been suppressed.

A search and seizure "must be confined to the terms and limitations of the warrant authorizing it." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988); *see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971) ("[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant."). The warrant authorized seizure of (1) documents concerning "the ownership of, rental of, mortgaging of, or investing in" Assa, Assa Company Ltd, the Fifth Avenue Company, 650 Fifth Avenue, or Bank Melli; (2) financial documents concerning these entities, Alavi, and their officers and employees; and (3) Alavi's computers and data storage equipment. (*See* A 5153.) Instead of abiding by these already over-generous limits, the searching agents carried off virtually all of the Foundation's hard-copy files—over 200 boxes—containing all of Alavi's records going back to the 1970s. This failure to abide by the terms of the warrant constituted a separate Fourth Amendment violation.

### C. The District Court Committed Legal Error In Denying Claimants' Suppression Motion

Rather than address the constitutional violations that plagued the December 19, 2008 search, the District Court held that the Fourth Amendment was "not implicated" here

105

because Claimants had a pre-existing obligation to preserve relevant documents and had produced a subset of the seized materials in response to discovery requests. (SPA 14-15.) Specifically, the District Judge found that Claimants had a common law obligation to *preserve* documents, and that the Fifth Avenue Company was required by Protective Order to *allow inspection* of its documents. (SPA 15-16.) According to the District Judge, these preservation and inspection obligations provided the Government a separate means to obtain the seized materials free from the taint of the Fourth Amendment violations and, therefore, excused any Fourth Amendment violation. (SPA 11.) The District Court further held that Claimants "waived" their constitutional rights by not objecting that Judge Holwell's Protective Order was overbroad. (SPA 14.) Lastly, without holding a hearing, the District Judge found that the Government would have "inevitably discovered" the seized evidence through civil discovery in the forfeiture action and related turnover actions, without regard to the District Court's finding that the forfeiture action was largely based on the unlawfully-seized evidence. The District Court's holdings are not supported by the facts or applicable law. The order denying suppression should be reversed, and the summary judgment decisions, which were premised on unlawfully-seized evidence, must also be reversed.

### 1. Claimants' Alleged Preservation, Inspection, And Production Obligations Did Not Obviate The Need For A Fourth Amendment Analysis

In denying suppression, the District Court held that the Fourth Amendment was "not implicated on this set of facts," and that it need not "engage in an unreasonable search and seizure analysis" because "separate and preexisting civil discovery retention and production requirements obviate the need for any Fourth Amendment analysis." (SPA 3, 11, 15.) The District Judge found that "the Government had the right

106

to the full set of documents irrespective of the search, as the result of both the Protective Order and the common law document preservation requirements," and therefore, the Government "had a factual basis to add Alavi as a named defendant [to the Amended Complaint] absent the search." (SPA 13.)  The District Court cited no legal authority to support its holding that a Fourth Amendment analysis was unnecessary, and its factual findings in support of its holding were completely incorrect.

The Foundation and the Fifth Avenue Company held a protected Fourth Amendment interest—that is, a reasonable expectation of privacy—in their business records and their business offices.  *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977); *Mancusi v. DeForte*, 392 U.S. 364, 368-70 (1968).  Here, the Government executed an overbroad search and seizure based on an invalid warrant, thereby violating Claimants' constitutional rights.  This Fourth Amendment violation was "fully accomplished" at the time of the December 19, 2008 search.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (Fourth Amendment violation is "'fully accomplished' at the time of an unreasonable governmental intrusion") (citations omitted).  Given this completed constitutional violation, the District Judge was required to consider suppression in the civil forfeiture action of all unlawfully-seized evidence, as well as the "fruits" of the illegal search.  *See One 1958 Plymouth Sedan*, 380 U.S. at 696 (Fourth Amendment exclusionary rule applies in civil forfeiture proceedings).

The District Court erred in finding that the criminal investigation that led to the search of the Foundation's offices was "separable" from the civil forfeiture action for purposes of analyzing the suppression issues, and that any Fourth Amendment violation that occurred in the criminal investigation was "not relevant to [the seized documents'] availability for use in the forfeiture action."  (SPA 1-3, 10.)

107

This assertion is contrary to established law and common sense. The Government executes search warrants *only* in conjunction with criminal investigations. *See* Fed. R. Crim. P. 41(c). Because civil forfeiture of property is based on violations of the law, civil forfeiture actions and criminal investigations are often inextricably intertwined. The exclusionary rule, when applied to forfeiture actions, deals with precisely the circumstances at issue here.

In the leading Supreme Court case on the exclusionary rule's applicability in civil forfeiture actions, the police executed a search and seizure pursuant to a criminal investigation, and the owner of the property sought to be forfeited was arrested and charged with a criminal offense. *One 1958 Plymouth Sedan*, 380 U.S. at 694. The Supreme Court held that the Fourth Amendment exclusionary rule applied not only in the original criminal proceeding, but in the subsequent civil forfeiture action as well. *Id*. at 696; *see also United States v. 500 Delaware Street*, 113 F.3d 310, 312 & n.2 (2d Cir. 1997) (recognizing that exclusionary rule applies in forfeiture action even where allegedly defective search warrant was issued as part of a separate criminal investigation and prosecution). The District Judge's observation here that "[t]he search warrant was issued and executed in connection with a criminal investigation which is . . . not a part of this trial," (SPA 10), therefore was not a valid basis for denying Claimants their Fourth Amendment protections and remedies in this forfeiture action.

The District Court's ruling as to the inapplicability of the Fourth Amendment was premised in part on its factual findings regarding Claimants' alleged pre-existing obligations at the time of the search. However, those findings are contradicted by the text of the Protective Order on which they are based. The District Judge stated on several occasions that *Alavi* was required to make all of its records available to the Government even before the FBI

108

executed the search warrant.[28] (SPA 13 ("Alavi was under a pre-existing duty prior to the 2008 search to provide its books and records to the Government for inspection—all of them."); SPA 14 ("Alavi was under an obligation to make available all of its books and records as of December 17, 2008[.]").) But the Protective Order did not impose any such obligation. (A 2575-81.) The *only* obligations that applied to the Foundation—and to "[a]ll persons and entities having actual knowledge of this Protective Order"—were not to transfer or to diminish in value the defendant properties named in the Complaint, and not to "directly or indirectly, destroy any documents relating in any manner or part to the allegations in the Complaint." (A 2578.) Contrary to the District Court's statements, Alavi was not required to "provide" documents or even to make them "available" to the Government. The District Judge's ruling that an obligation to *preserve* documents is tantamount to a production requirement and removes a party's ability to suppress illegally-seized evidence would eviscerate the protections of the Fourth Amendment for any person or entity that was subject to potential litigation or otherwise had an obligation to maintain documents. The District Court cited no legal authority, and none can be found, to support this far-reaching holding.

---

[28] The District Court's ruling that suppression was unwarranted in this action because of alleged pre-existing production or preservation requirements is more appropriately considered in connection with the application of the Fourth Amendment "inevitable discovery" doctrine. As discussed below, *see infra* Section II.C.3, inevitable discovery is a defense to the application of the exclusionary rule on which the Government bears the burden of proof. It does not, however, obviate the need for Fourth Amendment analysis.

109

The Protective Order imposed limited obligations on the Fifth Avenue Company, but it did not require the Partnership to produce anything close to the full set of documents seized during the search by the Government. The Protective Order required the Fifth Avenue Company (and the independent building manager, JLL) to "maintain" books and records relating to itself and other entities; to "make available for inspection" its own books and records; and to "provide" to the Government "a complete list of the Fifth Avenue Company's assets" and "a report of monthly income and expenses from December 2007 through the Present." (A 2578-79.) The documents the Fifth Avenue Company was required to "provide," and even those it was required to "make available for inspection," made up only a small fraction of the materials seized in the December 2008 search. The Fifth Avenue Company was not even formed until 1989; therefore, documents from before 1989 would have been out of reach. The Protective Order did not "obviate[]" the need for a Fourth Amendment analysis, *see United States v. D'Andrea*, 648 F.3d 1, 28-29 (1st Cir. 2011) (remanding for suppression hearing despite Government's arguments that the inevitable discovery doctrine applies), especially where the unlawful search resulted in the seizure of hundreds of thousands of documents and electronic records that would not have otherwise been turned over to the Government.

### 2. Claimants Did Not "Waive" Their Fourth Amendment Protections By Not Objecting To The Protective Order Or Discovery

The District Court also lacked a legal or factual basis to conclude that Claimants "waived" their right to challenge the reasonableness of the December 2008 search and seizure by not objecting to the scope of the Protective Order. The District Court held that Claimants forfeited their ability to suppress the unlawfully-seized materials by abiding by Judge Holwell's Protective Order and engaging in civil discovery.

110

(*See* SPA 1-2, 8-9, 11, 14, 17-18.)  The District Court's novel "waiver" theory is contrary to Fourth Amendment law: Claimants' Fourth Amendment rights were violated at the time of the unlawful search and seizure, and those rights were not "waived" by their post-search conduct.  In any event, Claimants could not refuse to follow the District Court's Protective Order or refuse to engage in civil discovery.  There was no legal basis for the District Judge to find that Claimants' compliance with the Protective Order and with the District Court's discovery schedule constituted a "waiver" of their Fourth Amendment remedies.

The District Court treated the exclusionary rule as if it were akin to a privilege or right to confidentiality that could be waived by disclosing the relevant materials.  This was incorrect as a matter of law.  The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."  *United States v. Calandra*, 414 U.S. 338, 348 (1974).  The rule functions by preventing the Government from *using* illegally-obtained evidence to prove its case.  *See Herring v. United States*, 555 U.S. 135, 139 (2009).  But it does not prevent the Government from *viewing* unlawfully-seized evidence; indeed, the rule applies only after the Government has already obtained the relevant materials and committed a Fourth Amendment violation.  *See United States v. Leon*, 468 U.S. 897, 906 (1984) ("The wrong condemned by the Amendment is fully accomplished by the unlawful search or seizure itself, and  the exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered.") (internal quotations and citations omitted).  There is no support in Fourth Amendment case law for the District Court's ruling that a party can "waive" the exclusionary rule by preserving documents, making them available, or producing them to the Government *as required* by court order or in discovery.

111

The circumstances of this case make the District Court's finding of a waiver particularly unreasonable. The District Judge incorrectly stated that, in responding to the Fifth Avenue Company's limited production obligation under the Protective Order—*i.e.*, to produce "a complete list of the Fifth Avenue Company's assets" and "a report of monthly income and expenses from December 2007 through the Present" (A 2579)—Claimants' counsel "explicitly relied upon the seizure to fulfill his civil production obligations." (SPA 8). This was simply not true. In the letter cited by the District Court, counsel informed the Government that documents responsive to the Protective Order were mostly held by the Fifth Avenue Company's management company, JLL, and that *JLL* would be producing documents directly. (A 5189-90.) Counsel also explained that "there are very few documents, if any, and little information that the Fifth Avenue Company can produce that are not *otherwise being produced by JLL*." (*Id*. (emphasis added)). The Fifth Avenue Company's agreement to turn over "any responsive documents and information, to the extent not already produced" referred to JLL's production, not the FBI's unlawful seizure. (*Id.*). The Fifth Avenue Company, therefore, did not rely on the FBI seizure to satisfy its limited production obligations. Moreover, even if it had, there is no support for the District Court's conclusion that such reliance without "any protest or reservation of rights with respect to the seizure" constituted a waiver of Claimants' right to exclude illegally seized evidence at trial. (*See* SPA 14.) Whether the Fifth Avenue Company relied on the seizure or not is legally irrelevant.

Likewise, the District Court's implication (SPA 7-10), if not actual finding, that Claimants "waived" their right to suppression by producing documents in response to civil discovery was also erroneous. The Government seized Claimants' records on December 19, 2008 and held the records since that time. Over three years later, the parties

112

agreed that to protect Claimants' privileges, a complete copy set of the seized materials would be provided to Claimants' counsel, who would remove privileged and non-responsive documents and then return the responsive, non-privileged copies to the Government and produce a similar set to the Iran Creditors. (A 2651-53.) The Government marked documents in this so-called "production" with *Government* bates labels since Claimants' role was merely to remove privileged and non-responsive documents from the seized records. (SDNY Dkt. No. 1088 Ex. C.) Claimants "produced" the subset of the seized materials in May and June 2012, after the Government had three-and-a-half years to review and use the materials in drafting and litigating the forfeiture claims in the Amended Complaint. Any finding that Claimants waived their right to seek suppression of unlawfully-seized evidence by turning over documents that the Government already possessed for years is not supported by law and defies logic. This Court has considered cases in which the Government has attempted to obtain evidence, through lawful process *after an unlawful search has already been executed*, and has never adopted a waiver theory like that espoused by the District Judge. *See, e.g.*, *United States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006); *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993); *United States v. Eng*, 971 F.2d 854, 859, 861 (2d Cir. 1992).

To the extent the District Court ruled that Claimants waived their rights by producing the search documents to the Iran Creditors (*see* SPA 2-3 & n.2, 17-18), that conclusion was also in error. The exclusionary rule does not preclude evidence unlawfully seized by the Government from being used by private litigants. *See Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 362-65 (1998). Thus, there was no basis to refuse to produce the search documents to the Iran Creditors in discovery. The District Judge emphasized the fact that she partially consolidated the forfeiture trial and turnover actions, suggesting that the forfeiture jury would

113

have been privy to the search evidence, even if excluded from the forfeiture action. (SPA 10, 14, 17.)  But the District Court even recognized that certain evidence would have been heard only by the District Court in the turnover actions outside the presence of the jury (SPA 10), and in any event, consolidation does not justify or excuse the admission of otherwise inadmissible evidence.

Finally, the District Court faulted Claimants for filing their suppression motion on July 1, 2014, which was described as "the eve" of the September 16, 2014 trial. (SPA 1.)  This criticism is misplaced, as the motion was timely under an analogous Federal Rule and the District Court's scheduling orders.  *See* Fed. R. Crim. P. 12(b)(3)(C) (suppression motion must be made before trial); (A 3156 (Suppression Briefing Order).)  Claimants informed the District Court that they would be moving to suppress the unlawfully-seized evidence at a conference on March 28, 2012, and stated that the motion would be filed only after the Government had produced the search warrant application, including the supporting affidavit, and had completed document discovery.  (A 3626-28.)  The Government first produced the search warrant application and Ennis Affidavit in April 2012, well over three years after the search. (A 12088-91.)  Without these documents, Claimants could not file the suppression motion.  Claimants intended to file their suppression motion after the Government produced all documents in discovery; however, the Government's continuing productions and the approaching trial date led Claimants to file before discovery was complete.[29]

---

[29] Notably, the motion to suppress was filed before the motions for summary judgment, and while fact and expert depositions were ongoing.  Indeed, the Government was still producing relevant documents in July and August 2013 when the motion to suppress was being briefed.

114

### 3. The District Court's Ruling That The Search Evidence Would Have Been "Inevitably Discovered" Is Legally And Factually Unsupportable

The District Court ruled in the alternative that suppression was unwarranted because the Government would have "inevitabl[y] discover[ed]" the illegally-seized evidence pursuant to Claimants' preservation obligations and through discovery. The District Court refused to hold a hearing, finding that the Government satisfied its burden of proving this exception to the exclusionary rule despite not calling a single witness or offering any evidence. (SPA 16.) The District Judge erred in finding the inevitable discovery doctrine applied here.

#### a. The Government Bears A High Burden To Prove Inevitable Discovery As To Each Piece Of Seized Evidence

A trial court may admit illegally seized evidence if the Government can prove that "the disputed evidence inevitably [would] have been found through legal means 'but for' the constitutional violation." *Heath*, 455 F.3d at 55, 58 n.6. This inquiry requires a court "to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) ("*Eng II*") (emphasis in original).

The Second Circuit has imposed stringent criteria that must be met before evidence will be admitted under the "inevitable discovery" exception. The doctrine imposes a "requirement of *certitude*"—not merely likelihood—that evidence would have been discovered. *Heath*, 455 F.3d at 59 n.6 (emphasis added). Accordingly, the Government cannot prevail "merely by establishing that it is more probabl[e] than not that the disputed evidence would have

115

been obtained without the constitutional violation." *Id.* at 58. The Government also may not rely on "speculative elements" to satisfy its burden, but must instead adduce "demonstrated historical facts capable of ready verification or impeachment." *United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) ("*Eng I*") (quoting *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984)).

The inevitable discovery doctrine also imposes corresponding obligations on the District Court to make specific findings before allowing evidence to be admitted. With regard to "*each particular piece of evidence*" that the Government asserts would have been inevitably discovered, the District Court must "*specifically analyze and explain* how, if at all, discovery of *that piece* of evidence would have been more likely than not inevitable absent the [unlawful] search." *Eng I*, 971 F.2d at 862 (citing *Nix*, 467 U.S. at 444) (emphasis added, internal quotation marks omitted). A court may deem the lawful discovery of any particular piece of evidence "inevitable" *only* if it finds "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Heath*, 455 F.3d at 60.

Where the Government attempts to use compulsory discovery mechanisms as a means to prove inevitable discovery, the Second Circuit has cautioned the district courts to exercise "special care" to "prevent the inevitable discovery exception from swallowing the exclusionary rule." *Eng I*, 971 F.2d at 860. Post-seizure conduct must be scrutinized to ensure that it was not informed by seized evidence, *id.* at 860, and proceedings that are not "sufficiently active or developed prior to" an illegal search may not support a finding of inevitable discovery, *id.* at 861. Thus, for example, a subpoena issued contemporaneously with an unlawful search may not be used to "validate [the] unlawful search under the inevitable discovery doctrine,"

116

and the Government may not rely on general assertions that the unlawfully seized materials would have been produced in response to the subpoena. *Id.*

### b. The District Court Failed To Conduct A Proper Inevitable Discovery Analysis

The District Court committed reversible error by ruling, without conducting any of the necessary inquiries, including holding a hearing, or making any of the specific factual findings required by law, that the Government would have "inevitabl[y]" discovered each piece of evidence seized during the illegal search. (SPA 15.) Instead of following the evidentiary procedures set out by the Second Circuit, the District Judge simply assumed that the Government would have gotten all of the unlawfully-seized evidence—including over 200 boxes of diverse hard-copy records, the entire contents of all of Alavi's computers and electronic media, and the entire contents of its servers—via ordinary common law preservation obligations and the Protective Order. (SPA 15-16.) Indeed, the District Court's inevitable discovery "analysis" consists of just two perfunctory paragraphs (SPA 15-17), neither of which evidence a fact-sensitive inquiry into "what would have happened had the unlawful search never occurred," *Eng II*, 997 F.2d at 990. As a result, the District Court could not, and did not, "specifically analyze and explain" how "each particular piece of evidence" that the Government seized would have been inevitably discovered, *Eng I*, 971 F.2d at 862, or how "each of the contingencies necessary to the legal discovery of the contested evidence would [have been] resolved in the government's favor," *Heath*, 455 F.3d at 60.[30]

---

[30] Moreover, because the District Court never held a taint hearing or considered the extent to which post-search evidence was derived from illegally-obtained documents, it

117

The District Court's failure to conduct these required inquiries alone warrants reversal and remand. *See Eng I*, 971 F.2d at 862-64 (vacating conviction and remanding for particularized findings where "the specific reasoning behind the district court's belief that every item of challenged evidence was admissible under the inevitable discovery doctrine is unknown"). But even if properly conducted, the evidence overwhelmingly indicates that the vast majority of search materials would not have been discovered absent the unlawful seizure.

The District Court found, without substantial examination or elaboration, that the Government would have inevitably discovered the illegally-seized evidence through the December 17, 2008 Protective Order. The Protective Order was directed at the *Fifth Avenue Company* (but not Alavi), and at most allowed the Government to *inspect* (but not seize) books and records of the Fifth Avenue Company, and to receive a copy of the Fifth Avenue Company's list of then-current assets and monthly income and expense reports from 2007 onward. (A 2578-79.) The District Court's statements regarding the production obligations as to *Alavi* (SPA 13) were simply wrong. The Protective Order merely required Alavi (and all parties with knowledge of the Order) to *preserve* its books and records; it did not give the Government the right to inspect Alavi's records, much less seize them. (A 2578-81.) Thus, the Protective Order would not have allowed the Government to review the Alavi Board minutes, Alavi correspondence, Alavi property records, Alavi financial and tax records, and the notes and personal diaries of Alavi Board members, all of which the Government relied on heavily in the Amended Complaint, its later discovery requests, and its summary judgment motions.

---

necessarily did not consider whether such derivative evidence would have been inevitably discovered.

118

To the extent the District Court reasoned that the Government would have inevitably discovered the illegally-seized evidence by requesting it in discovery during the civil forfeiture action, that conclusion was legal error. The Supreme Court has expressly rejected the notion that the Government can circumvent the exclusionary rule by using ordinary legal processes to obtain evidence that it previously seized illegally. In *Silverthorne Lumber Co. v. United States*, the Court held that the Government cannot seize a party's papers, "study the papers before it returns them, copy them, and then . . . use the knowledge it has gained to call upon the owners in a more regular form to produce them." 251 U.S. 385, 391 (1920), *overruled in part on other grounds, United States v. Havens*, 446 U.S. 620, 624 (1980); *accord Eng I*, 971 F.2d at 859, 861 (subpoena served after illegal search cannot "serve as an after the fact 'insurance policy' to 'validate' an unlawful search"). The *Silverthorne* Court recognized that permitting the Government to immunize an illegal search by simply tacking on a subsequent legal request for the same evidence would "reduce[ ] the Fourth Amendment to a form of words." 251 U.S. at 392.

This case perfectly demonstrates why the *Silverthorne* rule exists and must be enforced. The Government filed the initial forfeiture Complaint on December 17, 2008, at which date the Government did not have sufficient evidence to bring a forfeiture action against Alavi's or the Fifth Avenue Company's property interests. *See* Fed. R. Civ. P. G(2)(f) (forfeiture complaints must include "sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial"). Two days later, on December 19, 2008, the Government executed the search warrant and seized virtually every document and all computers and electronic media from the Foundation's offices. (A 4882 ¶ 3; A 5139.) For the next eleven months, the Government combed through illegally-seized records

119

dating back to the 1970s and 1980s to build a forfeiture case against Claimants' properties (A 4959-61), and then filed an Amended Complaint that relied heavily on the seized evidence, particularly Alavi's records. Even the District Judge recognized that the records seized in December 2008 "have subsequently been used in the forfeiture litigation and form the basis for many of the factual allegations in the [Amended Complaint.]" (SPA 6.) The Government then continued to pore over the seized evidence for another year-and-a-half before propounding discovery requests to support its tainted Amended Complaint. Unsurprisingly, these discovery requests were targeted to the same documents that the Government had seized, reviewed, and deemed useful to its case.[31]

### D. The Summary Judgment Orders Must Be Reversed Because The District Court Relied On Illegally-Seized Evidence

The District Court's failure to suppress the search evidence and any "fruits" derived therefrom requires reversal of the entire forfeiture judgment since the District Judge granted summary judgment in large part on the basis of the unlawfully-seized evidence. The District Court relied on the unlawfully-seized evidence in ruling that there was no genuine dispute of material fact as to the forfeitability of the

---

[31] A proper suppression analysis would also have considered what evidence obtained derivatively from the search should have been suppressed. Under the "fruit of the poisonous tree" doctrine, a court is required to exclude not only evidence obtained directly through an illegal search, but also "derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search." *Murray v. United States*, 487 U.S. 533, 536-37 (1988).

Defendant Properties. (*See, e.g.*, SPA 61-62 (citing 1991 Alavi Board minutes to establish Iranian control over Alavi and Alavi's awareness of same); SPA 73 (using 1992 Alavi Board minutes and personal journals of Alavi Board member to determine that the Foundation had conspired with Iran to conceal Assa's identity as a front for Bank Melli); SPA 37-44 (using seized documents, among others, to establish the "undisputed facts" regarding Claimants' knowledge of Bank Melli's role in the 1989 Partnership Transaction, Iran's alleged influence over the composition of Alavi's Board, and Iran's purported influence over its charitable giving).) The District Judge's use of the inadmissible evidence was not inconsequential error; rather, it infected the entire judgment. The summary judgment orders must be reversed, and the case remanded for consideration of issues regarding suppression.

### III. The District Court Committed Reversible Error By Granting, *Sua Sponte*, Summary Judgment On Claimants' Statute of Limitations Defense Based On Its Erroneous Ruling That The Statute Had Not Run As A Matter of Law

The District Court erred in granting, *sua sponte*, summary judgment against Claimants on their statute of limitations defense, thereby denying them the opportunity to present the defense to the jury. The statute of limitations in a civil forfeiture action is five years, and the limitations period runs from the time the Government *discovered or should have discovered* the conduct giving rise to forfeiture, even if the conduct continues within the limitations period. The limited evidence obtained by Claimants in discovery reveals that the Government knew, or if reasonably diligent should have known, of the facts underlying its forfeiture claims in the mid-1990s. Indeed,

121

██████████████████████████

████████████████████  Nevertheless, the Government did not file suit against Claimants until November 2009, more than ten years after learning of the alleged conduct giving rise to forfeiture.  The Government's claims were time-barred, and the District Court should have allowed Claimants to present their affirmative defense to a jury.

## A.  Applicable Law On Statute Of Limitations In Civil Forfeiture Actions

The Government must commence a civil forfeiture action within five years of discovering the alleged forfeitable offense.  *See* 19 U.S.C. § 1621.[32]  The limitations period begins to run when "the Government discovers or possesses the means to discover the alleged wrong, whichever occurs first." *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502 (6th Cir. 1998); *see also Merck & Co. v. Reynolds*, 559 U.S. 648 (2010) (finding "discovery" of alleged facts "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known").  For continuing offenses or violations, the limitations period runs from the initial point

---

[32] In pertinent part, 19 U.S.C. § 1621 reads:

> No suit or action to recover any duty under section 1592(d), 1593a(d) of this title, or any pecuniary penalty or forfeiture of property accruing under the customs laws shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later[.]

122

when the offense is discovered, even if the offense extends for many years. *$515,060.42 in U.S. Currency*, 152 F.3d at 501-02.

Whether the alleged forfeitable conduct constitutes a series of independent acts or a continuing violation is a question of fact for the jury. *See id.* at 502 ("The district court's determination of the timing of the Government's discovery and the concomitant triggering of the statute of limitations under 19 U.S.C. § 1621 was a factual determination.") A continuing violation is one that results from an ongoing practice or policy, or where a "series of separate acts . . . collectively constitute one unlawful [act]." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks and citations omitted); *see also Shomo v. City of New York*, 579 F.3d 176, 181-82 (2d Cir. 2009) (applying continuing violation analysis in the context of an Eighth Amendment claim of deliberate indifference); *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010) (explaining that conspiracy is a continuing offense); *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999). The classic example of a continuing violation is a hostile work environment claim, where a plaintiff alleges that repeated conduct over an extended period of time amounts to an actionable discriminatory offense. *See Morgan*, 536 U.S. at 115-118.

Although this Court has yet to address this issue in the context of a civil forfeiture action under § 1621, three other circuits have, and all applied a similar analysis. In *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502 (6th Circ. 1998), the Sixth Circuit deemed the Government's action time-barred because it had not been brought within five years of when the Government learned that the claimant's currency was used to commit or facilitate the commission of an illegal gambling business. The Sixth Circuit rejected the Government's argument that the

123

currency seized was a product of "relatively recent bingo operations" for which the statute of limitations had not yet run; the court instead concluded the bingo games were not individual, discrete acts, but part of a continuing violation—namely, the operation of a gambling business. The Sixth Circuit affirmed the dismissal of the forfeiture claims, referencing the policies behind the § 1621 limitations period: "[s]tatutes of limitation are statutes of repose representing 'a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *Id.* (quoting *United States v. Kubrick*, 444 U.S. 111, 117 (1979)).

The Seventh Circuit applied the same legal framework, but reached a different conclusion based on the distinct factual circumstances. At issue in *United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504 (7th Cir. 2010), was whether an individual's multiple cigar-smuggling offenses should be classified as separate offenses or grouped together as part of the operation of a cigar smuggling business. *Id.* at 507-508. If the offense was deemed part of an illegal operation, the limitations period would have run on the Government's forfeiture claim. However, the court found that "each time [the claimant] committed a new crime by smuggling illicit cigars into the country, he re-exposed his house to the risk of forfeiture." *Id.* at 509. According to the court, the smuggling acts were "distinct" criminal offenses because they were not tied to one another and "independently could support forfeiture" of the property at issue. Because the Government established all of the required elements with respect to a single individual offense within the limitations period, the forfeiture was upheld.

Finally, in *United States v. Kivanc*, the Fourth Circuit upheld the forfeiture of claimant's property, finding that the

124

Government had established that claimant committed at least two separate offenses supporting forfeiture. 714 F.3d 782 (4th Cir. 2013). The Fourth Circuit rejected the claimant's argument that the various acts constituted a single, continuing offense of "health care fraud," describing the two distinct offenses as follows:

> Regarding the first offense, the government began investigating Dr. Kivanc in April 2005 after the Drug Enforcement Agency interviewed Dr. Kivanc's former patient Kimberly Maxwell. Maxwell alleged that Dr. Kivanc overprescribed controlled substances to her, including several pain medications such as hydrocodone, oxycodone, and methadose, without a medical exam and billed her insurance for services that she never received. Maxwell did not allege that Dr. Kivanc prescribed, administered, or billed her insurance for Remicade.

> Regarding the second offense, the FBI became aware of the Remicade fraud on October 18, 2006, after Agent Weeter interviewed two of Dr. Kivanc's former employees who specifically mentioned the Remicade infusion scheme. Prior to that date, the FBI was investigating Dr. Kivanc's "illegal distribution of prescription drugs" but was not aware of "anything related to Remicade."

*Id.* at 790. Although the district court acknowledged the first offense was known to the Government five years before it brought suit, and therefore was time-barred, the second—the distinct Medicare fraud offense related to Remicade—was not time-barred. *Id.* The Fourth Circuit's conclusion was based in part on the Government's decision to indict Dr. Kivanc separately for the second set of offenses related to

125

Remicade rather than treating all of the unlawful conduct as a single conspiracy offense. *See id.* at 790 ("The government based its civil forfeiture action not on Dr. Kivanc's overprescribing of controlled substances, but specifically on the Remicade health care fraud.").

Because the statute of limitations is an affirmative defense, a claimant bears the burden at trial of establishing that the Government discovered or possessed the means to discover the forfeitable offense(s) more than five years before filing suit. On a motion *by the Government* for summary judgment, however, the Government as the movant bears the burden of demonstrating that the record, when viewed "in a light most favorable to the defendant reveals the absence of evidence supporting an essential element of the defense." *FDIC v. Giammettei*, 34 F.3d 51, 54-55 (2d Cir. 1994). To the extent the District Court imposed the burden of proof on Claimants with respect to the Government's motion for summary judgment, it did so in error. (*See* SPA 99 ("On summary judgment, Claimants bear the burden of demonstrating no triable issue as to this defense.").) On appeal, this Court reviews the District Court's grant of summary judgment *de novo*. *Sudler v. City of New York*, 689 F.3d 159, 168 (2d Cir. 2012).[33]

---

[33] The District Court's rulings depriving Claimants of access to discovery on issues concerning the statute of limitations are reviewed for an abuse of discretion. "A district court abuses its discretion when [] its decision rests on an error of law . . . or a clearly erroneous factual finding[.]" *Mastrio v. Sebelius*, No. 13 Civ. 2529, 2014 U.S. App. LEXIS 17837, at *3 (2d Cir. Sept. 17, 2014). Because the District Court's mistaken understanding of the statute of limitations pervaded its discovery rulings, those errors are by definition an abuse of discretion. *Koon v. U.S.*, 518 U.S. 81, 100 (1996) ("A

**B. The Limited Materials Obtained In Discovery Reveal That The Government Knew Of The Alleged Forfeitable Offenses More Than Five Years Before Filing Suit Against Alavi And The Fifth Avenue Company**

Claimants did not have a full and fair opportunity to develop and present their statute of limitations defense at trial, even though the limited information the Government produced in discovery revealed that Claimants had a meritorious defense. Although Claimants repeatedly sought discovery from the Government on the question of when it learned of the alleged acts giving rise to forfeiture, the Government consistently refused to produce the materials and the District Court denied Claimants' attempts to compel production. In particular, the District Court denied Claimants' motion to compel documents from OFAC ███████████ (A 3259-3266); denied Claimants' motion for spoliation against the Government relating to documents destroyed by the IRS relating to ███████████ (SPA 102); prevented Claimants from questioning OFAC's Rule 30(b)(6) designee about ███████████ uring deposition (A 3271-73); and precluded Alavi from offering *any* evidence or argument concerning ███████████ of the Foundation or the Fifth Avenue Company at trial (A 3278-86). Claimants were essentially foreclosed from raising their statute of limitations defense at trial.

Notwithstanding the District Court's orders limiting such discovery, a handful of documents ███████████

———————————

district court by definition abuses its discretion when it makes an error of law.").

127

an
article in *The American Spectator* by Kenneth Timmerman.
(A 10983-85.) The Timmerman article contains allegations
nearly identical to those raised in the Government's
Amended Complaint. Timmerman wrote as follows:

> High above New York's fashionable Fifth
> Avenue, controlling a 34-storey complex that
> once belonged to the Shah of Iran, sits an
> unusual organization called the Alavi
> Foundation. According to its charter, Alavi is a
> non-profit charitable organization run by an
> independent board of directors seeking to
> promote "understanding and harmony among
> persons of all faiths." But according to a
> classified FBI report of 1994, Alavi is "entirely
> controlled by the government of Iran."

128

(A 10986-92.)[34]  Timmerman references a 1994 FBI report discussing Alavi and its alleged activities on behalf of Iran, but like the Government's investigation here, the article exclusively focused on alleged conduct *before the Iranian sanctions went into effect*.  (*Id.*)  Although clearly relevant to this action and Claimants' statute of limitations defense, the Government did not produce the 1994 FBI report, and the District Court ordered that the Government was not obligated to do so.  (*See, e.g.*, A 3259-66.)

Together, these documents confirm that the Government knew of Alavi's alleged services to Iran for many years before filing the suit.  The Government never disputed such knowledge, but merely argued that the materials were classified or irrelevant.  The District Court improperly denied Claimants the opportunity to obtain discovery on this issue and erroneously granted summary judgment on the defense, thereby permitting the entry of the forfeiture judgment.

### C.  The District Court Erred In Finding As A Matter Of Law That Discrete IEEPA Violations Supporting Forfeiture Occurred After November 12, 2004

As an initial matter, the Government did not move for summary judgment on Claimants' statute of limitations defense in the proceedings below.  (SPA 24.)  Nevertheless, the District Court *sua sponte* granted summary judgment in the Government's favor, claiming that it had "scoured the record" and determined that there was no triable issue as to the defense.  (SPA 99.)  Because the District Court did not provide Claimants an opportunity to present evidence or to

---

[34] A second article in *Newsday* from 1995 contains many of the same allegations as the Timmerman article.  (A 10993-97.)

brief the statute of limitations issue before granting summary judgment on the defense, its decision was erroneous and should be reversed for that reason alone. *See* Fed. R. Civ. P. 56(f) (stating that a Court may grant summary judgment *sua sponte* only "[a]fter giving notice and a reasonable time to respond"); *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996) (reversing the District Court's *sua sponte* grant of summary judgment where the Court failed to give the parties an opportunity to present "all pertinent materials obtained in discovery" to the Court).[35]

The District Court's decision on Claimants' statute of limitations defense was also erroneous on the merits. To avoid the conclusion that the Government's action was time-barred, the District Court reclassified what the Government alleged to be Claimants' ongoing course of unlawful conduct as a set of independent, discrete acts, some of which it found to have occurred within the limitations period. Specifically, the District Judge found the following purported IEEPA offenses occurred after November 2004 (five years before the Amended Complaint was filed): (1) managing the building on behalf of Assa; and (2) managing the Fifth Avenue Company, which included making partnership distributions to Assa, conspiring to launder funds internationally from Assa to Assa Ltd., and, more generally, concealing Bank Melli's alleged ownership of Assa. (SPA 101.) Those findings were made in error; Claimants' statute of limitations defense should have proceeded to trial for a jury to resolve.

---

[35] Although *Ramsey* was decided before Rule 56(f) was amended in 2010, this Court has confirmed that "its statements regarding the care a district court must take before *sua sponte* granting summary judgment remain good law." *Swatch Grp. Mtmt. Servs. Ltd. v. Bloomberg*, 742 F. 3d 17, 24 n.2 (2d Cir. 2014).

130

### 1. The Foundation Managed The Building As Part Of Its Continuing Course Of Conduct

The District Court concluded that Alavi committed an IEEPA violation within the limitations period by managing the Building "for" Iran. (SPA 80-81.) From 1989, when the Fifth Avenue Company was formed, through 2009, Alavi managed the Building on behalf of the Partnership, of which it was the majority owner, in accordance with the terms of the partnership agreement. (A 6226-66.) In that capacity, Alavi performed various activities each day, including working with the third-party commercial manager of the Building to collect rent and invoice tenants, market the Building, negotiate and execute leases, and prepare a budget. (A 6564-68.) Without describing Alavi's specific acts in detail, the District Court concluded that the Foundation's management of the Building constituted *many separate* IEEPA violations. The District Judge stated, paradoxically, "Alavi managed the Building on behalf of Assa *continuously* through the filing of the Verified Amended Complaint; each day it did so constituted a *separate* IEEPA violation." (SPA 101 (emphasis added).)

The District Court's conclusion contorts the common-sense reading of the term "manage," and misapplies the prevailing case law. According to the *American Heritage Dictionary of the English Language*, "manage" means "to have charge of, direct or administer" and "to exert control over; regulate or limit toward a desired end." (*American Heritage Dictionary of the English Language* 1064 (5th Ed. 2011). Both represent ongoing conduct rather than discrete acts. Alavi's management of the Building was an ongoing and consistent practice, which followed from the execution of the partnership agreement in 1989. (A 6226-66, 6564-68.) Managing the Building required Alavi to undertake hundreds of actions over the course of two decades, but they were all part of the Foundation's management duties. Not every act

131

Alavi took in carrying out its management responsibilities can be deemed a separate and distinct "offense." At the very least, this was an issue to be resolved by the jury at trial.

Like the conduct at issue in *$515,060.42 in U.S. Currency*, the management activities undertaken by Alavi were continuous and inseparable. Under the District Court's interpretation of the statute, every activity—including the illegal gambling activity that was at issue in *$515,060.42 in U.S. Currency*—should be treated as an individual offense supporting forfeiture. Although the District Court seemed to recognize that managing the Building was a "continuous[]" offense—and it did not isolate or describe any specific act— it nevertheless concluded that *every day* the Foundation acted as manager constituted a separate violation. (SPA 101.) Such a reading of the term "offense" would eliminate continuing violations entirely and make every scheme or conspiracy a series of distinct acts.

Further, if Claimants' management of the Building (or any other allegedly unlawful service) was comprised of hundreds of individual IEEPA-violating acts, the Government's forfeiture claims should have been limited to seeking only the proceeds of those individual acts that occurred after November 2004, or the property involved in a money laundering transaction occurring after that time. However, the District Court did not limit the Government's claims in any such manner. For forfeiture purposes, the District Judge calculated "proceeds" as funds derived from the Building from 1996 through 2008, even though two-thirds of that time period was outside of the limitations period. (SPA 156.) Thus, the District Court found that Claimants' conduct was a continuing violation when it came to tallying up *potential proceeds*, but found precisely the opposite when addressing Claimants' *statute of limitations defense*. If Claimants' allegedly unlawful services were distinct acts, the Government was not entitled to proceeds

132

from activity that occurred prior to November 2004, and was not entitled to otherwise seek forfeiture for events outside of the limitations period. *Cf. Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) ("Discrete acts . . .which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."). The District Court's decision—to simply divide a continuous state into arbitrary pieces—was little more than an attempt to avoid what it deemed to be an unpalatable conclusion. It was error.

### 2. Managing The Partnership And Conspiring To Conceal Assa's Identity Were Not A Series Of Multiple Distinct Events

The District Court also found the Foundation and the Fifth Avenue Company provided a second set of unlawful services giving rise to forfeiture: managing the Fifth Avenue Company and taking actions incident to such management, such as conspiring with Assa to conceal Assa's identity and transferring partnership distributions. (SPA 26, 72-78, 100-01.) Like the building-management services addressed above, Alavi's management of the Fifth Avenue Company emanated from the partnership agreement between the Foundation and Assa and was continuous and unabated between 1989 and 2008. For the same reasons, this conduct cannot be separated into individual "management" or "concealment" events. When the Government learned of Alavi's participation in the Partnership with Assa, and Bank Melli's purported relationship with Assa, the five-year limitations period began to run.

Moreover, to the extent the District Court found a broader IEEPA violation related to concealing Assa's alleged ownership, this violation did not involve any conduct by Alavi at all. Rather, it was Alavi's purported inaction—not

133

taking steps to disclose Assa's ownership—that the District Court found unlawful. Certainly Alavi's *inaction* cannot be characterized as separate and distinct *actions* for purposes of Claimants' statute of limitations defense.

In addition to the general management and concealment services, the District Court focused on two specific offenses: making distribution payments on behalf of the Fifth Avenue Company to Assa, and conspiring with Assa to transfer these funds internationally. Whether analyzed individually or as part of the broader concealment services, the same conclusion holds. (SPA 101-02.)

### a. Distribution Payments To Assa

The District Court held that the Fifth Avenue Company's periodic distribution payments to Assa were forfeitable offenses within the limitations period. (SPA 101.) Like the Foundation's general management activities, the distribution payments to the Foundation and to Assa were dictated by the terms of the partnership agreement and made consistently on a quarterly basis until December 5, 2007.[36] (A 6226-66.) The Government did not plead such payments separately in the Amended Complaint (*see* A 2439; A 2486), and it introduced no evidence supporting the conclusion that *any of the distribution payments* were individual IEEPA violations or money laundering transactions within the limitations period. Unlike in *5443 Suffield Terrace, Skokie, Ill.* or

---

[36] The District Court stated numerous times that the distribution payments continued until December 1, 2008, (*see e.g.*, SPA 101), but this is not supported by the documents cited by the District Court or the record more generally. The Government acknowledges in its memorandum of law supporting summary judgment that the last distribution payment to Assa was made on December 5, 2007. (SDNY Dkt. No. 689 at 44.)

134

*Kivanc*, where the courts found that the forfeitable offenses were independent and could be proven on their own, the distribution payments from the Partnership to Assa were made in accordance with Claimants' obligations under a partnership agreement from 1989 that continued for years. Once the Government learned that Alavi was managing the Fifth Avenue Company and making the required distribution payments to Assa—sometime in the 1990s—the statute of limitations began to run.

The determination that Claimants' conduct was comprised of a series of discrete acts was not one for the District Court to make. And if a jury were to consider whether each distribution payment made up a separate and distinct offense, it would have been required to determine (1) whether the IEEPA or money laundering elements were satisfied for each independent payment, and (2) the extent of proceeds Alavi and the Fifth Avenue Company received in connection with each individual payment. The Government's forfeiture claims would have hinged on those determinations and any calculation of the forfeitable property limited by them.

### b. Conspiracy To Commit International Money Laundering

The District Court also found that Alavi—as part of its management and concealment services—served as a co-conspirator of Assa in international money laundering violations. (SPA 101-02.) Specifically, it concluded that "each of the steps required to engage in the international money laundering (receiving and holding funds in a U.S. account; sending those funds overseas) constitutes a separate money laundering transaction." (SPA 97 (citing *United States v. Harris*, 79 F.3d 223, 231 (2d Cir. 1996)).) For a number of reasons, the District Court's conclusion was erroneous.

135

As an initial matter, the District Court's citation to and reliance on *Harris* is misplaced. In *Harris*, this Court disagreed with defendant's argument that the movement of funds within the United States and then from the United States to Europe constituted two separate events. *Id.* at 231. Instead, it concluded that "while the scheme was implemented in two stages, each stage was an integral part of a single plan to transfer funds from a place in the United States to or through a place outside the United States." *Id.* (internal quotation marks omitted). Like the defendant's conduct in *Harris,* the different steps of the Foundation's alleged money laundering transactions cannot be treated as separate offenses for purposes of the statute of limitations. (SPA 97-98.)

More significantly, the alleged international money laundering conspiracy operated continuously from 1989, and its operations cannot be broken down into individual or finite acts. As this Court has declared, "[c]onspiracy is a continuing offense." *See, e.g., United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010). Indeed, the conduct is analogous to that discussed in *$515,060.42 in U.S. Currency*, where the defendant was convicted of conspiracy to conduct an illegal gambling business and the Sixth Circuit found that the statute of limitations began running when the Government first learned of the conspiracy, regardless of how long the conspiracy lasted or what individual acts were committed in furtherance of it. *Id.* at 502-03. Here, the statute of limitations on the conspiracy count began to run when the Government first learned of Alavi's alleged partnership with an entity owned by Bank Melli (which allegedly created the conspiracy) and the payments from the Fifth Avenue Company to Assa. The fact that additional, identical, and unpleaded events occurred over the course of two decades allegedly in furtherance of the conspiracy does not extend the statute of limitations period for the conspiracy offense itself.

136

Moreover, *even if* each individual international transfer of funds from Assa to Assa Ltd. constituted a separate international money laundering violation, the record is clear that the last such transfer occurred on April 5, 2004, *more than 5 years before* the Government filed suit against Claimants' interests in the Defendant Properties. The District Court acknowledged this in its decision, but nevertheless concluded that these April 2004 transactions fell "within the limitations period." (SPA 101-02.) That statement was simply wrong. No international transfers occurred within the five-year limitations period for seeking forfeiture of properties belonging to Claimants.[37]

Finally, the District Court's appeal to "logic" and policy concerns to support its conclusion that Alavi's conduct was not time-barred is unavailing, and merely confirms the result-oriented nature of its analysis. The District Judge wrote: "[I]t could not have been Congress's purpose to prevent the Government from seeking forfeiture in a case such as this. Otherwise, a party continuously providing services to Iran in violation of IEEPA and other statutes could permanently escape forfeiture . . . where the Government fails to bring suit within five years of its first discovery [of] one violation. This outcome defies logic." (SPA 102.) The District Court's statement was an implicit acknowledgement that § 1621—as written—bars the Government's claims against the Defendant Properties. The District Court's appeal to policy and equity to override the plain language of the statute is unavailing.

---

[37] While the April 2004 transaction may be relevant in seeking forfeiture of properties belonging to Assa, against whose assets the Government filed its Complaint in December 2008, it is clearly outside the five-year limitations period applicable to the Amended Complaint, which was filed on November 12, 2009. (A 2423-2519.)

137

The Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, applying the 180-day EEOC charging period in the context of a Title VII claim, is instructive on this point.[38]  550 U.S. 618 (2007).  There, in the face of a highly unpopular outcome—a long-aggrieved employee who might be unable to pursue a discrimination claim against her employer—the Supreme Court strictly adhered to the procedural requirements set forth by Congress.  Explaining that "[u]ltimately, 'experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law,'" (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)), the Court rejected the plaintiff's appeals to policy.  Theoretical policy goals cannot trump the plain language of the statute.  The same result applies here.

---

[38] In *Ledbetter*, the plaintiff sued her employer for pay discrimination, claiming that because of poor evaluations she had received over the course of several years on the basis of her sex, her pay was lower than it should have been had she been evaluated fairly.  550 U.S. at 621-22.  According to the plaintiff, the disparity caused by the intentional discrimination continued with each paycheck she received and indeed increased over the duration of her employment with the company.  *Id.* at 622.  The Supreme Court rejected plaintiff's claims based on Title VII's 180-day limitations period, finding that the initial pay-setting act (*i.e.*, the evaluation)—which the plaintiff admitted was the core act of intentional discrimination—could not be challenged, even though it resulted in disparate paychecks within the limitations period.  *Id.* at 632.  According to the Court, "[b]ecause Ledbetter did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time."  *Id.* at 637.

Because of the District Court's errors, Claimants were deprived of discovery relevant to their statute of limitations defense, and were erroneously precluded from presenting their defense to a jury. The District Court's grant of summary judgment on Claimants' statute of limitations defense was in error, and the forfeiture judgment must be reversed and the case remanded for additional discovery concerning Claimants' statute of limitations defense.

## IV. The Forfeiture Of Claimants' Interests In The Defendant Properties Was Grossly Disproportional To The Gravity Of Their Alleged Conduct And Constitutionally Excessive

Section 983(g) of Title 18 of the United State Code permits a claimant in a civil forfeiture action to petition the district court adjudicating the action for a determination whether a civil forfeiture is constitutionally excessive. *See* 18 U.S.C. § 983(g). The statute directs a court considering such a petition to "reduce or eliminate the forfeiture as necessary to avoid a violation of the Excessive Fines Clause of the Eighth Amendment." *Id.* § 983(g)(4). Section 983(g) further requires that the District Court conduct a hearing to evaluate whether forfeiture is grossly disproportional. Here, the District Court erroneously decided the question of proportionality and did so without holding a hearing.

This Court reviews a district court's determination of whether a fine is constitutionally excessive *de novo*, with deference to factual findings unless clearly erroneous. *United States v. Bajakajian*, 524 U.S. 321, 336 & n.10 (1998); *see also von Hofe v. United States*, 492 F.3d 175, 181 (2d Cir. 2007). Even if this Court were to find there was an adequate legal and factual basis to support the District Judge's summary judgment decisions, it should nonetheless remand the action because the District Court erred in ordering the forfeiture, without reduction under 18 U.S.C. §

139

983(g) and the Excessive Fines Clause of the Eighth Amendment, of properties Alavi has held for up to forty years and which are worth hundreds of millions of dollars. The magnitude of the forfeiture ordered was grossly disproportional to the gravity of the alleged offenses and constitutionally excessive.

### A. Proportionality Under The Eighth Amendment's Excessive Fine Clause And § 983(g)

*In rem* forfeitures that are at least partially punitive are limited by the Eighth Amendment's Excessive Fines Clause. *Austin v. United States*, 509 U.S. 602, 621-22 (1993). "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 337. In the Second Circuit, the excessiveness of an *in rem* forfeiture is judged by a consideration of:

> the harshness, or gross disproportionality, of the forfeiture in comparison to the gravity of the offense, giving due regard to (a) the offense committed and its relation to other criminal activity, (b) whether the claimant falls within the class of persons for whom the statute was designed, (c) the punishments available, and (d) the harm caused by the claimant's conduct; (2) the nexus between the property and the criminal offenses, including the deliberate nature of the use and the temporal and spatial extent of the use; and (3) the culpability of each claimant.

*von Hofe*, 492 F.3d at 186.

Where a forfeiture serves a *non*-punitive purpose, such as a forfeiture of drug proceeds, the Eighth Amendment's Excessive Fines Clause does not apply. *United States v. Sum of $185,336.07 United States Currency*, 731 F.3d 189, 194

140

(2d Cir. 2013). Where, however, the forfeiture is clearly *punitive*, a proportionality analysis is required. *See von Hofe*, 492 F.3d at 183.

### B. The Forfeiture Of The Defendant Properties Is Punitive And Therefore Implicates The Eighth Amendment

Unlike the situation in *Sum of $185,337*.07, a drug-related forfeiture where the underlying unlawful activity (*i.e.*, drug dealing) had a direct relationship with the amount of proceeds generated, the value of the Defendant Properties had no relationship to the conduct alleged.[39] The District Judge found that "[b]ecause Alavi retained its partnership interest through providing services, its entire interest constitutes proceeds of its violation." (SPA 173.) The District Court referred to purported services of "acting as the general partner" of the Fifth Avenue Company, which "enabled Bank Melli to obtain the array of services needed to manage its partnership interest and to conceal its identity." (SPA 172.) But as explained above, *supra* Section I.C.2, there was no evidence to show—and no legal basis to conclude—what would have happened with respect to the Building and the Fifth Avenue Company if Alavi had not provided these alleged services. If Bank Melli owned Assa and that ownership were disclosed, it would have likely meant that *Assa's* interest in the Partnership would have been lost, but there is no reason, and certainly no evidence, to

---

[39] As detailed above, the forfeiture in this case is punitive and is substantively distinct from non-punitive forfeitures, such as drug proceeds. *Cf. Sum of $185,337.07*, 731 F.3d at 194 ("[T]he forfeiture of drug proceeds will always be directly proportional to the amount of drugs sold. The more drugs sold, the more proceeds that will be forfeited.").

141

suggest that *Alavi's* interest would have been forfeited as well.

Further, the value of the Defendant Properties was in no way affected by the amount of "general partner" services or "concealment" services performed. Unlike drug dealing, where the proceeds of the unlawful act are directly proportional to the amount of the dealing, the value of the Defendant Properties remained the same regardless of the services performed. The Defendant Properties were worth hundreds of millions of dollars, and that value had nothing to do with the relevant conduct. Indeed, Alavi's alleged conduct is similar to that involved in a reporting violation, in which the relevant activity is failing to disclose a crime. Here, the District Court found that Alavi knew of Assa's ownership and services, but failed to disclose that information (the Court did not find or refer to any act by Alavi of active concealment after 1995). The circumstances here are thus similar to those presented in *Bajakajian*. In *Bajakajian*, the Supreme Court held that the Government's seizure of the entire $357,144 not reported in currency disclosure forms violated the Eighth Amendment's Excessive Fines Clause. *Bajakajian*, 524 U.S. at 344. The Supreme Court's decision rested on the fact that, as here, the conduct at issue would have been the same regardless of the monetary value of the relevant assets.

The nature of the "proceeds" forfeited here and Claimants' relationship to them further distinguish this case from *Sum of $185,337.07 United States Currency*. The bulk of the proceeds in this case are real estate, which, as this Court has recently noted, "have no correlation to, or proportionality with, the costs incurred by the government and society because of the large and unpredictable variances in the value of real estate and conveyances in comparison to the harm inflicted upon government and society by the criminal act." *Sum of $185,337.07*, 731 F.3d at 194 (quoting

142

*United States v. Tilley*, 18 F.3d 295, 300 (5th Cir. 1994)). Indeed, any "harm" caused by Claimants' services simply has no relation to the value of the Building or the Fifth Avenue Company. The value of the Building is determined primarily by its location, which was secured by the purchase of the Fifth Avenue property in the early 1970s; its construction, which was completed later that decade; and the New York City commercial real estate market. There is little, if any, relationship between the value of the Building and Alavi's services with respect to Assa, the minority partner in Fifth Avenue Company. The same argument applies with even greater force to the Foundation's other real properties, with which Assa and Bank Melli never had any involvement. Each fact demonstrates the punitive nature of the forfeiture at issue here.

That Claimants acquired their interests in the Defendant Properties decades ago further supports the conclusion that the forfeiture in this case is punitive in nature. Alavi acquired its interest in the Building more than twenty years before the relevant Iranian sanctions went into effect. The Fifth Avenue Company acquired the Building and the Foundation acquired its majority stake in Fifth Avenue Company in 1989, six years before the Iranian sanctions went into effect. And with one minor exception, Alavi purchased the seven real properties years before the Iranian sanctions were instituted. The timing of these acquisitions confirms that the acquisitions—and the values of the properties themselves—have no relation to any harm allegedly caused by Claimants' subsequent violation of the IEEPA. Thus, even if previously-acquired property became "proceeds" of that violation under a retention theory, there is no relationship between the value of the Defendant Properties and any societal harm. Because the forfeiture was clearly punitive rather than remedial in nature, the District Court was required to undertake a proportionality analysis

143

pursuant to Section 983(g) and the Excessive Fines Clause of the Eighth Amendment.

## C. Forfeiture Of Claimants' Interests In The Defendant Properties Is Grossly Disproportional To The Alleged Conduct And Constitutes An Excessive Fine Under The Eighth Amendment

Without reaching a conclusion as to whether the Eighth Amendment applies here, the District Court found that the forfeiture of the Defendant Properties was proportional to the gravity of Claimants' conduct. While the District Court properly referenced the *von Hofe* factors, its application of them was erroneous; it ignored certain factors and did not properly weigh others. When analyzed properly, a substantial reduction in the amounts forfeited is warranted.

### 1. Forfeiture Of Claimants' Interests In The Defendant Properties Was Grossly Disproportional To The Gravity Of The Alleged Offenses

The District Court erred in applying the first *von Hofe* factor, which required consideration of the harshness of the forfeiture in comparison to the gravity of the offense. The District Judge overstated the gravity of the alleged IEEPA violations by deeming Claimants' *pre-sanctions* conduct as illegal when it clearly was not. Further, the District Court declined to consider the potential penalty Claimants would have faced had they been charged criminally with IEEPA and money laundering offenses and convicted. And finally, the Court failed to consider the harm caused by the conduct in analyzing the gravity of the offense.

In considering the gravity of the offense, the District Court relied on the formation of the Fifth Avenue Company and its alleged function as a "front" as justification for the immense forfeiture. (SPA 174-75.) But the formation of the

144

Fifth Avenue Company occurred in 1989, six years before President Clinton issued the first Executive Order imposing sanctions on Iran. At that time, there was no legal impediment to partnering with a company owned by Bank Melli or Bank Melli itself. Even if its actions suddenly became unlawful, Alavi's crime was essentially conducting "business as usual," or passively continuing to act in a manner that had been lawful before 1995. Even the more serious alleged service for Iran—"conspir[ing] with Bank Melli to conceal Assa's true identity"—amounted only to not taking affirmative steps to reveal Bank Melli's purported ownership of Assa. Forfeiting virtually all of Alavi's property interests acquired over its forty-year existence would be a constitutionally-excessive penalty based on the alleged violation. *See von Hofe*, 492 F.3d at 191 (holding that forfeiture of the claimant's half-interest in her residence was excessive, where her "offensive conduct boils down to her joint ownership [of the property] and silence in the face of her husband's decision to grow marijuana in their basement almost thirty years into their marriage").[40]

The District Court further erred by not even considering what punishment Claimants would have received if they had been prosecuted criminally. If Claimants had been charged and found criminally liable for violating the IEEPA, the United States Sentencing Guidelines would have provided for a fine in an amount far less than the value of the forfeited properties. *See United States v. Castello*, 611 F.3d 116, 123 (2d Cir. 2010) ("Statutory penalties reflect severity in a

---

[40] The District Judge cited case law for the proposition that forfeiture of property may be justified when unlawful proceeds are commingled with legitimate property to conceal its nature (SPA 175); however, there was no evidence presented that Alavi commingled proceeds of IEEPA violations with legitimate assets for such unlawful purposes.

145

general way, but the applicable Guidelines are more indicative.")  Under a Guidelines analysis, a corporate entity charged and convicted of IEEPA and money laundering offenses like those alleged here would be fined in a range between $17.5 million and $35 million.[41]  U.S.S.G. §§ 8C2.4, 8C2.6.  The District Court did not consider the Guidelines and ordered forfeiture of Claimants' property valued at well over $300 million.

Finally, the District Court erred by not considering the harm Alavi purportedly caused in comparison to the gravity of the offense.  *Cf. Bajakajian*, 524 U.S. at 340 (seizure of entirety of unreported currency "bears no articulable correlation to any injury suffered by the Government")  The District Court made vague references to the anti-proliferation and anti-terrorism purposes of the Iranian sanctions (SPA 174), but did not consider Claimants' behavior or the harms

---

[41] The full Guidelines analysis was presented to the District Court in petitioning for relief under § 983(g).  (*See* SDNY Dkt. No. 1019 at 3.)  Appellants took a conservative approach in presenting a Guidelines range to the District Court ($17.5 million to $35 million) since a compelling argument can be made that the appropriate Guidelines range is actually only $6.3 million to $12.6 million.  Indeed, this lower range is calculated by applying the base offense level of the underlying IEEPA violation, 26, and adding an additional two points for a violation of 18 U.S.C. § 1956 to arrive at a total offense level of 28.  *See* U.S. Sentencing Guidelines Manual, § 2S1.1 commentary (noting that subsection (a)(2), which provides a separate base offense level for money laundering, applies only when "the defendant did not commit the underlying offense" or "the defendant committed the underlying offense . . . but the offense level for the underlying offense is impossible or impracticable to determine").

146

it may have caused. This is not a case where the alleged conduct had any connection to terrorism or weapons proliferation. The Government offered no evidence showing how the funds transferred to Assa were used, or any harm resulting from the transfer of funds. As the fund transfers themselves were the only allegedly harmful activity identified in this case, the amount of funds actually transferred to Assa from 1996 through 2007—$31.6 million—should have been the starting point in evaluating the gross disproportionality of the forfeiture. Additional analysis was required as to harshness of the alleged conduct compared to the magnitude of the forfeiture.

## 2. The Defendant Properties' Nexus To The Alleged Offenses Was Largely Incidental

The second *von Hofe* factor is the nexus between the forfeited properties and the offense. 492 F.3d at 186. The District Court's conclusion that the Building was "integral" to Claimants' offenses (SPA 175) overstates any such nexus. It was not constructed, managed, or rented with the intent to commit IEEPA violations or to promote or conceal money laundering transactions. Nor is there evidence that it added an appearance of legitimacy to an illegal operation. Rather, the Building was simply an asset Alavi constructed in the 1970s to provide a source of revenue from which Alavi could make charitable donations.

The Fifth Avenue Company was described by the District Court as having been "created to benefit Iran," though there is no evidence to support that assertion. The Fifth Avenue Company was in fact formed as a means for Alavi to lawfully mitigate the tax consequences of earning revenue on the basis of debt-financed property. (A 6842-51.) Even if Bank Melli were involved in its formation—for the purpose of ensuring its mortgage was paid off or otherwise—there is no evidence to suggest that in 1989, Bank Melli, Alavi, or

147

anyone else could have predicted the issuance of the Executive Orders in 1995 or the promulgation of the ITRs, which went into effect in 1997. The Building generated rental income, and the Fifth Avenue Company transferred a portion of that income to Assa as partnership distributions, but those distributions amounted to $31.6 million, not the hundreds of millions of dollars that the Building was worth. (*See* (SDNY Dkt. No. 1019 at 3.)[42]

The nexus between Alavi's other properties and the offenses at issue here is even more tangential. The only connection between Alavi's seven real properties and the alleged unlawful services is that the properties received funds generated by the Building for capital improvements, repairs, and taxes. (A 11290-320.) The attenuated nexus between the Defendant Properties and the alleged unlawful services support a finding that the forfeiture in this case was grossly disproportional to the offenses at issue.

### 3. Claimants' Culpability Does Not Justify Forfeiture Of Their Entire Property Interests In The Defendant Properties

The final *von Hofe* factor the District Court was required to consider was the culpability of the claimant. *von Hofe*, 492 F.3d at 186. Again, although the District Court attributed great significance to its finding that Alavi was "present at the creation and birth of Assa" (SPA 176), this finding should have been entirely irrelevant to its analysis. The District Court ignored the fact that at the time that Assa

---

[42] The District Court found that the Building is valued at more than $500 million and Alavi's 60% interest in Fifth Avenue Company is therefore worth in excess of $300 million. (*See* SPA 171.) The District Court further held that Alavi's other real properties are worth more than an additional $37 million. (SPA 113-14.)

was created, nothing prohibited transactions with Bank Melli. It was years after the 1989 Partnership Transaction that OFAC promulgated the ITRs, which limited substantially the ability to transact with or provide services to entities such as Bank Melli. Thus, at base, Claimants' culpability involves continuing to run Fifth Avenue Company while allegedly disregarding the ownership of its alleged partner. *Cf. von Hofe*, 492 F.3d at 189 (Claimants' "culpability, falling at the low end of the scale, is best described as turning a blind eye to her husband's marijuana cultivation.")

Although the District Court noted Alavi's significant charitable contributions over the course of four decades, it gave these activities insufficient weight when it essentially deemed the Foundation as operating solely to serve Bank Melli. That characterization was grossly inaccurate. Alavi's primary purpose, throughout its forty-year history, has been to perform charitable activities. It has fulfilled that purpose through millions of dollars of donations and the use of its real properties. It has funded charitable and education projects in the United States and Canada. (*See* A 6669-70 ¶¶ 22-24.) And it has used the income it received from the Building to fund these charitable projects. Alavi's non-profit nature and status, and the charitable purpose to which it put the revenues it received from the Fifth Avenue Company, should have been considered by the District Court as it weighed the Foundation's relative culpability. The District Court's analysis was deficient.

To the extent this Court declines to reverse the District Court's orders granting summary judgment, the matter should be remanded for the District Court to consider the proportionality of any forfeiture pursuant to § 983(g).

149

## <u>CONCLUSION</u>

For the reasons stated above, the District Court's decisions on suppression and summary judgment should be reversed and the judgment of forfeiture should be vacated. The case should be remanded with instructions to reconsider the Fourth Amendment issues presented by the December 2008 search and seizure, to re-open discovery, and, if necessary, to conduct a trial on the Government's forfeiture claims and Claimants' affirmative defenses.

Dated: October 1, 2014
      New York, New York

Respectfully submitted,

PATTERSON BELKNAP
WEBB & TYLER LLP

/s/ *Daniel S. Ruzumna*
Daniel S. Ruzumna
Krista D. Adler
Adam P. Blumenkrantz
Melissa R. Ginsberg

*Attorneys for Claimants-Appellants Alavi Foundation and 650 Fifth Avenue Company*

1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222

150

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's September 10, 2014 Order, because it contains 42,722 words, calculated by the word processing system used in its preparation, and excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Local Rule 32.1(a)(2), and the type-style requirements of Fed. R. App. 32(a)(6), because it has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 12-point font.

Dated:  October 1, 2014
         New York, New York

PATTERSON BELKNAP
WEBB & TYLER LLP

/s/ *Daniel S. Ruzumna*
Daniel S. Ruzumna
Krista D. Adler
Adam P. Blumenkrantz
Melissa R. Ginsberg

*Attorneys for Claimants-Appellants Alavi Foundation and 650 Fifth Avenue Company*

1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222